Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2019 SEP 17 PM 4:59

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK.

# UNITED STATES DISTRICT COURT

for the

2nd District of Denver County

Division

CHADWICK JORDAN

Plaintiff(s)

*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

–v–

Lisa Forbes
David Steward
Kristin Kushmider
Patrick T. O'Rourke
Vice President, University Counsel and Secretary of
the Board of Regents
The State of Colorado, Jared Polis

Defendant(s)

*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names. Do not include addresses here.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)*   ☒ Yes   ☐ No

# COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## (Non–Prisoner Complaint)

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

## I.     The Parties to This Complaint

### A.     The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | CHADWICK JORDAN |
| Address | 8853 Colorado Blvd., A-101 |
| | Thornton / CO / 80229 |
| | *City* / *State* / *Zip Code* |
| County | DENVER |
| Telephone Number | 720-276-5377 |
| E-Mail Address | cjllc@post.com |

### B.     The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Lisa Forbes |
| Job or Title *(if known)* | Psycho Therapist. NLC.0012711 |
| Address | Denver 1380 Lawrence Street P.O. Box 17336. Campus box 106 |
| | Denver / CO / 80217 |
| | *City* / *State* / *Zip Code* |
| County | Denver |

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

| | |
|---|---|
| Telephone Number | 303.315.6306 |
| E-Mail Address *(if known)* | lisa.forbes@ucdenver.edu |

☒ Individual capacity    ☒ Official capacity

**Defendant No. 2**

| | |
|---|---|
| Name | David Steward |
| Job or Title *(if known)* | Director of Student Conduct and Community Standards |
| Address | Tivoli Rm 309 |

| | | |
|---|---|---|
| Denver | CO | 80217 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Denver |
| Telephone Number | 303-315-7310 |
| E-Mail Address *(if known)* | DeanOfStudents@ucdenver.edu |

☒ Individual capacity    ☒ Official capacity

**Defendant No. 3**

| | |
|---|---|
| Name | Kristin Kushmider |
| Job or Title *(if known)* | PHD. Dean of Students |
| Address | tivoli Rm 309 |

| | | |
|---|---|---|
| Denver | CO | 8021. |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Denver |
| Telephone Number | 303-315-7310 |
| E-Mail Address *(if known)* | DeanOfStudents@ucdenver.edu |

☒ Individual capacity    ☒ Official capacity

**Defendant No. 4**

| | |
|---|---|
| Name | Patrick T. O'Rourke. (Represents the entire Univ. of CO: Board |
| Job or Title *(if known)* | Vice President. University Counsel and Secretary of the Board of |
| Address | 1800 Grant Street. 8th Floor |

| | | |
|---|---|---|
| Denver | CO | 80203 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | Denver |
| Telephone Number | 303-860-5686 |
| E-Mail Address *(if known)* | Patrick.ORourke@cu.edu |

☐ Individual capacity    ☒ Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971),* you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Lisa Forbes:

Medical Malpractice
Negligently and intentionally Breached our Confidentiality agreement, and invaded the plaintifs privacy.
Defemation of Character
Invasion of Privacy
Intentional infliction of Emotional Stress
Disparagement
Civil Conspiracy
Breah of Duty of Care

David Steward:

Equal Protection
Substantative Due Process
Procedural Due Process
Erroneous Outcome
Selective Enforcement
Deliberate Indifference
Archaic Asumptions
Hostile Environment Theory

Kristen Kusmider:

Deliberate Indifference
Erroneous Outcome
Equal protection
Selective Enforcement

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Lisa Forbes: under color of state and local law, while working as Assistant Clinical Professor, Counseling Program / Human Development and Family Relations Program at the University of Colorado Denver, Registered Psycho Therapist, NLC.001271, breached the plantiffs confidentiality and invaded his privacy by disclosing confidential information, on the ground that such disclosure constituted a breach of a confidential or privileged relationship existing between patient and physician Lisa violated a clearly establised constitutional right. And made false statements against the plaintiff.

David Steward: under color of state and local law, as the Director of Student Conduct and Community Standards of the University of Colorado-Denver, violated a clerly established constitutional right of Procedural Due process, Erroneous Outcome, Selective Enforcement, Deliberate Indeifference, and made Archaic Asumptions, and also created a Hostile Environment Theory for the Plaintiff

Kristen Kusmider: as the Dean of Students, of the University of Colorado Denver, was Deliberately Indifferent. Deliberate indifference – Kristien Kushmider the dean who had authority to institute corrective measures had actual notice of and was deliberately indifferent to the misconduct of David Steward, and so was David Steward who was made awere by the Plaintiff and Kristen of the Plaintiffs concerns; (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a particularized. Causal connection between the flawed outcome and gender bias. I made several complaints.

Case 1
1 Under color of the state of Colorado on the 7th day of August, 2017, David Steward alleged the Plaintiff violated University of Colorado-Denver standards by, Abusive Behavior, Interference, obstruction, or Disruption of University Activity; case no. 201700601, (Pg 141 exhibit C), and set a conference for August 11th, at which the Plaintiff Denied all allegations, categorically.
2 Aug 21st David said the Plaintiff was guilty of Abusive Behavior, Interference, obstruction, or Disruption of University Activity, violating the UCD standards. then suspended, and ordered the plaintiff to 4 counseling sessions.
3 Sept 1st 2017, Exhibit C, Pg. 51. Plaintiff appealed, on the grounds David Steward, the official who initiated, investigated or prosecuted the charges against the student/plaintiff, and also who the decision to suspend the student, was biased, discriminatory, all of these charges were fabricated by David Steward and that he was racist. During this appeal the plaintiff specifically stated David Steward has been biased and discriminatory, and I repeated his comments calling me a "liar," and said I did not deserve to be at the University, and his bisased comments towards the Marine Corps, telling the plaintiff hes not in the Marine Corps. The plaintiff also stated that he told Kristen Kushmider David Stewards supervisor about his biased behavior, and that all she kept saying is its going to be alright, and I stated David Steward was a racist. The plaintiff even mentiond Will Dewese. who had Davids current position and who was now head of the Offfice of Diversity and Inclusion or title IX office, who said, David was biased and discriminatory as well. When the plaintiff asked David Steward if he even talked to the accuser, David told him he was trying to do his job. The plaintiff also stated everything in this case was fabricated by David Steward, it was all lies, and David Steward was trying to destroy his education motivated by his racism. The appeal was denied simply because the plaintiff did not meet acceptable grounds.In fact the plaintiff appealed.

• The appeal remained illusory, because the plaintiff was not aloud to record the hearings. The plaintiff was not aloud to cross-examine his accusers, who are anonymous (see exhibit C). The plaintiff was never given an idea of who what witness or accusers were involved. In fact, the plaintiff's accusers remain anonymous, which were confidential records at the time, and that David Steward only had. The accusers are confidential to this day even after the plaintiff got access to the student conduct records around Sept. 6 2018. Cross examination is critical here, because there is only testimonial evidence, and because this case raised a credibility issue.
• There were factual isssues presented, therefore, notice was required to include the names of witnesses, and a list of the evidence David intended to present. The plaintiff was not given notice of

anything. David told the plaintiff somebody said he did something, and never gave the plaintiff a chance to defend hiself. Eventhoug the plaintiff explicitly denied everything.
• The plaintiff was not given the right to cross-examine witnesses, eventhough, he brought this up in the appeal. In fact when the plaintiff asked David to speak with the accusers he told the plaintiff "know your telling me how to do my job.
• The plaintiff was not permitted to tape record David Stewards Hearings, which made the appeal all but illusory. The plaintiff was never given a transcript of proceedings, nothing was grounded in evidence. David Steward did whaever he wanted, and everything he did was behind closed doors and he alone was the only one who, initiated the charges, investigated; or prosecuted, and made judgment on these charges. As far as the plaintiff knew David Steward simply felt like finding him guilty of something. A fair and equitable hear requires more than an informal interview with a biased administrator.
• The plaintiffs right to freedom form invidious discrimination under the Equal Protection Clause was certainly clearly established due to the seriousness of the allegations, reasonable person in David Stewards position would have known that they were not partial and they could not be impartial. He should of recused himself, especially since he initiated the charges, investigated; or prosecuted, and made the final judgment on these charges. David Steward violated the plaintiffs due process rights because he was not an impartial adjudicator. David Steward involvement created a bias.

o    Prior to Caso No. 201700601, David steward and the plaintiff, (see exhibit C, pg. 41), could not even finish a meeting together. In a prior appeal 2015039201 pg52 of exhibit C, March 16. 2016, the plaintiff clearly stated that if his skin color would not of been black he would not of been accused by David Steward. The Plaintiff also stated in this appeal that David Steward violated the fair credit reporting act with his administrative hearing, and this appeal was upheld by Kristen Kushmider, David Stewards boss and supervisor pg. 72, and she reduced the plaintiffs sanctions. After complaing to Kristen Kushmider about David Stewards , racism, bias, discrimination and unfair and unequal treatment, she connected the plaintiff with the, Will Dewese of the Office of Equity; Title IX, 303-315-0120, pg 79. Who said that David Steward did in fact was biased, did discriminate, and he would not of made the decisecions that David Steward made, if he had not been promoted to his current position. Kristen also connected me with, Omar Montgomery, Director of Black Student Services, regarding David Steward, bias and Discrimination, Omar, who I mentioned in the 201700601 case, to prove Davaid Steward was biased. Omar then, contacted his boss who contacted Kristen, they told me talk to Kristen Pg79. In fact the four of us had a meeting regarding David Stewards bias and discrimination. OMBUDS office, and Title IX. When I talked to Kristen about David Steward bias and discrimination, specifically telling her the racist and biased comments he made to me ("You should of never been allowed in this school", "you get mad when you don't get what you want", "You have a hard time seeing other peoples perspective"), she said I spoke with him, and I should try to speak with him. I don't think he's biased. Then she told me to contact the Office of Civil Rights, Pg94. Kristen Kushmider had authority to institute corrective measures and had actual notice, and was deliberatyly indifferent to misconduct. All of this occurred prior to any incidents suit civil suit, and has presisted. I even told David Steward he was involved in a pattern of racism at the University, Pg. 155.
4 Erronous outcome- due to all of the affermentiond and reasons above there was a erronous out come in this hearing. Erronous outcome-1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and 2) a particularized. casual connection between the flawed outcome and racial bias.

5 Deliberate indifference -- Kristien Kushmider the dean who had authority to institute corrective measures had actual notice of and was deliberately indifferent to the misconduct of David Steward, and so was David Steward who was made awere by the Plaintiff and Kristen of the Plaintiffs concerns; (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a particularized. Causal connection between the flawed outcome and gender bias. I made several complaints.

Case 2

Case No. 2017094401

6 Friday  8, 2016 Kristen Kushmider, tells the plaintiff, the psychologist at the campus, are free and confidential and she also told me this might be more convienant for me than the VA Pg. , 74, 155 in exhibit C.

7 In August, 2017,  the plaintiff and Lisa Forbes sign a confidentiality agreement.

8 Between August 2017 and the 19th of Feburary 2018, Lisa Forbes and the Plaintiff usually meet on Mondays after the plaintiffs classes.  The last time the plaintiff and Lisa Forbes met was on the 19th day of Feburary, 2018.  That Friday on the 2nd day of Feburary, 2018, about five police show up at the plaintiffss apartment stating they were there for a welfare check, and they heard the plaintiff had $80,000 and a AR-15, and they know he is a ex-marine.  Then they asked can they asked to search the plaintiffs  apartment.  The plaintiff said no,  and was confused, until he realized these are things he only told his psychotherapist-Lisa Forbes.  This is when it was obivious Lisa Forbes Breached the Plaintiffs confidentiality and invaded his privacy.

9 The following Monday on the 5th day of March, David Steward asked the plaintiff to come to his office before he went to class.   When the plaintiff got there David Steward was there and so was Officer Justin Verardi.  David Steward told the plaintiff he received a report  dated February 19th, 2018, he threatened someone during a verbal altercation, and that he recently purchased an AR-15, so he had to immediately suspend the plaintiff from school.

10 David Steward was the official who initiated, investigated and or prosecuted the charges against the plaintiff and who, made the decision to suspend the student or plaintiff again despite the bias assertions made to his before Case no. 201700601 and during, this case in appeal to David steward supervisor, who once again was deliberately indifferent.   The plaintiff has no idea to this day what David Steward is talking about he never threatened anyone, and this is what he told him.  The plaintiff believes he received these reports from Justin Verardi and who does not have Jurisdiction anywhere other than Auraria Campus, so this was a violation of Col. Rev. statute 23-5-141, of a Auraria Campus officer or constible.  And the only person the plaintiff told about an AR-15 was to his psycho therapist Lisa forbes, and ironically the 19th was the last time they met.  This is when the plaintiff knew Lisa breached his confidentiality, probably because of a fear of firearms.  This was saddening to the plaintiff because he told Lisa I went to tanners gun show and bought a legal AR-15, it actually was not even a firearm at all the plaintiff was speaking of it was a AR-15 kit.  She never bothered to ask, or expressed any concern to to the plaintiff, who had no idea until or even think about, his words until he was suspened on March 5th, 2018.  The plaintiff trusted her, and she knew he would never hurt any one because she asked him.  There was no duty to warn; there was no clear and artivulable threat against anyone.

11 On the 25th of June David Steward said he was going to add drugs to the 2017094401 case, because after there meeting on the 5th of March, about the possibility of  posse the plaintiff poessing a weapon, and threatening someone.  He was informed the plaintiff was arrested and weapons and drugs were found in the trunk.  David Steward, states he was informed.  As soon as the plaintiff left the meeting with David Steward his house and his car were searched.  This case is still pending; or has not been adjudicated.  The plaintiff contends he never had a firearm,  and this search was in vilation of his 4th amend rights, the plaintiff will have his day in court; due process of law, which was not given by David Steward or Lisa Forbes.  The plaintiff believes this search was set up by Officer Justin Verardi, of the Auraria police Department.

12 Then David Steward set a phone conference for the 31st day of July, 2018, as follow up of the March 5th and June 25th  letters.  David Steward found the plaintiff guilty of threats.  The plaintiff denied the allgations, nevertherless, this was enough for David Steward to find the plaintiff guilty.  Then David said he found the plaintiff guilty of Drugs, based on  report (2018-9518073).  once again the plaintiff  vehemently denied everything, as David stated.  Then David said the plaintiff was guilty of having weapons based on court case No. 18CR01675, which has not been adjudacated.  This police report, exhibit A, by officer Hall is proof Lisa Forbes breached the plaintiffs confidentiality, stating the detectives wre conducting surveillance on the plaintiff because they heard from Lisa Forbes about being in possession of an AR15  andother hand guns and expressing ideations that he was in support of mlitay

mass killings. Nothing the plaintiff did trigged A Duty to Warn, by Lisa Forbes. When David found the Plaintifff guilty of these charges, the plaintiff did not even have his first day in court yet or preliminary hearing. The plaintiff never had a weapon, vehemently, denied these allegations, and plans to be exonerated. The state never found the plaintiff guilty of possessing a weapon. David Steward does not and has not given the plaintiff Due process. Then without due process, David Steward expels the plaintiff. The plaintiff was exonerated of these charges in state court.

13 The plaintiff was carful to appeal Case No 2017094401, according to the student code of conducts required grounds and his appeal was still denied for not meeting accetable grounds. The grounds are:

1. Except as necessary to explain the basis of new information, an appeal shall generally be limited to a review of the record of the disciplinary conference and supporting documents for one or more of the following reasons:
a. To determine whether the disciplinary conference was conducted fairly in light of the charges and information presented, and in conformity with proscribed procedures giving both the respondent and complaining parties the opportunity to prepare and present relevant information to be considered in the determination of an appropriate outcome. Minor deviations from designated procedures will not be a basis for sustaining an appeal unless there is a demonstrable adverse effect on the outcome of the disciplinary conference.
b. To determine whether the sanctions(s) imposed were appropriate for the violation of the student code of conduct which the student was found to have committed.
c. To consider new information, sufficient to alter the decision or other relevant facts not brought out in the original disciplinary conference, because such information and/or facts were not known to the person appealing at the time of the original disciplinary conference. This does not include information that was known at the time of the disciplinary conference but was not shared.

The Plaintiff appealed the following:

•      The plaintiff was not present during hearing
•      No tape recordings; or transcript provided
•      Entiltled to presumption of innocence
•      David was not impartial
•      Plaintiff did not receive explanation of evidence against him. Malacious prosecution David knowingly and reckless made false statements, fabricated evidence. No Cross-examination, the plaintiff was not aloud to challenge ;the credibility of the witnesses. There is a Critical right to cross-examination with testimonial evidence. Sunbstantive due process and procedural due process
•      David was bisased and not impartial the evidence used against the plaintiff was not provided. The official who initiates, investigates or prosecutes charges against a student plays a role in decision to suspend the student. David Steward should of recused himself.
•      Evidence contained in report was used in hearing panal to adjudicate the plaintiff and he was not provided this evidence. This is a congnizible due process violation.
•      The constitution required the plaintiff be provided the evidence against him.
•      There were factual isssues disputed, therefore notice was required to include the names of witnesses and a list of the evidence that David intened to present. There was no names of witnesses or list of evidence. In fact the plaintiff did not even attend the hearing which made witnesses and evidence more pertinent.
•      The student must be permitted the assistance of a lawyer, at least in major disciplinary proceedings.
•      There is a right to cross-examine witnesses in the most serious of cases.
•      The plaintiff was not permitted to tape record of hearing, when he did not receive summary of testimony, evidence, and decision.
•      If David Steward is not a fair minded administrator. He would not of imposed on himself," Ability of one person; official, " who initiates, investigates or prosecutes charges against a student and

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

plays a role in the decision to suspend the student. with his life; or expulsion (the capital offense in the academic world),  inorder to avoid an unfair decision.
- The plaintiff was even denied a request in this appeal, to hold of hearings until these accusations were adjudicated in court. The plaintiff mentioned his guilt was at issue.  And vehemently stated he never had a firearm.
- The plaintiff did not receive a comprehensive list of witnesses or evidence.  The plaintiff was not aloud to hear or observe any testimony.
- The Plaintiff had a right to written findings of facts
- There was not a reasonable ground for the expulsion, it shocks the conscious.
- This case required more than a informal interview with a administrative authority of college. The Plaintiff was  required  more than a informal interview with an administrative authority of college. Students accused of drug and firearm possession have a "compelling" interest in the outcome of the disciplinary hearing.  "A finding of responsibility will thus have a substantial lasting impact on the plaintiffs personal life, educational and employment opportunities, and reputation in the community. Against the plaintiffs personal interest, a court must balance "additional procedures requested, any error-reducing benefit those procedures might have, and the burden on the University of adding those additional procedures.
- Not done in good faith.

## III. Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

See attached.

B.    What date and approximate time did the events giving rise to your claim(s) occur?

C.    What are the facts underlying your claim(s)?  *(For example: What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

## III. STATEMENT OF CLAIM

❖ **David Steward**

**Where did the events giving rise to your claim(s) occur?**

During Case No. 201700601 and 2017094401, which David initiated, investigated or prosecuted the charges against the plaintiff/student and he played a role in the decision to suspend the student.

**What date and appx time did the events giving rise to your claim(s) occur?**

7th day of August, 2017, David charged the plaintiff with, Abusive Behavior, Interference, obstruction, or Disruption of University Activity. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights.

Aug 21st David found the plaintiff guilty of Abusive Behavior, Interference, obstruction, or Disruption of University Activity. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights.

Sept 1st 2017, the Plaintiff appealed, Abusive Behavior, Interference, obstruction, or Disruption of University Activity. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights.

5th day of March, 2018, David charged the plaintiff with threatening someone during a verbal altercation, and that he recently purchased an AR-15, or weapons possession, so he had to immediately suspend the plaintiff from school. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights

25th of June: David Steward added Drugs, based on his informant. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights

31st day of July, 2018:  David said he found the plaintiff guilty of threats, based on a "report,' Drugs, based on report (2018-9518073), once again the plaintiff, vehemently denied everything, as David stated.  Then David said the plaintiff was guilty of having weapons based on court case No. 18CR01675. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights.

**What are the facts underlying your claim(s)?**

*Prior to The University of Colorado, student conduct Caso No. 201700601 and 2017094401 David Steward has been biased, David steward and the plaintiff, (see exhibit C, pg. 41), could not even finish a meeting together.  In a prior appeal 2015039201 pg52 of exhibit C, March 16. 2016, the plaintiff clearly stated that if his skin color would not have been black, he would not have been accused by David*

Steward. The Plaintiff also stated in this appeal that David Steward violated the fair credit reporting act with his administrative hearing, and this appeal was upheld by Kristen Kushmider, David Stewards boss and supervisor pg. 72, and she reduced the plaintiff's sanctions. After complaining to Kristen Kushmider about David Stewards, racism, bias, discrimination and unfair and unequal treatment, she connected the plaintiff with the, Will Dewese of the Office of Equity; Title IX, 303-315-0120, pg. 79. Who said that David Steward did in fact was biased, did discriminate, and he would not of made the decisions that David Steward made, if he had not been promoted to his current position? Kristen also connected me with, Omar Montgomery, Director of Black Student Services, regarding David Steward, bias and Discrimination, Omar, who I mentioned in the 201700601 case, to prove David Steward was biased. Omar then, contacted his boss who contacted Kristen, they told me talk to Kristen Pg79. In fact, the four of us had a meeting regarding David Stewards bias and discrimination. OMBUDS office, and Title IX. When I talked to Kristen about David Steward bias and discrimination, specifically telling her the racist and biased comments he made to me ("You should of never been allowed in this school", "you get mad when you don't get what you want", "You have a hard time seeing other people's perspective"), she said I spoke with him, and I should try to speak with him, I don't think he's biased. Then she told me to contact the Office of Civil Rights, Pg94. Kristen Kushmider had authority to institute corrective measures and had actual notice, and was deliberately indifferent to misconduct. All of this occurred prior to any incidents suit civil suit, and has persisted. I even told David Steward he was involved in a pattern of racism at the University, Pg. 155

The Plaintiffs was denied Equal Protection and the right to Due Process by David Steward. This lawsuit concerns two cases. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights. During case No. 201700601:

•    The appeal remained illusory, because the plaintiff was not allowed to record the hearings. The plaintiff was not allowed to cross-examine his accusers, who are anonymous (see exhibit C). The plaintiff was never given an idea of who what witness or accusers were involved. In fact, the plaintiff's accusers remain anonymous, which were confidential records at the time, and that David Steward only had. The accusers are confidential to this day even after the plaintiff got access to the student conduct records around Sept. 6 2018. Cross examination is critical here, because there is only testimonial evidence, and because this case raised a credibility issue.

•    There were factual issues presented, therefore, notice was required to include the names of witnesses, and a list of the evidence David intended to present. The plaintiff was not given notice of anything. David told the plaintiff somebody said he did something, and never gave the plaintiff a chance to defend himself. Eventhood the plaintiff explicitly denied everything.

•    The plaintiff was not given the right to cross-examine witnesses, even though, he brought this up in the appeal. In fact, when the plaintiff asked David to speak with the accusers, he told the plaintiff "know your telling me how to do my job.

•    The plaintiff was not permitted to tape record David Stewards Hearings, which made the appeal all but illusory. The plaintiff was never given a transcript of proceedings, nothing was grounded in evidence. David Steward did whatever he wanted, and everything he did was behind closed doors and he alone was the only one who, initiated the charges, investigated; or prosecuted, and made judgment on these charges. As far as the plaintiff knew David Steward simply felt like finding him guilty of

something. A fair and equitable hear requires more than an informal interview with a biased administrator.

- The plaintiffs right to freedom form invidious discrimination under the Equal Protection Clause was certainly established due to the seriousness of the allegations, reasonable person in David Stewards position would have known that they were not partial and they could not be impartial.· He should have recused himself, especially since he initiated the charges, investigated; or prosecuted, and made the final judgment on these charges. David Steward violated the plaintiffs due process rights ,, because he was not an impartial adjudicator.  David Steward involvement created a bias.

Erroneous outcome- due to all of the aforementioned and reasons above there was an erroneous out come in this hearing. Erroneous outcome-1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and 2) a particularized. casual connection between the flawed outcome and racial bias.

*The Plaintiff was denied Equal Protection and the right to Due Process by David Steward.  This lawsuit concerns two cases. This occurred while David violated the plaintiff, Equal Protection, Sustentative Due Process, Procedural Due Process, Erroneous Outcome, Selective Enforcement, Deliberate Indifference, Archaic Assumptions, Hostile Environment Theory, rights.  During case No. 2017094401:*

- The plaintiff was not present during hearing

- No tape recordings; or transcript provided

- Entitled to presumption of innocence

- David was not impartial

- Plaintiff did not receive explanation of evidence against him.  Malicious prosecution David knowingly and reckless made false statements, fabricated evidence.  No Cross-examination, the plaintiff was not allowed to challenge; the credibility of the witnesses.  There is a Critical right to cross-examination with testimonial evidence. ·Substantive due process and procedural due process

- David was biased and not impartial the evidence used against the plaintiff was not provided. The official who initiates, investigates or prosecutes charges against a student plays a role in decision to suspend the student.  David Steward should have recused himself.

- Evidence contained in report was used in hearing panel to adjudicate the plaintiff and he was not provided this evidence.  This is a cognizable due process violation.

- The constitution required the plaintiff be provided the evidence against him.

- There were factual issues disputed, therefore notice was required to include the names of witnesses and a list of the evidence that David intended to present.  There was no names of witnesses or list of evidence.  In fact, the plaintiff did not even attend the hearing which made witnesses and evidence more pertinent.

- The student must be permitted the assistance of a lawyer, at least in major disciplinary proceedings.

- There is a right to cross-examine witnesses in the most serious of cases.

- The plaintiff was not permitted to tape record of hearing, when he did not receive summary of testimony, evidence, and decision.

- If David Steward is not a fair-minded administrator. He would not of imposed on himself," Ability of one person; official, " who initiates, investigates or prosecutes charges against a student and plays a role in the decision to suspend the student, with his life; or expulsion (the capital offense in the academic world), in order to avoid an unfair decision.

- The plaintiff was even denied a request in this appeal, to hold of hearings until these accusations were adjudicated in court. The plaintiff mentioned his guilt was at issue. And vehemently stated he never had a firearm.

- The plaintiff did not receive a comprehensive list of witnesses or evidence. The plaintiff was not allowed to hear or observe any testimony. .

- The Plaintiff had a right to written findings of facts

- There was not a reasonable ground for the expulsion, it shocks the conscious.

- This case required more than an informal interview with an administrative authority of college. The Plaintiff was required more than an informal interview with an administrative authority of college. Students accused of drug and firearm possession have a "compelling" interest in the outcome of the disciplinary hearing. "A finding of responsibility will thus have a substantial lasting impact on the plaintiff's personal life, educational and employment opportunities, and reputation in the community. Against the plaintiff's personal interest, a court must balance "additional procedures requested, any error-reducing benefit those procedures might have, and the burden on the University of adding those additional procedures.

- Not done in good faith.

❖ **Lisa Forbes**

### Where did the events giving rise to your claim(s) occur?

At the University of Colorado Case No. 2017094401, Between August 2017 and the 19th of February 2018, Lisa Forbes and the Plaintiff usually meet on Mondays after the plaintiff's classes. The last time the plaintiff and Lisa Forbes met was on the 19th day of February, 2018. That Friday on the 2nd day of March, 2018, about five police show up at the plaintiff's apartment stating they were there for a welfare check, and they heard the plaintiff had $80,000 and an AR-15, and they know he is an ex-marine. Then they asked can they asked to search the plaintiff's apartment. The plaintiff said no, and was confused, until he realized these are things, he only told his psychotherapist-Lisa Forbes. This is when it was obvious Lisa Forbes Breached the Plaintiffs confidentiality and invaded his privacy.

The following Monday on the 5th day of March, David Steward asked the plaintiff to come to his office before he went to class. When the plaintiff got there David Steward was there and so was Officer Justin Berardi. David Steward told the plaintiff he received a report dated February 19th, 2018, he threatened someone during a verbal altercation, and that he recently purchased an AR-15, so he had to immediately suspend the plaintiff from school. This was when, the 19th of February, the plaintiff met with Lisa Forbes.

During the 5th day of March, and the 31st day of July, 2018, in University of Colorado, Student Conduct Case No. 201700601, David Steward received reports from Justin Verardi, who does not have Jurisdiction anywhere other than Aurania Campus, so this was a violation of Col. Rev. statute of an Aurania Campus officer or constable. And the only person the plaintiff told about an AR-15 was to his psycho therapist Lisa Forbes, and ironically the 19th was the last time they met. This is when the plaintiff knew Lisa breached his confidentiality, probably because of a fear of firearms. This was saddening to the plaintiff because he told Lisa I went to tanner's gun show and bought a legal AR-15, it actually was not even a firearm at all the plaintiff was speaking of it was an AR-15 kit. She never bothered to ask, or expressed any concern to the plaintiff, who had no idea until or even think about, his words until he was suspended on March 5th, 2018. The plaintiff trusted her, and she knew he would never hurt anyone because she asked him. There was no duty to warn; there was no clear and articulable threat against anyone.

On the 25th of June David Steward said he was going to add drugs to the 2017094401 case, because after their meeting on the 5th of March, about the possibility of posse the plaintiff posing a weapon, and threatening someone. He was informed the plaintiff was arrested and weapons and drugs were found in the trunk. David Steward, states he was informed. As soon as the plaintiff left the meeting with David Steward his house and his car were searched. This case is still pending; or has not been adjudicated. The plaintiff contends he never had a firearm, and this search was in violation of his 4th amend rights, the plaintiff will have his day in court; due process of law, which was not given by David Steward or Lisa Forbes. The plaintiff believes this search was set up by Officer Justin Berardi, of the Aurania police Department.

31st day of July, 2018, David Steward set a phone conference as follow up of the March 5th and June 25th letters. David Steward found the plaintiff guilty of threats. The plaintiff denied the allegations, nevertheless, this was enough for David Steward to find the plaintiff guilty. Then David said he found the plaintiff guilty of Drugs, based on report (2018-9518073), once again the plaintiff vehemently denied everything, as David stated. Then David said the plaintiff was guilty of having weapons based on court case No. 18CR01675, which has not been adjudicated. This police report, exhibit A, by officer Hall is proof Lisa Forbes breached the plaintiff's confidentiality, stating the detectives were conducting surveillance on the plaintiff because they heard from Lisa Forbes about being in possession of an AR15 and other hand guns and expressing ideations that he was in support of military mass killings. Nothing the plaintiff did trigged A Duty to Warn; by Lisa Forbes. When David found the Plaintiff guilty of these charges, the plaintiff did not even have his first day in court yet or preliminary hearing. The plaintiff never had a weapon, vehemently, denied these allegations, and plans to be exonerated.

**What date and appx time did the events giving rise to your claim(s) occur?**

<u>Friday 8, 2016</u> Kristen Kushmider, tells the plaintiff, the psychologist at the campus, are free and confidential and she also told me this might be more covenant for me than the VA Pg., 74, 155 in exhibit C.

<u>August, 2017</u>, the plaintiff and Lisa Forbes sign a confidentiality agreement.

<u>Between August 2017 and the 19th of February 2018</u>, Lisa Forbes and the Plaintiff usually meet on Mondays after the plaintiff's classes.

**What are the facts underlying your claim(s)?**

On the 2nd day of March, 2018, about five police show up to the plaintiff's apartment stating they were there for a welfare check, and they heard the plaintiff had $80,000 and an AR-15, and they know he is an ex-marine.  Then they asked can they asked to search the plaintiff's apartment.  *These are things he only told his psychotherapist-Lisa Forbes.  This is when it was obvious Lisa Forbes Breached the Plaintiffs confidentiality and invaded his privacy.*

During the 5th day of March, and the 31st day of July, 2018, in University of Colorado, Student Conduct Case No. 201700601, David Steward receives a report from Justin Verardi, that the plaintiff had an AR-15, then suspended the plaintiff.  *And the only person the plaintiff told about an AR-15 was to his psycho therapist Lisa Forbes, and ironically the 19th was the last time they met.  This is when the plaintiff knew Lisa breached his confidentiality, probably because of a fear of firearms.  The plaintiff trusted her, and she knew he would never hurt anyone because she asked him.  There was no duty to warn; there was no clear and articulable threat against anyone.  Lisa, negligently and intentionally Breached our Confidentiality agreement, and invaded the plaintiff's privacy. Lisa negligently and intentionally Breached our Confidentiality agreement, and invaded my privacy by telling Brooke Farley, Case Manager-Downtown Campus, David Steward, Student conduct, and Justin Verdi of the Aurania Police.*

31st day of July, 2018, David Steward set a phone conference as follow up of the March 5th and June 25th letters.  David Steward found the plaintiff guilty of threats.  The plaintiff denied the allegations, nevertheless, this was enough for David Steward to find the plaintiff guilty.  Then David said he found the plaintiff guilty of Drugs, based on report (2018-9518073), once again the plaintiff vehemently denied everything, as David stated.  Then David said the plaintiff was guilty of having weapons based on court case No. 18CR01675, which has not been adjudicated.  This police report, exhibit A, by officer Hall is proof Lisa Forbes breached the plaintiff's confidentiality, stating the detectives were conducting surveillance on the plaintiff because they heard from Lisa Forbes about being in possession of an AR15 and other hand guns and expressing ideations that he was in support of military mass killings. Nothing the plaintiff did trigged A Duty to Warn, by Lisa Forbes.

Lisa Forbes: under color of state and local law, while working as Assistant Clinical Professor, Counseling Program / Human Development and Family Relations Program at the University of Colorado Denver, Registered Psycho Therapist, NLC.001271, breached the plaintiffs confidentiality and invaded his privacy by disclosing confidential information, on the ground that such disclosure constituted a breach of a confidential or privileged relationship existing between patient and physician.

❖ **Kristen Kushmider**

**What are the facts underlying your claim(s)?**

Prior to The University of Colorado, student conduct, Case No. 201700601 and 2017094401 David Steward has been biasing, David steward and the plaintiff, (see exhibit C, pg. 41), could not even finish a meeting together.  In a prior appeal 2015039201 pg52 of exhibit C, March 16. 2016, the plaintiff clearly

stated that if his skin color would not have been black, he would not have been accused by David Steward. The Plaintiff also stated in this appeal that David Steward violated the fair credit reporting act with his administrative hearing, and this appeal was upheld by Kristen Kushmider, David Stewards boss and supervisor pg. 72, and she reduced the plaintiff's sanctions. After complaining to Kristen Kushmider about David Stewards, racism, bias, discrimination and unfair and unequal treatment, she connected the plaintiff with the, Will Dewese of the Office of Equity; Title IX, 303-315-0120, pg. 79. Who said that David Steward did in fact was biased, did discriminate, and he would not of made the decisions that David Steward made, if he had not been promoted to his current position? Kristen also connected me with, Omar Montgomery, Director of Black Student Services, regarding David Steward, bias and Discrimination, Omar, who I mentioned in the 201700601 case, to prove David Steward was biased. Omar then, contacted his boss who contacted Kristen, they told me talk to Kristen Pg79. In fact, the four of us had a meeting regarding David Stewards bias and discrimination. OMBUDS office, and Title IX. When I talked to Kristen about David Steward bias and discrimination, specifically telling her the racist and biased comments he made to me ("You should of never been allowed in this school", "you get mad when you don't get what you want", "You have a hard time seeing other people's perspective"), she said I spoke with him, and I should try to speak with him, I don't think he's biased. Then she told me to contact the Office of Civil Rights, Pg94. Kristen Kushmider had authority to institute corrective measures and had actual notice, and was deliberately indifferent to misconduct. All of this occurred prior to any incidents suit civil suit, and has persisted. I even told David Steward he was involved in a pattern of racism at the University, Pg. 155

**What date and appx time did the events giving rise to your claim(s) occur?**

<u>Feb 29th ,2016</u>, David Steward stated, the plaintiff escalated became angry and he had to end the meeting, and that the plaintiff asked to speak with his supervisor Kristen Kushmider. Exhibit C, Pg. 41.

March 16, 2016, exhibit c, Pg. 51, in appeal 2015039201 to Kristen Kushmider, the plaintiff stated he would not have been accused of these charges had he not been black or African American, and that David Steward violated the fair credit reporting act. Kristen remained indifferent.

<u>April 8, 2016, Kristen</u> Kushmider connects the plaintiff with the OMBUDS office, because he was concerned about David Steward being biased and discriminating. Kristen Kushmider also connected the plaintiff with the, learning resource center, and Office of Case Management. Pg. 74 exhibit c.

<u>November 1, 2016</u> Will Dewese of the Office of Equity Contacted the plaintiff, about David Stewards, bias and discrimination, because we were meeting regularly regarding this topic. Will helped the plaintiff include David Stewards bias and discrimination in appeals 2015039201, 201700601 and 2017094401. This page also shows some of the conversations and meetings Omar Montgomery, of the office of Diversity and Inclusion, we had regarding David Stewards Bias and Discrimination, also racism. Exhibit C, Pg79. We informed Kristen Kushmider of our conversations.

<u>Nov 9, 2016,</u> The Plaintiff told Kristen Kushmider that David Steward and the writing center was trying to paint him in a bad light. Exhibit C, Pg. 81.

<u>April 19th, 2017</u> Kristen Kushmider organized a meeting concerning the discrimination, Civil Rights, false reporting and the bias of David Steward. All the professional heads concerning "Highered.gov,

concerning grievances, Equality and The Office of Civil Rights," at the campus were Present.  Exhibit C,
Pg. 94

<u>Aug 3, 2017</u> David Steward says the plaintiff has a pattern of confrontational behavior and anger. Exhibit
C, Pg. 122.  The Plaintiff responds the only pattern of racism is your racism; David Steward.  Exhibit C Pg.
123.

**What are the facts underlying your claim(s)?**

Despite, knowing the plaintiffs concern for David Stewards bias, racism, and discrimination, she was
deliberately Indifferent to David Steward initiating, investigating; or prosecutes charges against the
plaintiff, then making a decision or judgment, which was always extreme and suspend the plaintiff,
which had to be reduced by Kristen on a couple occasions.  Kristin new of our difficulty with each other
telling the plaintiff she will work with him so he avoids David Steward, Kristen even went as far as
setting a meeting between the plaintiff and David Steward so they could reconcile their differences, yet
she remained indifferent student plays a role in decision to suspend the student

Deliberate indifference – Kristin Kushmider the dean who had authority to institute corrective measures
had actual notice of and was deliberately indifferent to the misconduct of David Steward, and so was
David Steward, who was also made aware by the Plaintiff and Kristen of the Plaintiffs concerns, in The
University of Colorado Student Conduct cases 201700601 and 2017094401. There was 'deliberate
Indifference because (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome
of the disciplinary proceeding' and (2) a particularized. Causal connection between the flawed outcome
and gender bias.' I made several complaints.

Erroneous outcome- due to all of the aforementioned and reasons above there was an erroneous out
come in this hearing. Erroneous outcome-1) facts sufficient to cast some articulable doubt on the
accuracy of the outcome of the disciplinary proceeding' and 2) a particularized. casual connection
between the flawed outcome and racial bias.

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Special Damages- Lisa should have known the police officers would take her word as true and search and arrest the plaintiff's property.

Future Damages- anxiety, depression relating thereto, as an element of recovery, expert testimony and future suffering. Legal fees

Permanent damages- The plaintiffs, quality of life will permanently be diminished, the plaintiffs earning potential is permanently diminished, and the plaintiff's reputation is permanently diminished, there is no remedy for any of these diminishments. The plaintiff has trust issues now.

Prospective damages- The Plaintiffs earning potential will be diminished. It will be difficult for the plaintiff to have a child because of his stigmatized reputation. The plaintiff will have a difficult time achieving his bachelors, if at all, especially since he's older and he lost his education benefits due to Lisa Forbes Breach of Confidentiality, It will be difficult for the plaintiff to have an enjoyable life Since hit plaintiff has trust issue because of this it will be hard to maintain relationships.

Proximate damages- It was foreseeable, I would be kicked out of school. loose both of my jobs, and have a dispute these allegations. It would be foreseeable my reputation will be damaged; it is foreseeable my career would be negatively impacted. It was foreseeable the plaintiff would not be able to trust anyone again, in order to fit help.

Actual Damages- My apartment was robbed due to his incident, I lost my lease on my apt, my new car was confiscated by police, I lost my career, My attorney fees.

•      Monetary Losses- I lost my job at the BA and DKS&H. I lost my future earning potential as an accountant, reflecting that what a plaintiff in fact lost was "a chance to compete of fair footing, not the promotion itself," can, according to the seventh Circuit, be awarded as actual damages under the loss-of -a-chance doctrine.

-      The plaintf request that he be given new hearings in cases, 201700601 and 2017094401. The plaintiff also request that he be reinstated as a student. The plaintiff request that his appeal be overturnd, given a new hearing; or reinstated as a student in student conduct case 2017094401.

Hedonic damage- The loss of life's pleasures. The plaintiff won't be able to trust anyone again in order to get help.

General Damages- for mental anguish and for physical pain and suffering. Loss reputation.

Punitive damages- Lisa, acted recklessly, when invading my privacy and so wantonly talking about my personal matters that were protected under the constitution, it is reprehensible to violate a confidentiality agreement because of political beliefs.

Putative damages- Damages that are alleged; claimed but unproved damages/

Substantial damages- The plaintiff lost his lively hood and career.

Nominal damages- The plaintiff was forced to fight her allegations in the county over eight months of his life he will never get back, for Lisa's breach of confidentiality

Irreparable damages- Damages for breaking the Hippocratic Oat, and the Plaintiff being resistant or stigmatized for the rest of his life when seeking treatment for his PTSD and traumatic brain injury incurred during Operation Iraq Freedom. The Plaintiff cannot trust anyone.

Tort damages-Monetary compensation for tangible an Intangible harm to persons and property as the result of a tort!

Uncertain damages- Damages that are not clearly the result of a wrong. The rule against allowing recovery of uncertain damages refers to these damages, not damages that are uncertain only in amount.

V.     **Relief**

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Special Damages-$ 40 million
Future Damages- $100 million
Permanent damages- $60 million
Prospective damages- $80 million
Proximate damages- $100 million
Actual Damages- Monetary Losses- $100,000
Hedonic damage-$100 million
General Damages- $100 million
Punitive damages- $ 250 million
Putative damages- $20 million
Substantial damages- $150 million
Nominal damages- $100 million
Irreparable damages- $20 million
Tort damages- $40 millon
Uncertain damages- 20 million

Expulsion overturned
Reinstatement as a student
Plaintiffs property Interest in education restored

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    8/29/19

Signature of Plaintiff

Printed Name of Plaintiff    CHADWICK JORDAN

### B.    For Attorneys

Date of signing:

Signature of Attorney

Name of Law Firm

Address

|  | City | State | Zip Code |
|---|---|---|---|

Telephone Number

E-mail Address

**DENVER POLICE DEPARTMENT**
**NARRATIVE TEXT HARDCOPY**

GO# 2018-9518073 OPEN                    5212-1 WEAPON BY PREV OFFENDER-POWPO

Exhibit A
Off Hall
Case Report
2018-9518073

**WEAPON BY PREV OFFENDER-POWPO**
**OFFICER STATEMENT (HALL)**
**OFFICER STATEMENT**

On 5-3-18 at approx. 1345hrs while working TAC33 with Ofc. Catlett 13078, and assisting undercover detectives on a surveillance operation near the Auraria Campus located near Speer Blvd and Walnut St.

Detectives were conducting a surveillance on Chadwick Jordan 6-5-82 who had made comments to his counselor and campus staff about being in possession of an AR15 and other handguns and expressing ideations that he was in support of military mass killings. It was also brought to our attention that he was a convicted felon with a lengthy criminal past making him prohibited from possessing firearms.

At this time, it was made aware to us that he was traveling away from the campus where he had just had a meeting with counselors on campus. The vehicle was a black BMW bearing CO LIC# OJZ765. It was also made known to us that undercover detectives observed him make a right hand turn from Market St onto 17th St. without signaling. Tac25 Cpl. Ingersoll then initiated a traffic stop in the 1200 blk of 17th St. I covered Cpl. Ingersoll at the drivers side while he was the initial contact. Jordan related that he did not have a DL, insurance or registration on him. I stayed at the drivers door with Jordan while Cpl. Ingersoll cleared his name back at his car. After a short time, it was brought to my attention that he was driving on a cancelled CO DL. He was then asked to step out of the vehicle to explain to him that his drivers license was canceled. Jordan was asked for consent to search his vehicle. Jordan said that he did not give consent.

Prior to impounding Jordans vehicle, I conducted an inventory search with Ofc. Catlett. As I looked into the glove box, I observed a gray neoprene case. Inside the case was two large baggies with suspected cocaine inside, several small glass viles, with one partially full vile with cocaine. At this time, I advised Cpl. Ingersoll of my findings. Jordan was then placed into handcuffs without incident. Ofc. Catlett and myself then continued the search. Also in the glove box, I observed a pair of silver (brass) knuckles. I took photos of this evidence. In the trunk of the vehicle, I observed a large black plastic garbage bag containing an AR15 upper (silver barrel with a black hand guard, five drilling templates to complete a lower receiver. Numerous pins and springs consistent with the parts to an AR15, a lower receiver and paper instructions to complete an AR15 build. Also in the trunk I observed a brown Hannible Lector mask. I took photographs of all evidence found. Also in the trunk, we collected personal property that



## DENVER POLICE DEPARTMENT
## NARRATIVE TEXT HARDCOPY

GO#: 2018-9518073 OPEN                    5212-1 WEAPON BY PREV OFFENDER-POWPO

was a Brother printer and several CenturyLink modems. These personal
property items were also placed into the property bureau. None of the AR15
parts contained a visible serial number.

I secured all evidence found in the vehicle, into my vehicle. Ofc. Catlett
and myself then transported the evidence to the Property Bureau and booked
them in. I also completed an ATF Form for the upper and completed the
Presumptive form. Jordan was ultimately charged with PCS with Intent to
Distribute. Ofc. Catlett and myself then transported Jordan to the DDC
where custody of Jordan was transferred to the DSD.

I then completed this statement. This completed my involvement with this
case.

                    1.   Author: HALL, III, WILBUR D.
                         Related date: Mar-05-2018 (Mon.) 1732

                    *** END OF HARDCOPY ***

2100

County Court, City and County of Denver, Colorado
Lindsey-Flanigan Courthouse, Room 160
520 W. Colfax Ave.
Denver, CO 80204

Filed in the County Court
City & County of Denver, Colorado

MAR 12 2018

CLERK OF COURT

▲ COURT USE ONLY ▲

Plaintiff:     The People of the State of Colorado

Defendant:   **CHADWICK H JORDAN**
             **(DOB 06/05/1982)**

Jonathan P Long, Reg. No. 39153
Senior Deputy District Attorney
For:  Beth McCann, Reg. No. 5834
District Attorney
201 W. Colfax Ave. Dept. 801
Denver, CO 80202
Phone Number: 720-913-9000
Fax Number: 720-913-9035

Case Number: 18CR01675

Div: Criminal Ctrm
2100/2300/5H

## ENDORSED LIST OF WITNESSES

Beth McCann, District Attorney, in and for the Second Judicial District, City and County of
Denver, State of Colorado, by and through the undersigned Senior Deputy District Attorney, and
pursuant to C.R.S., 1973-16-5-203, as amended, submits and tenders this List of Witnesses in the
above-captioned cause:

JOHN R GOODFELLOW - #DA66
DA
201 W COLFAX AVE DEPT 801
DENVER, CO 80202

TIM NORTON
DA
201 W COLFAX AVE DEPT 801
DENVER, CO 80202

TRACEY L STANLEY
DA
201 W COLFAX AVE DEPT 801
DENVER, CO 80202

MIKE P WALKER - #DA25
DA
201 W COLFAX AVE DEPT 801
DENVER, CO 80202

ETHAN D ALDRIDGE - #05100
DPD
1331 CHEROKEE ST
DENVER, CO 80204

PAUL CAMPBELL - #06125
DPD
1331 CHEROKEE ST
DENVER, CO 80204

JOSHUA CATLETT - #13078
DPD
1331 CHEROKEE ST
DENVER, CO 80204

JON CROWE - #04091
DPD
1331 CHEROKEE ST
DENVER, CO 80204

WILBUR DEAN HALL III - #06091*
DPD
1331 CHEROKEE ST
DENVER, CO 80204

LEE INGERSOLL - #06110
DPD
1331 CHEROKEE ST
DENVER, CO 80204

ANTHONY PARISI - #89028
DPD
1331 CHEROKEE ST
DENVER, CO 80204

AARON REBETERANO - #08057
DPD
1331 CHEROKEE ST
DENVER, CO 80204

CHRISTOPHER SHOTTS - #92014
DPD
1331 CHEROKEE ST
DENVER, CO 80204

RICHARD P SPENCE - #94031
DPD
1331 CHEROKEE ST
DENVER, CO 80204

MICHAEL TIMMERMAN - #00086
DPD
1331 CHEROKEE ST
DENVER, CO 80204

OFFICER JUSTIN VERARDI - #12-04
AURARIA POLICE DEPARTMENT
ATTN: AUTHORIZED AGENT
1201 5TH ST
DENVER, CO 80217

CUSTODIAN OF RECORD OR AGENT
DPD PROPERTY BUREAU
DPD - ID BUREAU
1331 CHEROKEE ST
DENVER, CO 80204

PRGM MANAGER BROOKE FARLEY
AURARIA CAMPUS
900 AURARIA PKWY
DENVER, CO 80204

COUNSELOR LISA FORBES
AURARIA CAMPUS
900 AURARIA PKWY
DENVER, CO 80204

SUZANNE FREDRICKSON
ADAMS COUNTY DISTRICT COURT
1100 JUDICIAL CENTER DR.
BRIGHTON, CO 80601

JILL ROBINSON
DPD - CRIME LAB
1371 CHEROKEE ST
DENVER, CO 80204

*The District Attorney has received notice from the Denver Police Department that the below listed officer(s) has/have been subject to an administrative finding that may or may not prove relevant if he or she testifies in a criminal matter. Information regarding that administrative finding may be reflected in personnel records in the custody and control of the Denver Police Department. Information regarding the administrative proceedings may be obtained through the Office of Civil Liability for the Denver Police Department.

WILBUR DEAN HALL III reference IAB Number P2008 07 0015 - Law Violation

7/30/2019                                    mail.com - Re· Appointment



Exhibit B
Emails

## Re: Appointment

**From:**   "Jordan, Chadwick H" <CHADWICK.JORDAN@UCDENVER.EDU>
**To:**     "cjllc@post.com" <cjllc@post.com>, "Forbes, Lisa K" <LISA.FORBES@UCDENVER.EDU>
**Date:**   Dec 3, 2017 1:37:36 PM

Lisa,

That works for me I will see you then.

Chadwick Jordan

**From:** Forbes, Lisa K
**Sent:** Friday, December 1, 2017 11:23:43 AM
**To:** Jordan, Chadwick H; cjllc@post.com
**Subject:** Re: Appointment

Hi Chadwick,

So great to hear from you. Wednesday the 6th at 4pm would work the best for me. Does that work for you?

My best,

Lisa Forbes, Ph.D., NCC
Assistant Clinical Professor
Counseling Program | Human Development & Family Relations Program
University of Colorado Denver
303.315.6306
Office: LSC 1126

**From:** "Jordan, Chadwick H" <CHADWICK.JORDAN@UCDENVER.EDU>
**Date:** Friday, December 1, 2017 at 10:46 AM
**To:** Lisa Forbes <lisa.forbes@ucdenver.edu>
**Subject:** Re: Appointment

Hi Lisa,

The 4th, 5th, and the 6th work.

Chadwick Jordan

**From:** Forbes, Lisa K
**Sent:** Tuesday, November 28, 2017 10:35:43 AM
**To:** Jordan, Chadwick H
**Subject:** Appointment

Hi Chadwick,

7/30/2019                                              mail.com - Re. Appointment

I wanted to touch base with you about scheduling your first counseling session with me at the CU Denver Counseling Center. I attempted to call your cell phone but it said the number is not reachable so I was unable to leave a message. Below are some times I am available, please let me know if one of those dates works and if you're still interested in scheduling. To keep spaces open for other clients, if I don't hear from you by December 4th I will go ahead and close your file. I hope to hear from you soon.

Nov 29th at 4p
Nov 30th at 5p
Dec 4th at 4p
Dec 6th at 4p
Dec 7th at 5p

Be well,

Lisa Forbes, Ph.D., NCC
Assistant Clinical Professor
Counseling Program/Human Development & Family Relations Program
University of Colorado Denver
303.315.6306
Office: LSC 1126

"The cure for anything is salt water. Sweat, tears, or the sea." - Isak Dinesen



# Re: Chadwick Jordan

| | |
|---|---|
| **From:** | "Forbes, Lisa K" <LISA.FORBES@UCDENVER.EDU> |
| **To:** | "Chadwick Jordan" <cjllc@post.com> |
| **Date:** | Feb 12, 2018 6:34:09 PM |

Hi Chadwick,

Thanks for the response. Will Feb 19th at 3p work for you? I have a meeting across campus I have to be at so can't do 4pm session. Let me know if 3pm will work otherwise we can try to find another time. Thanks!

Lisa Forbes, Ph.D., NCC
Assistant Clinical Professor
Counseling Program/Human Development & Family Relations Program
University of Colorado Denver
303.315.6306
Office: LSC 1126

"The cure for anything is salt water. Sweat, tears, or the sea." - Isak Dinesen
_____
From: Chadwick Jordan <cjllc@post.com>
Sent: Monday, February 12, 2018 4:29 PM
Subject: Chadwick Jordan
To: Forbes, Lisa K <lisa.forbes@ucdenver.edu>

Lisa,

Your time us important to me. This is a routine I am trying to get down. I am thankful for your patience. I was saddened to miss our appointment, baby steps, therefore I look forward to our first step. I do have good news to share, my businesses landed a contract. Next Monday at 4PM.

Sincerely,
Chadwick Jordan
--
Sent from my Android phone with mail.com Mail. Please excuse my brevity.

8/1/2019                                                     mail.com - Re: Chadwick Jordan
Case No. 1:19-cv-02660-RM-JPO      Document 1      filed 09/17/19      USDC Colorado      pg
30 of 190



# Re: Chadwick Jordan

**From:**      "Forbes, Lisa K" <LISA.FORBES@UCDENVER.EDU>

**To:**      "Chadwick Jordan" <cjllc@post.com>

**Date:**      Feb 12, 2018 9:46:07 PM

Great see you then!

Lisa Forbes, Ph.D., NCC
Assistant Clinical Professor
Counseling Program/Human Development & Family Relations Program
University of Colorado Denver
303.315.6306
Office: LSC 1126

"The cure for anything is salt water. Sweat, tears, or the sea." - Isak Dinesen

**From:** Chadwick Jordan <cjllc@post.com>
**Sent:** Monday, February 12, 2018 6:23:58 PM
**To:** Forbes, Lisa K
**Subject:** Re: Chadwick Jordan

Lisa,

That will be fine.

Chadwick Jordan

> **Sent:** Monday, February 12, 2018 at 5:34 PM
> **From:** "Forbes, Lisa K" <LISA.FORBES@UCDENVER.EDU>
> **To:** "Chadwick Jordan" <cjllc@post.com>
> **Subject:** Re: Chadwick Jordan
>
> Hi Chadwick,
>
> Thanks for the response. Will Feb 19th at 3p work for you? I have a meeting across campus I have to be at so can't do 4pm session. Let me know if 3pm will work otherwise we can try to find another time. Thanks!
>
> Lisa Forbes, Ph.D., NCC
> Assistant Clinical Professor
> Counseling Program/Human Development & Family Relations Program
> University of Colorado Denver
> 303.315.6306
> Office: LSC 1126
>
> "The cure for anything is salt water. Sweat, tears, or the sea." - Isak Dinesen
>
> **From:** Chadwick Jordan <cjllc@post.com>
> **Sent:** Monday, February 12, 2018 4:29 PM
> **Subject:** Chadwick Jordan
> **To:** Forbes, Lisa K <lisa.forbes@ucdenver.edu>
>
> Lisa,
>
> Your time us important to me. This is a routine I am trying to get down. I am thankful for your patience. I was saddened to miss our appointment, baby steps, therefore I look forward to our first step. I do have good news to share, my businesses landed a contract. Next Monday at 4PM.
>
> Sincerely,
> Chadwick Jordan

--
Sent from my Android phone with <u>mail.com</u> Mail. Please excuse my brevity.



---

# Re: Chadwick Jordan

**From:**   "Kim, Franklin" <FRANKLIN.KIM@UCDENVER.EDU>
**To:**     "Chadwick Jordan" <cjllc@post.com>
**Cc:**     "Kushmider, Kristin" <KRISTIN.KUSHMIDER@UCDENVER.EDU>
**Date:**   Jun 29, 2018 5:33:57 PM

---

Hello Chadwick,

You can file a complaint with the Department of Regulatory Agencies, Division of Professions and
Occupations. The website is www.colorado.gov/pacific/dora/dpo.  There will be a link under the
"Consumers" tab where you can file the complaint.  You may register so that they can contact you; or if
you prefer, I believe that you can file anonymously.

Frank


Frank Kim, PhD
Director
Student and Community Counseling Center
University of Colorado Denver
303/315-7277

---

**From:** Chadwick Jordan <cjllc@post.com>
**Sent:** Friday, June 29, 2018 2:03 PM
**To:** Kim, Franklin
**Subject:** Chadwick Jordan

Kim,

May you email the licensing boards email inwhich I file malpractice claims in your counseling office?

Respectfully,
Chadwick Jordan
C.Jordan,LLC
cjllc@post.com
720-273-9741

7/29/2019                                              mail.com - Re  Chadwick Jordan #830282211



# Re: Chadwick Jordan #830282211

**From:**   "Chadwick Jordan" <cjllc@post.com>
**To:**     "Kım, Franklin" <FRANKLIN.KIM@UCDENVER.EDU>
**Date:**   Jul 19, 2018 7:51:11 AM

尊敬;Respectfully,
Chadwick Jordan
Regional Representative
Huadian Power International
C.Jordan,LLC
cjllc@post.com
720-273-9741

**Sent:** Wednesday, July 11, 2018 at 5:21 PM
**From:** "Kim, Franklin" <FRANKLIN.KIM@UCDENVER.EDU>
**To:** "Chadwick Jordan" <cjllc@post.com>
**Subject:** Re: Chadwick Jordan #830282211

Hello Chadwick,

We need to have a signed release (records request), which I have attached.  Please fill this out and send back to me (scanned or faxed).  The "confidentiality agreement" is our Disclosure form which you would have signed at the outset of treatment.  I assume this is what you want?

Hope you well.
Frank

Frank Kim, PhD
Director
Student and Community Counseling Center
University of Colorado Denver
303/315-7277

**From:** Chadwick Jordan <cjllc@post.com>
**Sent:** Tuesday, July 10, 2018 12:31:29 PM
**To:** Kim, Franklin
**Subject:** Chadwick Jordan #830282211

Director KIM,

How are you this is Chadwick Jordan, student No. 830282211.
May you email a copy of the confidentiality agreement I signed with your counseling office, and suppoting documents.

Respectfully,
Chadwick Jordan

mail.com - Re: Chadwick Jordan #830282211

C.Jordan,LLC
cjllc@post.com
303-286-1997

**CREDIT UNION**
OF
**COLORADO.**
A FEDERAL CREDIT UNION
1390 Logan Street, Denver, CO 80203-2309

**Northern Colorado** 970-353-4819 • **Southern Colorado** 719-542-4816 • **Western Slope** 970-242-4816
**Denver Metro** 303-832-4816 • **Toll Free** 800-444-4816 • www.cuofco.org

| Member Statement | | | Page 1 |
|---|---|---|---|

Account Number: xxxxxx4340
Statement Period: 01MAY19 - 30JUN19

| Summary - All Accounts | | Branch 19 |
|---|---|---|
| **Account Type(s)** | **Beginning Balance** | **Ending Balance** |
| SHARE SAVINGS ACCOUNT | 0.00 | 25.01 |

CHADWICK JORDAN
8853 COLORADO BLVD APT 101          0-2-25
DENVER CO  80229-8428



WANT TO ENJOY A UNIFIED
BANKING EXPERIENCE?
ENROLL IN **DIGITAL BANKING!**
LEARN MORE AT CUOFCO.ORG/UPGRADE

EACH TRANSACTION WITH A # TO THE LEFT IS EFFECTIVE DATED

## ID 01 SHARE SAVINGS ACCOUNT

| Trans. Date | Transaction Description | Withdrawal | Deposit | Balance |
|---|---|---|---|---|
| MAY01 | Balance Forward | | | 0.00 |
| MAY01 | Deposit | | 25.00 | 25.00 |
| | ONLINE DEPOSIT/JORDAN | | | |
| JUN30 | Deposit Dividend 0.250% | | 0.01 | 25.01 |
| | Annual Percentage Yield Earned 0.240% From MAY01 Through JUN30 | | | |
| JUN30 | Ending Balance | | | 25.01 |

| Year to Date Dividend | | |
|---|---|---|
| ID 01 | 0.01 | |
| Total | 0.01 | |

SEE REVERSE SIDE FOR IMPORTANT INFORMATION. ALL ACCOUNTS EXCEPT SHARE DRAFT ACCOUNTS ARE NOT TRANSFERABLE AS DEFINED IN REGULATION D.

**NAME AND ADDRESS CHANGE**

PLEASE CHECK YOUR NAME(S) AND ADDRESS ON THE FRONT OF THIS STATEMENT, IF NOT EXACTLY CORRECT, PLEASE CALL THE CREDIT UNION AT 303-832-4816 OR 1-800-444-4816 WITH THE CORRECT INFORMATION.

### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Write us at 1390 Logan Street, Denver, CO 80203 as soon as you can if you think that your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than sixty (60) days after we send the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights

In your letter, give us the following information:
(1) Include your name and account number.
(2) Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the date and dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If your inquiry is in regards to an electronic transfer and we take more than 10 business days to investigate, we will re-credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the portion of your bill that is not in question. While we investigate your question we cannot report you as delinquent or take any action to collect the amount in question.

### PERIODIC STATEMENT DISCLOSURE FOR OPEN END LOANS OR CREDIT CARDS

#### What to Do If You Think You Find A Mistake On Your Statement
If you think there is an error on your statement, write to us at:
Credit Union of Colorado, 1390 Logan St, Denver, Colorado 80203
In your letter, give us the following information:
- Account information: Your name and account number.
- Dollar amount: The dollar amount of the suspected error
- Description of Problem. If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake

You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question
While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount  But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance
- We can apply any unpaid amount against your credit limit.

#### Your Rights If You Are Dissatisfied With Your Credit Card Purchases
If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.
To use this right, all of the following must be true:
1  The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note. Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase  Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3  You must not yet have fully paid for the purchase.
If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at.
Credit Union of Colorado, 1390 Logan Street, Denver, Colorado, 80203
While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

> We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

If you have an unresolved issue or additional items that you feel the Credit Union of Colorado Supervisory Committee should be aware of, please write:

**Credit Union of Colorado**
**Supervisory Committee**
**1390 Logan Street**
**Denver, Colorado 80203**

For general correspondence, please write:
**Credit Union of Colorado**
**1390 Logan Street**
**Denver, CO 80203**

This credit union is federally insured by the National Credit Union Administration

---

### TO BALANCE YOUR SHARE DRAFT REGISTER (CHECKBOOK) WITH YOUR STATEMENT

COMPARE EACH SHARE DRAFT (CHECK) AND VISA DEBIT ITEMS LISTED ON THIS STATEMENT WITH THOSE WRITTEN IN YOUR REGISTER AND MARK OFF THE ITEMS THAT AGREE  THEN, IN THE TWO OUTSTANDING ITEM COLUMNS, ENTER THE AMOUNTS OF ALL TRANSACTIONS WHICH APPEAR IN YOUR REGISTER BUT ARE NOT SHOWN ON THIS STATEMENT, INCLUDING THOSE WRITTEN IN A PRIOR STATEMENT PERIOD

| OUTSTANDING SHARE DRAFTS AND VISA DEBIT CARD ITEMS | | | |
|---|---|---|---|
| ITEM | AMOUNT | ITEM | AMOUNT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL ➡ | |

| MEMBER RECORDS | STATEMENT |
|---|---|
| SHARE DRAFT REGISTER BALANCE _____ | ENTER BALANCE AS SHOWN ON THE FRONT OF THIS STATEMENT |
| ADD INTEREST PAID (POSTED) TO THIS STATEMENT + _____ | ADD ANY DEPOSITS MADE AFTER THE DATE OF THIS STATEMENT + _____ |
| ADD ANY DEPOSITS AND TRANSFERS FROM SAVINGS OR LOANS NOT SHOWN IN YOUR REGISTER + _____ | SUBTRACT THE TOTAL OF THE OUTSTANDING SHARE DRAFTS AND VISA DEBIT CARD ITEMS - _____ |
| SUBTRACT ANY VISA DEBIT CARD TRANSACTION NOT ENTERED IN REGISTER - _____ | ADJUSTMENTS ± _____ |
| OTHER (FEES, AUTOMATIC TRANSFERS, ETC.) - _____ | ACCOUNT BALANCE _____ |
| ADJUSTMENTS ± _____ | |
| REVISED SHARE DRAFT REGISTER BALANCE = _____ | |

**THESE TWO BALANCES SHOULD AGREE**

**IF YOU DO NOT BALANCE**

- Verify additions and subtractions above and in your draft register.
- Compare the dollar amounts of drafts listed on this statement with the draft amounts listed in your draft register
- Compare the dollar amounts of deposits listed on this statement with the deposit amounts recorded in your draft register

Rev  02-2014



# Re: Chadwick Jordan #830282211

| | |
|---|---|
| **From:** | "Kim, Franklin" <FRANKLIN.KIM@UCDENVER.EDU> |
| **To:** | "Chadwick Jordan" <cjllc@post.com> |
| **Date:** | Jul 11, 2018 5:21:20 PM |

Hello Chadwick,

We need to have a signed release (records request), which I have attached.  Please fill this out and send back to me (scanned or faxed).  The "confidentiality agreement" is our Disclosure form which you would have signed at the outset of treatment.  I assume this is what you want?

Hope you well.
Frank


Frank Kim, PhD
Director
Student and Community Counseling Center
University of Colorado Denver
303/315-7277

**From:** Chadwick Jordan <cjllc@post.com>
**Sent:** Tuesday, July 10, 2018 12:31:29 PM
**To:** Kim, Franklin
**Subject:** Chadwick Jordan #830282211

Director KIM,

How are you this is Chadwick Jordan, student No. 830282211.
May you email a copy of the confidentiality agreement I signed with your counseling office, and suppoting documents.

Respectfully,
Chadwick Jordan
C.Jordan,LLC
cjllc@post.com
303-286-1997


**Attachments**

- Authorization to Request Records.doc

**Kaiser Permanente - Colorado**

Jordan, Chadwick H
MRN: 411244783, DOB: 6/5/1982, Sex: M
Encounter date: 12/15/2017

---

## Visit Summary

### Reason for Visit

| KNEE PROBLEM | LEFT |
|---|---|

### Diagnoses

| | Comments |
|---|---|
| HEALTH ADVICE, EDUCATION, OR COUNSELING | |

Reviewed On: **12/15/2017** By: Daniel Sahling,
RN

### Allergies as of 12/15/2017

| | Noted | Reaction Type | Reactions |
|---|---|---|---|
| **No Known Drug Allergies** | 06/07/2014 | | |
| **No Known Food Allergies** | 06/07/2014 | | |

### Vitals

| BP | Pulse | Temp | Resp | SpO2 |
|---|---|---|---|---|
| 118/72 (BP Location: RA-RIGHT ARM, Patient Position: SITTING, Cuff Size: Standard Adult) | 64 | 97.5 °F (36.4 °C) (Tympanic) | 16 | 97% |

---

## Orders

### Lab and Imaging Orders

No orders found

### Other Orders

No orders found

## Progress Notes

### Daniel Sahling, RN at 12/15/2017 1:51 PM

Status. Signed

S: Knee problem

B: States he was seen here in trauma 12/13 and was doing the stretching exercises he was given but that his knee "retracts" (recoils?) and locks up, feels like his knee "pops" out only when doing exercises, (Pt appears to be sitting comfortably in wheelchair with both legs on foot rests). Pt wheeled himself into room via wheelchair, then states he is able to ambulate and he was going to go to the mall but then developed numbness/tingling in left foot/knee and that his left knee is "more swollen" than the other day and he decided to return. Bilateral knee comparison do not appear to show that left knee is swollen, left dorsalis pedis and tibial pulse 2-3+, CMS intact. Pt was able to successfully ambulate back to waiting room.

A: Concern for knee problem

R: Consulted S. Villalobos, NP d/t pt being seen recently in trauma, now reporting numbness/tingling in left foot/knee. No xray/imaging done previously, pt now requesting MRI.

---

# COLORADO
**Bureau of Investigation**
Department of Public Safety

Page 1 of 7

Identification
690 Kipling Street, Suite 3000
Lakewood, CO 80215
303-239-4208

UNIVERSITY OF COLORADO DENVER
900 AURARIA PKWY
DENVER, CO 80204

Date: 02/29/16 08:54:57(MT)

RE: JORDAN, CHADWICK   DOB: 060582   SOC: XXXXX9084

The Colorado arrest record for the person noted to follow.

The Colorado Bureau of Investigation's database contains detailed information of arrest records based upon fingerprints provided by Colorado law enforcement agencies. Arrests, which are not supported by fingerprints, will not be included in this database  On occasion the Colorado criminal history will contain disposition information provided by the Colorado Judicial system  Additionally, warrant information, sealed records, and juvenile records are not available to the public

*The results attached are based on a name search which may or may not be the subject of this inquiry. This search does not include a fingerprint comparison, which is the only means of positive identification.* Since an arrest record may be established after this inquiry, an arrest record is only valid at the time of the current request  To ensure the most current available information in regards to subsequent arrest after an initial inquiry, it is recommended another query be made.

The results attached below are based on the criteria given

Falsifying or altering this document with the intent to misrepresent the contents of the record is prohibited by law, and may be punishable as a felony when done with intent to injure or defraud any person.

Sincerely,
Michael S. Rankin, Director
Colorado Bureau of Investigation

700 Kipling Street  Suite 1000, Lakewood, CO  80215  cdpsweb.state.co.us
John W. Hickenlooper, Governor  |  Stan Hilkey, Executive Director



CU JORDAN_0001

```
*** ATTN: NTI
        COLORADO BUREAU OF INVESTIGATION - IDENTIFICATION UNIT
   690 KIPLING STREET,SUITE #3000, DENVER, COLORADO 80215 (303)239-4208
```

THIS IDENTIFICATION RECORD IS FOR LAWFUL USE ONLY AND SUMMARIZES
INFORMATION SENT TO THE COLORADO BUREAU OF INVESTIGATION FROM
FINGERPRINT CONTRIBUTORS IN THE STATE OF COLORADO.

UNLESS FINGERPRINTS ACCOMPANIED YOUR INQUIRY, THE COLORADO BUREAU OF
INVESTIGATION CAN NOT GUARANTEE THIS RECORD RELATES TO THE PERSON IN
WHOM YOU HAVE AN INTEREST.

IF THE DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF AN ARREST
CHARGE OR DISPOSITION IS DESIRED, THAT INFORMATION MAY BE OBTAINED FROM
THE AGENCY WHO FURNISHED THE ARREST INFORMATION.

ONLY THE COURT OF JURISDICTION OR THE RESPECTIVE DISTRICT ATTORNEY'S
OFFICE WHEREIN THE FINAL DISPOSITION OCCURRED CAN PROVIDE AN OFFICIAL
COPY TO ANY SPECIFIC DISPOSITION.

STATE LAW GOVERNS ACCESS TO SEALED RECORDS.

BECAUSE ADDITIONS AND DELETIONS TO A CRIMINAL HISTORY RECORD MAY BE MADE
AT ANY GIVEN TIME, A NEW INQUIRY SHOULD BE REQUESTED WHEN NEEDED FOR
SUBSEQUENT USE.

```
............................  IDENTIFICATION  ............................
NAME(S) USED:
               JORDAN, CHAD HEATH
               JORDAN, CHADWICK H
               JORDAN, CHADWICK HEATH
               JORDAN, CHAD H
               JORDAN, CHADWICK

PHYSICAL:
               SEX: M   RACE: W   HGT: 510   WGT: 200
               EYE: BRO   HAIR: BLN   SKN: DRK

DATE(S) OF BIRTH:
               04/05/1982

PLACE(S) OF BIRTH:
               NC
SCARS/MARKS:
               SC L LEG
               TAT L SHLD


............................  CRIMINAL HISTORY  ............................
==============================  Cycle 1 of 15  ==============================
------ ARREST ------
DATE ARRESTED          09/29/2000
AGENCY                 WESTMINSTER POLICE DEPARTMENT
ARREST NUMBER          002389
NAME USED              JORDAN, CHADWICK HEATH
CHARGE                 01
  CHARGE LITERAL       ASSAULT  MENACING
  TYPE/LEVEL           FELONY
  OFFENSE DATE         09/29/2000
------ COURT ------
CHARGE                 01
  CHARGE LITERAL       ASSAULT  FELONY MENACING-REAL/SIMULATED WE
  TYPE/LEVEL           FELONY
  OFFENSE DATE         09/29/2000
  DOCKET               D0302000CR002555
  COURT DISPOSITION    DISMISSED BY DA
```

Page 3 of 7

```
DISPOSITION DATE        09/26/2001
CHARGE                  02
    CHARGE LITERAL      ASSAULT  ASSAULT 3
    TYPE/LEVEL          MISDEMEANOR
    OFFENSE DATE        09/29/2000
    DOCKET              D0302000CR002555
    COURT DISPOSITION   DISMISSED BY DA
    DISPOSITION DATE    09/26/2001
CHARGE                  03
    CHARGE LITERAL      BAIL-SECURE BOND  VIOLATE BAIL BOND COND-FELONY
    TYPE/LEVEL          FELONY
    OFFENSE DATE        01/23/2001
    DOCKET              D0302000CR002555
    COURT DISPOSITION   DISMISSED BY DA
    DISPOSITION DATE    09/26/2001
CHARGE                  04
    CHARGE LITERAL      ASSAULT  ASSAULT 3-KNOW/RECKLESS CAUSE INJ
    TYPE/LEVEL          MISDEMEANOR
    OFFENSE DATE        09/29/2000
    DOCKET              D0302000CR002555
    COURT DISPOSITION   GUILTY
    DISPOSITION DATE    09/26/2001
    SENTENCE            1:00 Y JAIL 5:00 D CREDIT FOR TIME S   ERVED
CHARGE                  05
    CHARGE LITERAL      ASSAULT  MENACING
    TYPE/LEVEL          MISDEMEANOR
    OFFENSE DATE        09/29/2000
    DOCKET              D0302000CR002555
    COURT DISPOSITION   GUILTY
    DISPOSITION DATE    09/26/2001
    SENTENCE            6:00 M JAIL
=================== Cycle 2 of 15 ===================
------ ARREST ------
DATE ARRESTED           09/30/2000
AGENCY                  WESTMINSTER POLICE DEPARTMENT
ARREST NUMBER           00074007
NAME USED               JORDAN, CHADWICK HEATH
CHARGE                  01
    CHARGE LITERAL      SIMPLE ASSAULT  FELONY MENACING        (WEST)
    TYPE/LEVEL          FELONY
=================== Cycle 3 of 15 ===================
------ ARREST ------
DATE ARRESTED           08/20/2001
AGENCY                  JEFFERSON COUNTY SHERIFF OFFICE
ARREST NUMBER           01233009
NAME USED               JORDAN, CHADWICK HEATH
CHARGE                  01
    CHARGE LITERAL      ARRESTED FOR OTHER JURISDICTION  FTA FELONY MENACE
                        WESTMINSTER PD
    TYPE/LEVEL          FELONY
CHARGE                  02
    CHARGE LITERAL      FAIL TO APPEAR  FTA 3RD DEG ASSLT WESTMINSTER PD
    TYPE/LEVEL          MISDEMEANOR
=================== Cycle 4 of 15 ===================
------ ARREST ------
DATE ARRESTED           08/16/2003
AGENCY                  BROOMFIELD POLICE DEPARTMENT
ARREST NUMBER           B03001090
NAME USED               JORDAN, CHADWICK HEATH
CHARGE                  01
    CHARGE LITERAL      OBSTRUCT POLICE
    TYPE/LEVEL          MISDEMEANOR
    OFFENSE DATE        08/16/2003
CHARGE                  02
    CHARGE LITERAL      DANGEROUS DRUGS  CONT SUBSTANCES
    TYPE/LEVEL          MISDEMEANOR
```

CU JORDAN_0003

OFFENSE DATE            06/16/2003
═══════════════════════════ Cycle 5 of 15 ═══════════════════════════

------ ARREST ------
DATE ARRESTED          12/30/2003
AGENCY                 THORNTON POLICE DEPARTMENT
ARREST NUMBER          10013965
NAME USED              JORDAN, CHADWICK HEATH
CHARGE                 01
  CHARGE LITERAL       TRAFFIC OFFENSE  HIT AND RUN
  TYPE/LEVEL           MISDEMEANOR
  OFFENSE DATE         12/30/2003
CHARGE                 02
  CHARGE LITERAL       TRAFFIC OFFENSE  CARELESS
  TYPE/LEVEL           MISDEMEANOR
  OFFENSE DATE         12/30/2003
CHARGE                 03
  CHARGE LITERAL       DRIVING UNDER THE INFLUENCE  DUI
  TYPE/LEVEL           MISDEMEANOR
  OFFENSE DATE         12/30/2003

------ COURT ------
CHARGE                 01
  CHARGE LITERAL       -    MENACING FELONY-REAL/SIMULATED WE
  TYPE/LEVEL           FELONY
  OFFENSE DATE         12/30/2003
  DOCKET               D0012004CR000029
  COURT DISPOSITION    DISMISSED BY DA
  DISPOSITION DATE     07/15/2004
CHARGE                 02
  CHARGE LITERAL       -    DRIVING UNDER THE INFLUENCE
  TYPE/LEVEL           MISDEMEANOR
  OFFENSE DATE         12/30/2003
  DOCKET               D0012004CR000029
  COURT DISPOSITION    GUILTY
  DISPOSITION DATE     07/15/2004
  SENTENCE             1:00 Y JAIL
CHARGE                 03
  CHARGE LITERAL       ASSAULT  MENACING FELONY-CSP
  TYPE/LEVEL           FELONY
  OFFENSE DATE         12/30/2003
  DOCKET               D0012004CR000029
  COURT DISPOSITION    GUILTY
  DISPOSITION DATE     07/15/2004
  SENTENCE             16:00 M DEPARTMENT OF CORRECTIONS 62     :00 D CREDIT
                       FOR TIME SERVED
═══════════════════════════ Cycle 6 of 15 ═══════════════════════════

------ ARREST ------
DATE ARRESTED          01/28/2004
AGENCY                 ADAMS COUNTY SHERIFF'S OFFICE
ARREST NUMBER          04-1336
NAME USED              JORDAN, CHADWICK HEATH
CHARGE                 01
  CHARGE LITERAL       ARRESTED FOR OTHER JURISDICTION  FOJ BROOMFIELD POSS
                       NARC EQUIP
  TYPE/LEVEL           MISDEMEANOR
  DOCKET               C0202003M0000470
═══════════════════════════ Cycle 7 of 15 ═══════════════════════════

------ ARREST ------
DATE ARRESTED          02/27/2004
AGENCY                 ADAMS COUNTY SHERIFF'S OFFICE
ARREST NUMBER          04-2855
NAME USED              JORDAN, CHADWICK HEATH
CHARGE                 01
  CHARGE LITERAL       CONTEMPT OF COURT  FAIL PAY FINE COSTS CARELESS
  TYPE/LEVEL           MISDEMEANOR
═══════════════════════════ Cycle 8 of 15 ═══════════════════════════

------ CUSTODY ------

CU JORDAN_0004

```
DATE RECEIVED          07/26/2004
AGENCY                 DENVER RECEPTION & DIAGNOSTIC CENTER DRDC
ARREST NUMBER          122029
NAME USED              JORDAN, CHADWICK
CHARGE                 01
   CHARGE LITERAL      ASSAULT  MENACING
   TYPE/LEVEL          FELONY
   DOCKET              D0611004CR000079
CHARGE                 02
   CHARGE LITERAL      DRIVING UNDER THE INFLUENCE  DUI
   TYPE/LEVEL          MISDEMEANOR
   DOCKET              D0012004CR000029
------ CUSTODY EVENT ------
   DATE                07/26/2004
   AGENCY              DENVER RECEPTION & DIAGNOSTIC CENTER DRDC
   STATUS              RECEIVED
-----
================================ Cycle 9 of 15 ================================
------ ARREST ------
DATE ARRESTED          10/14/2005
AGENCY                 THORNTON POLICE DEPARTMENT
ARREST NUMBER          19620141
NAME USED              JORDAN, CHADWICK HEATH
CHARGE                 01
   CHARGE LITERAL      ARRESTED FOR OTHER JURISDICTION  BROOMFIELD HARASSMENT
   OFFENSE DATE        10/14/2005
================================ Cycle 10 of 15 ================================
------ ARREST ------
DATE ARRESTED          03/09/2006
AGENCY                 WESTMINSTER POLICE DEPARTMENT
ARREST NUMBER          200671901
NAME USED              JORDAN, CHADWICK HEATH
CHARGE                 01
   CHARGE LITERAL      DANGEROUS DRUGS  POSS SCHED II
   TYPE/LEVEL          FELONY
   OFFENSE DATE        03/09/2006
CHARGE                 02
   CHARGE LITERAL      CARRYING A CONCEALED WEAPON
   TYPE/LEVEL          MISDEMEANOR
   OFFENSE DATE        03/09/2006
------ COURT ------
CHARGE                 01
   CHARGE LITERAL        -   CONTROLLED SUBST-POSSESS SCH 2-OV
   TYPE/LEVEL          FELONY
   OFFENSE DATE        03/09/2006
   DOCKET              D0012006CR000835
   COURT DISPOSITION   DISMISSED BY DA
   DISPOSITION DATE    03/30/2007
CHARGE                 02
   CHARGE LITERAL        -   CONTROLLED SUBS-SPECIAL OFF-DEADL
   TYPE/LEVEL          MISDEMEANOR
   OFFENSE DATE        03/09/2006
   DOCKET              D0012006CR000835
   COURT DISPOSITION   DISMISSED BY DA
   DISPOSITION DATE    03/30/2007
CHARGE                 03
   CHARGE LITERAL      POSSESSION OF WEAPON  WEAPON-POSS/PREVIOUS OFFEND-ANY P
   TYPE/LEVEL          FELONY
   OFFENSE DATE        03/09/2006
   DOCKET              D0012006CR000835
   COURT DISPOSITION   DISMISSED BY DA
   DISPOSITION DATE    03/30/2007
CHARGE                 04
   CHARGE LITERAL        -   CONTROLLED SUBST-POSSESS SCH 1-OV
   TYPE/LEVEL          FELONY
   OFFENSE DATE        03/09/2006
```

```
DOCKET                      D0012006CR000935                          Page 6 of 7
COURT DISPOSITION           GUILTY
DISPOSITION DATE            12/20/2006
SENTENCE                    4:00 Y DEPARTMENT OF CORRECTIONS 216    :00 D CREDIT
                            FOR TIME SERVED
================================= Cycle 11 of 15 ================================
------ ARREST ------
DATE ARRESTED               05/30/2006
AGENCY                      ADAMS COUNTY SHERIFF'S OFFICE
ARREST NUMBER               06-8738
NAME USED                   JORDAN, CHADWICK HEATH
CHARGE                      01
   CHARGE LITERAL           ASSAULT  2ND DEG -- 4 COUNTS
   TYPE/LEVEL               FELONY
------ COURT ------
CHARGE                      01
   CHARGE LITERAL           -   ASSAULT 2-PEACE OFFICER
   TYPE/LEVEL               FELONY
   OFFENSE DATE             05/30/2006
   DOCKET                   D0012006CR001675
   COURT DISPOSITION        DISMISSED BY DA
   DISPOSITION DATE         03/30/2007
CHARGE                      02
   CHARGE LITERAL           -   ASSAULT 2-PEACE OFFICER
   TYPE/LEVEL               FELONY
   OFFENSE DATE             05/30/2006
   DOCKET                   D0012006CR001675
   COURT DISPOSITION        DISMISSED BY DA
   DISPOSITION DATE         03/30/2007
CHARGE                      03
   CHARGE LITERAL           -   ASSAULT 2-IN CUSTODY/ADULT CONV/G
   TYPE/LEVEL               FELONY
   OFFENSE DATE             05/30/2006
   DOCKET                   D0012006CR001675
   COURT DISPOSITION        DISMISSED BY DA
   DISPOSITION DATE         03/30/2007
CHARGE                      04
   CHARGE LITERAL           -   ASSAULT 2-IN CUSTODY/ADULT CONV/G
   TYPE/LEVEL               FELONY
   OFFENSE DATE             05/30/2006
   DOCKET                   D0012006CR001675
   COURT DISPOSITION        DISMISSED BY DA
   DISPOSITION DATE         03/30/2007
CHARGE                      05
   CHARGE LITERAL           -   ASSAULT 2-PEACE OFFICER-ATT ADDED
   TYPE/LEVEL               FELONY
   OFFENSE DATE             05/30/2006
   DOCKET                   D0012006CR001675
   COURT DISPOSITION        GUILTY
   DISPOSITION DATE         12/20/2006
   SENTENCE                 4:00 Y DEPARTMENT OF CORRECTIONS 131    :00 D CREDIT
                            FOR TIME SERVED
================================= Cycle 12 of 15 ================================
------ ARREST ------
DATE ARRESTED               03/06/2007
AGENCY                      DENVER PD - IDENTIFICATION BUREAU
ARREST NUMBER               1330756
NAME USED                   JORDAN, CHADWICK HEATH
CHARGE                      01
   CHARGE LITERAL           OBSTRUCT POLICE  INTERFERENCE
   TYPE/LEVEL               MISDEMEANOR
   OFFENSE DATE             03/06/2007
CHARGE                      02
   CHARGE LITERAL           PUBLIC ORDER CRIMES  UNLAWFUL ACTS IN/ABOUT SCHOOLS
   TYPE/LEVEL               MISDEMEANOR
   OFFENSE DATE             03/06/2007
```

============================= Cycle 13 of 15 ==============================

```
------ ARREST ------
DATE ARRESTED              03/30/2007
AGENCY                     ADAMS COUNTY SHERIFF'S OFFICE
ARREST NUMBER       :      07-4899
NAME USED                  JORDAN, CHADWICK HEATH
CHARGE                     01
    CHARGE LITERAL         ARRESTED FOR OTHER JURISDICTION  PD FEDERAL HEIGHTS
                           SHOPLIFTING
    TYPE/LEVEL             MISDEMEANOR
CHARGE                     02
    CHARGE LITERAL         DANGEROUS DRUGS  POSS
    TYPE/LEVEL             FELONY
CHARGE                     03
    CHARGE LITERAL         ASSAULT  2ND DEG
    TYPE/LEVEL             FELONY
```

============================= Cycle 14 of 15 ==============================

```
------ CUSTODY ------
DATE RECEIVED              04/19/2007
AGENCY                     DENVER RECEPTION & DIAGNOSTIC CENTER DRDC
ARREST NUMBER              1102609
NAME USED                  JORDAN, CHADWICK H
CHARGE
    CHARGE LITERAL         ASSAULT  2ND DEGREE
    TYPE/LEVEL             FELONY
    DOCKET                 D0012006CR001675
CHARGE                     02
    CHARGE LITERAL         DANGEROUS DRUGS  POSS
    TYPE/LEVEL             FELONY
    DOCKET                 D0012006CR500835
------ CUSTODY EVENT ------
    DATE                   04/19/2007
    AGENCY                 DENVER RECEPTION & DIAGNOSTIC CENTER DRDC
    STATUS                 RECEIVED
```

-----
============================= Cycle 15 of 15 ==============================

```
------ ARREST ------
DATE ARRESTED              07/23/2013
AGENCY                     DENVER PD - IDENTIFICATION BUREAU
ARREST NUMBER              13-148449
NAME USED                  JORDAN,CHADWICK
CHARGE                     01
    CHARGE LITERAL         PAROLE VIOLATION
    TYPE/LEVEL             MISDEMEANOR
    OFFENSE DATE           07/23/2013
    DOCKET                 1226C9
```

```
    ** CRIMINAL JUSTICE AGENCIES MAY NOT HAVE PROVIDED ALL ARRESTS,  **
    ** CHARGES OR DISPOSITIONS TO THE CBI.  THIS RECORD SHOWS ALL     **
    ** ARRESTS, CHARGES & DISPOSITIONS THAT WERE PROVIDED, UNLESS     **
    ** ACCESS TO THEM HAS BEEN LIMITED BY COURT ORDER.
    * FALSIFYING OR ALTERING THIS RECORD WITH THE INTENT TO MISREPRESENT*
    * THE CONTENTS OF THE RECORD IS PROHIBITED BY LAW, AND MAY BE      *
    * PUNISHABLE AS A FELONY WHEN DONE WITH THE INTENT TO INJURE OR    *
    * DEFRAUD ANY PERSON.
       ---- END OF RECORD MEETING DISSEMINATION CRITERIA ----
       -------- 07/29/2018 09:26MF -------
```

CU JORDAN_0007

Chadwick Jordan

9/29/2000
Arrested – Westminster Police
Assault Menacing

Court
Menacing, Felony – Dismissed
Assault 3, Misdemeanor – Dismissed
Violate Bail Bond, Felony – Dismissed
Assault, Misdemeanor – Guilty
Assault Menacing, Misdemeanor – Guilty
6 Months

9/30/2000
Arrested – Westminster Police
Simple Assault/Felony Menacing

8/20/2001
Arrested – Jefferson County Sheriff
FTA

8/16/2003
Arrested – Broomfield Police
Obstruct Police, Misdemeanor
Dangerous Drugs, Misdemeanor

12/30/2003
Arrest – Thornton Police
Traffic – Hit and Run, Misdemeanor
Careless Driving, Misdemeanor

Court
Menacing, Felony – Dismissed
DUI, Misdemeanor – Guilty
Assault Menacing, Felony – Guilty
18 Months

1/28/2004
Arrest – Adams County Sherriff
Narc Equip, misdemeanor

2/28/2004
Arrest – Adams County Sherriff
Contempt of Court – Failure to pay fines/costs

7/26/2004
Arrest – Denver Reception and Diagnostic Center
Assault Menacing, Felony
DUI, Misdemeanor

10/14/2005
Arrest – Thornton Police
Harassment, Broomfield

3/08/2006
Arrest – Westminster Police
Dangerous Drugs, Felony
Carrying a Concealed Weapon, Misdemeanor

Court
Controlled Substance, Felony – Dismissed
Controlled Substance, Misdemeanor – Dismissed
Possession of a Weapon, Misdemeanor – Dismissed
Controlled Substance, Felony – Guilty
4 years

5/30/2006
Arrest – Adams County Sherriff
Assault 2nd Degree, Felony

Court
Assault 2 Peace Officer, Felony – Dismissed
Assault 2 Peace Officer, Felony – Dismissed
Assault 2-In Custody, Felony – Dismissed
Assault 2-In Custody, Felony – Dismissed
Assault 2 Peace Officer, Felony – Guilty
4 years

3/6/2007
Arrest – Denver Police
Obstruct Police, Misdemeanor
Public Order Crimes, unlawful acts in/about schools

3/30/2007
Arrest – Adams County Sherriff
Shoplifting, Misdemeanor
Dangerous Drugs, Felony
Assault, Felony

4/19/2007
Arrest – Denver Reception and Diagnostic Center
Assault 2nd Degree, Felony
Dangerous Drugs, Felony

7/23/2013
Arrest – Denver PD
Parole Violation, Misdemeanor

**UNIVERSITY OF COLORADO DENVER**
**Application for Undergraduate Admission**

Office of Admissions
Campus Box 167
P.O. Box 173364
Denver, CO 80217-3364

DOWNTOWN CAMPUS ONLY
To apply for all Health programs, go to
www.uchsc.edu or call 303-720-8005

This application is for:
Fall Term _____
Spring Term _____
Summer Term _____

Refer to the application instructions for further clarification. Use ink and print legibly.

1. Full legal name    Jordan
   _____Last_____    Chadwick
   _____First_____
   Heath
   _____Middle_____
   Name under which transcripts will be submitted if different from above

2. Social Security number (SSN)    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
   (Disclosure of SSN is voluntary and is used for record keeping purposes only. Use of SSN is protected under federal and state privacy laws. You will be assigned a student identification number.)
   830282211E
   Previous CU student number (if applicable)

3. Permanent address    8853 Colorado Blvd., Bldg A, Unit 101
   _____Number and Street or P.O. Box_____
   Thornton    Adams    Col    80229
   _____City_____    _____County_____    _____State_____    _____Zip Code_____    Foreign Country (if applicable)

4. Address to which all mailings should be sent
   if different from your permanent address
   _____Number and Street or P.O. Box_____
   _____City_____    _____State_____    _____Zip Code_____    Foreign Country (if applicable)

5. Telephone number    Home ( 303 ) 286-1997    Other ( 303 ) 507-7494
   E-mail address (optional) _____

6. Next of kin information: Complete the following information for your (check one):    Parent ✓    Legal Guardian _____    Spouse _____
   Name    Jordan    Gwen    Ratliff    Occupation    Secretary    Employer    Col. St Div. of Wildlife
   _____Last_____    _____First_____    _____Middle_____
   Home address    8853 Colorado Blvd    Thornton    Col    80229    (303) 286-1997    (303) 291-7386
   _____Number and Street or P.O. Box_____    _____City_____    _____State_____    _____Zip Code_____    _____Home Phone_____    _____Work Phone_____

7. List any family members who have attended the University of Colorado.

   | Name | Dates Attended | Year Graduated | Relationship |
   |------|---------------|----------------|--------------|
   |      |               |                |              |
   |      |               |                |              |

8. Military Service    ✓ Yes    _____ No
   Active duty dates (mo/yr)    12 / 00    to    00 / 02    Are you eligible for veterans' benefits?    ✓ Yes    _____ No

9. Age and birth date    21 / 10 / 5 / 82    10. Gender    ✓ Male    _____ Female
   _____Age_____    _____Month_____    _____Day_____    _____Year_____

11. Select the one category that most accurately reflects your ethnic background (for government reports and University compliance with the Civil Rights Act of 1964). Disclosure is voluntary and will not be used in a discriminatory manner.
   ✓ American Indian or Alaskan Native    _____ Asian or Pacific Islander    ✓ White, not of Hispanic origin
   Cherokee
   _____Tribal affiliation_____    _____ Black/African American, not of Hispanic origin    _____ I do not wish to provide this information
   _____Census Enrollment Number_____    _____ Hispanic (Chicano, Latino, Mexican American, Spanish American, other Spanish)

12. Citizenship
   ✓ U.S. citizen
   _____ Permanent resident (immigrant)    Alien Registration Number _____    Date of Issue _____
   Please attach copy of both sides of Alien Registration card.
   _____ Nonimmigrant on temporary status
   Type of visa you now hold
   _____ Student (F-1)    _____ Exchange Visitor (J-1)    _____ None    _____ Other (specify) _____

13. Country of Citizenship (if not U.S.) _____

CU JORDAN_0010

14. Have you ever been convicted of a crime, made a plea of guilty, accepted a deferred judgment, been adjudicated, or been required to register as a sex offender? (Misdemeanor traffic offenses are exempt) _____ Yes _____ No (Failure to answer this question will stop processing of your application. If you answer "yes," you must include a written explanation.)

15. Have you ever been placed on probation, suspended, expelled, or been subject to official disciplinary action from any high school or postsecondary institution for any academic misconduct or behavioral misconduct? _____ Yes _____ No (Failure to answer this question will stop processing of your application. If you answer "yes," you must include an explanation with this application including specific offense, the length of suspension, and the date (month/year) it occurred.)

16. To comply with Colorado state law, all males between the ages of 17 years, 9 months and 26 years must answer the following question: Are you registered with the selective service? _____ Yes _____ No

17. Indicate the highest level of formal education attained by your parents or guardians.

| | Father (or guardian) | Mother (or guardian) |
|---|---|---|
| No High School | 1 | |
| Some High School | 2 | |
| High School Graduate | 3 | |
| Some College or Technical Training | 4 | |
| Two-Year College Graduate | 5 | |
| Four-Year College Graduate | 6 ✓ | 6 ✓ |
| Post Graduate Study | 7 | |

18. Indicate the college you are applying to and the major:
   □ Arts and Media • Major _____
   □ Engineering • Major _____
   □ Liberal Arts & Sciences • Major _____
   ☑ Business • Major *Accounting*
   □ Public Affairs • Criminal Justice

19. If you were previously enrolled at the University of Colorado, what campus(es) did you attend?
   _____ Boulder   _____ Colorado Springs   _____ Continuing Education/Extended Studies   ✓ Denver   _____ Health Sciences Center

20. Admission level
   _____ Freshman (have not enrolled in a college or university since graduation from high school)
   _____ Transfer (have enrolled at a college or university, including other campuses of the University of Colorado, since graduation from high school)
   _____ Readmit (previously enrolled in an undergraduate degree program at UC Denver)

21. Term and year of intended enrollment
   _____ Fall 20 [_____] begins late August   _____ Spring 20 [_____] begins mid-January   ✓ Summer 20 [_____] begins late May/early June

22. Do you intend to obtain a degree from this campus?
   ✓ Yes _____ No (This information is used for planning purposes only and has no impact on your admission status)
   If no, what are your educational plans? _____

## 23. TEST SCORE INFORMATION

List the dates you have taken or are planning to take any of these tests. Please request that the appropriate testing service report scores directly to the University of Colorado Denver.

American College Test (ACT)
College code for UC Denver is: 0533     _____ Month/Year     _____ Month/Year     _____ Month/Year

College Board
Scholastic Aptitude Test (SAT I)
College code for UC Denver is: 4875     _____ Month/Year     _____ Month/Year     _____ Month/Year

## 24. HIGH SCHOOL INFORMATION

Complete this section even if you are a transfer student.

| Westminster | Westminster | Col. | 80229 | 04/99 | 04/00 | 12th | 04/00 |
|---|---|---|---|---|---|---|---|
| Name of current or last high school | City | State | Zip Code (required) | From Mo/Yr | To Mo/Yr | Highest Grade Completed | Graduation Date – Mo/Yr |

If you are not a high school graduate, have you earned a GED Certificate or equivalent? _____ Yes   Date _____   _____ No

If you are a freshman applicant and you answered "yes" to this question, you must submit an official copy of your GED scores as well as an official high school transcript from the last high school you attended.

If you are a freshman applicant and have not yet graduated from high school, please pay special attention to question #25. You must list all courses you are taking or plan to take beyond what is listed on your high school transcript.

CU JORDAN_0011

## 25. COLLEGE AND UNIVERSITY INFORMATION

List all collegiate institutions you have attended (including the University of Colorado and foreign institutions), regardless of the length of attendance, whether or not courses were completed, and whether or not you believe the record will affect your admission or transfer credit. You must notify the Office of Admissions as soon as possible if you attend additional institutions. Failure to list and submit transcripts from all institutions previously attended before enrolling at UCD is considered to be a violation of academic ethics and may result in the cancellation of your admission or your dismissal.

Be sure to request that each college or university send an official transcript directly to the Office of Admissions. Transcripts from the University of Colorado are not required. Final official transcripts showing all subsequent work must be submitted upon completion of the work. If you do not provide these final transcripts, you may not be allowed to register for classes.

| Names of institutions of higher education attended (chronological order) | City | State | Zip Code (required) | From Mo/Yr | To Mo/Yr | Degree and Date Earned | Type of System* | Number of Hours Completed |
|---|---|---|---|---|---|---|---|---|
| Front Range Community College | Westminster | Col | 80031 | 04/03 | 01/04 | | S | 9(a) |
| Metropolitan State College of Denver | Denver | Col | 80217 | 01/04 | 07/04 | | Q | 240 |
| University of Colorado-Denver | Denver | Col | 80217 | 01/06 | 03/06 | | Q | 220 |
| | | | | | | | | 2060 |

Are you eligible to return to all collegiate institutions previously attended? ✓ Yes ____ No   If no, attach a statement of explanation.
____ I am not currently enrolled in college nor do I plan to enroll prior to the term for which I am applying.

*Type of System: Semester (S), Quarter (Q), Trimester (T)

## 26. CURRENT AND FUTURE COURSE WORK

List all high school or college courses you are now taking or plan to take before enrolling at the University of Colorado Denver. This information is required to determine total number of academic units completed prior to enrollment.

| Name of High School or College | Term/Year | Complete Course Title | Course No. and Dept. | Credit Hours |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## 27. TUITION CLASSIFICATION

Are you claiming eligibility for in-state tuition classification? ✓ Yes ____ No
If yes, please answer the following questions. Failure to answer a question may result in your being misclassified. Indicate "none" or "not applicable," if appropriate. Month and year are sufficient for dates more than two years past. In addition to your own information, if you are under 23 years of age on the first day of classes for the term for which you are applying and not married, please give parent or court appointed legal guardian information.

Tuition Classification Information
(Use month/day/year to month/day/year)

| | (If you are 23 or older) YOU | N/A | (If you are under 23) CHECK ONE Parent ___ Guardian | | N/A |
|---|---|---|---|---|---|
| Dates of continuous physical presence in Colorado | 8/3/05 to 3/8/11 | | __/__/__ to __/__/__ | | |
| Dates of employment in Colorado | 3/6/08 to 12/29/08 | ⊘ | __/__/__ to __/__/__ | | ◯ |
| List exact years for which Colorado income tax returns were filed | | ✓ | __/__/__ | | ◯ |
| Dates of extended absences from Colorado of more than two months within the past two years | 12/29/08 to 6/5/02 | ◯ | __/__/__ to __/__/__ | | ◯ |
| Dates of active duty military service, if applicable | 12/29/08 to 6/5/02 | ◯ | __/__/__ to __/__/__ | | ◯ |
| Dates stationed in Colorado | __/__/__ to __/__/__ | ⊘ | __/__/__ to __/__/__ | | ◯ |
| Dates you have had a Colorado driver's license | 12/18/08 to 3/8/11 | | __/__/__ to __/__/__ | | ◯ |
| Current driver's license number | 97-073-0217 | | | | |
| List exact years of Colorado motor vehicle registration | | ✓ | __/__/__ | | ◯ |
| Current license plate number | | | _____ | | ◯ |
| Give state in which you are currently registered to vote | Colorado | ◯ | _____ | | ◯ |
| Dates of Colorado voter registration, if applicable | __/__/__ to __/__/__ | ⊘ | __/__/__ to __/__/__ | | ◯ |
| Dates of ownership of any Colorado residential property that is your primary residence | __/__/__ to __/__/__ | ✓ | __/__/__ to __/__/__ | | ◯ |

## TUITION CLASSIFICATION (continued)

If you are 23 years of age or older, give us your employment information. If not, give us your parent's or guardian's information.

| Employer | Type of Work/Hours Per Week | City | State | From Mo/Yr | To Mo/Yr |
|----------|------------------------------|------|-------|------------|----------|
| Veterans Admin. | Disabled | Denver | Col | 12/03 | current |
| Cd. State | secretary | Denver | Col | 6/97 | current |

## 28. PERSONAL STATEMENT

Please feel free to include on a separate sheet any additional information that you wish to share with us, such as your educational aspirations, travel and work experience, creative talents, factors affecting your academic record, and any other information that might be of use and interest to the admission committee.

## 29. SIGNATURES

Attach the non refundable $50 application fee, in the form of a check or money order made payable to the University of Colorado Denver. Write your name and birth-date on the back of the check or money order. If you are currently attending high school, submit your completed application to the appropriate high school official for review. Request that a copy of your high school transcript be sent with the application.

*I hereby certify that to the best of my knowledge the information furnished on this application is true and complete without evasion or misrepresentation. I understand that, if found to be otherwise, it is sufficient cause for rejection or dismissal. I also understand that if I am classified as a non-resident for tuition purposes, and I have not petitioned for a change in my status by the first day of classes, I will remain classified as a non-resident for the entire semester and must submit a petition to request a change in my status for a future term. Proof of age and proof of local employment or additional information may be required by the Tuition Classification Office.*

Applicant's Signature _____   Date 8 March 2011

Parent/Guardian Signature _____   Date _____
(if applicant is under 18 years of age)

## 30. HIGH SCHOOL OFFICIALS ONLY

1. Please complete the required information below concerning grade point average and rank-in-class (or statement that high school does not rank).

2. Verify the courses in progress.

3. Make sure the application has been signed by the student and parent or guardian (if the student is under 18), and then sign it yourself. Submit the following with the application: a) $50 application fee; b) high school transcript and available test scores; and c) any other information appropriate for admission consideration.

4. Please send the application and all credentials in one complete mailing to the Office of Admissions, University of Colorado Denver, Campus Box 167, P.O. Box 173364, Denver, CO 80217-3364.

Grade point average _____ Is this based on a 4.00 grading scale (4.00=A, 3.00=B, etc.)? _____ Yes _____ No  If not, what type of scale is used? _____

Cumulative rank and class size:   Unweighted ____/____   Weighted ____/____   For how many semesters? _____ For how many quarters? _____

_____ Rank does not include 9th grade _____ Rank includes work taken at another high school _____ By policy of this high school, students are not ranked

(_____) _____   _____   _____   _____   _____
High School Telephone    SAT/ACT Code    Signature of High School Official    Title    Date

_____
E-mail Address of High School Official

**THE UNIVERSITY OF COLORADO DENVER IS
AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION INSTITUTION.**
Alternative formats of this application are available upon request for applicants with disabilities.

CU JORDA

# Disciplinary History

On 3/09/2006, I was in the possession of cocaine, which was found in my pocket after I forgot it was there during a routine traffic stop. Albeit then I believed in moderation, invested in the wrong asset – I make more money legally – and frankly was immature, I now adamently oppose the use of any drug, unless there is a "ligit" medical need. Furthermore I think it is wrong to minimize the abuse of drugs, as witnessed with Michael Jackson, Paris Hilton, Jimmy Hendrix, Anna Nichol Smith, Elvis Presley, and more recently Charlie Sheen. It is a shame how much people die all-over the world from myopia and the need for instant self-gratification. I think the quintessentially sad segment of all this, is it is for nay. These undertakings do nothing to improve mankind.

Science has proven that alcohol is the most dangerous drug because of social use; the accepted pratice of drugs simply dimenishes our society, economic output and overall potential. Prescription drugs are now more widely being abused by patients and physicians then illegal drugs. This is a debilitating component of our society that needs corrected.

CU JORDA

The albeit fact specific question is how. We could bankrupt our state budgets by overflowing prisons; kill 30% of our population – terrible for the economy; invest in more counseling; or my favorite, just make everything legal and lack of moderation illegal. Here is why I support the last suggestion, supply did not create demand demand created supply. There is a large segment of addiction – 30% – rooted in DNA – There goes counseling – therefore a all encompassing solution would have to include genetic engineering, and unfortunately this is not available yet. Given genetics can be overcome, society would more accurately reflect reality – The most mentally capable affluent people with high IQ's would capitalize and continue to experience success. Fortunately I have a IQ of 159. This remedy coupled with abortion would dramatically reduce crime.

While I was in the county for possessing cocaine, on 5/30/2006, I attempted to assault a officer – Where was my IQ then, showing him a receipt for some stamps during a routine shakedown, he took them anyway then asked me to cuff up, I refused due to the whole indignation of the matter, and eventually was taken down. My actions were contrary to what I am willing to die for – After serving the Marine Corps Honorably – everybody deserves peace and welfare, I have

2

to live for and safeguard this, by simply compling with the societal norms I agreed upon.

I am not nor are my crimes Malum In Se- evil in itself, "naturally evil as adjudged by the sense of a civilized community". My crimes are Malum Prohibitum - Wrong because it is prohibited, "made unlawful by statute for the public welfare, but not inherently evil and not involving moral turpitude.①

I will willingly die for my country as most americans, evidenced by my enlistment in the Marines, and I realize I can not stop giving to the world- Forward or backwards, life or death. I was suffering from PTSD (Post Traumatic Stress Disorder), when I ended my military contract. It took me some time to adjust to the civilan world, I now have.

I have since learned the law of nature, that no one has been able to explain, some might call this religon. The name is of no importance. The fact is, if I keep positive thoughts, it works for the glory and success of mankind, when used constructively. On the other hand, if I have negative thoughts, and use them destructively, it will just as readily destroy. In this statement can be found a very significant truth, namely, that those who go down in defeat, and end their lives in poverty, misery, and distress, do so because

3

CU JORDAN_0016

of the negative application of their thoughts.
This is how my crimes came to be. All impulses
of thought have a tendency to clothe
themselves in their physical equivalent. I
assure you the positive clothes I am now
adorned in are very attractive.

 I am deeply remorseful for committing
these crimes. Regardless of how much I have
changed, I will have to face the consequences,
and to a large degree I believe I have. I
have spent five years in prison for these crimes.
I will have these crimes on my record for 10 more
years now, which is why I will understand
if you do not bestow your good graces upon
me and accept my re-admittance, however
I do believe I deserve to be re-admitted.

 I am entirely funded with 2 full rides
to pay for college, a total of eight years. If
you re-admit me I will continue my education
at the University of Colorado-Denver, for at
least 4 years.

<u>Footnote</u>

1. I have to note that neither of my crimes
were violent, I have not stolen anything, I
could never be a sex-offender, and I am foregiven.

4

CU JORDAN_0017

# Personal Essay

I believe in Samuel Adams and Jhon Hancocks vision of this country, largly motivated by their disdain for the King of England and Hamiltons vision of a capitalistic society — Which is motivated by money, supply and demand — the "Invisible Hand". This is why I served the United States Marine Corps Honorably, before being 30 percent disabled during Operation Iraq Freedom, because of massive shoulders like these I now stand on. Despite my willingness to die for this country I realize the true Heroes are the ones who create jobs in our country.

It is common knowledge that the Federal Reserve System primary function is to balence the economy — When its not growing, or cold, lower interest rates to get it growing, and when there is too much inflation, or hot, raise interest rates to take money out of the economy. In other words keep the economy warm. Despite the failure of the financial system the Federal Reserve has done a incredible job. The prospective growth of the economy is 3 - 4 % this year. With that in mind there is a whole lot more we need to do. The World Trade Organization has just found China has no right to impose export

CU JORDAN_0018

restrictions on nine raw materials - This will lead
to rare earth magnets - their attempt to attract
manufacturing under the guise of preventing
pollution. The Department of Commerce and Trade
Commission has just stoped China from buying
a company because of security reasons. These things
are good because we need a tougher trade policy,
after all this is how the rich developed countries
became rich. It is important to note that
eventhough we became rich thru protectionism
and to revert back to it against protectionism would
create that needed necessity, for instance a way
around using earth magnets, we need policies
to attract the best talent, as we have done in the
past. We have to build more infrastructure, out
educate, and innovate the rest of the world,
as indicated in president Obama's State of the
Union address this year.

The Quantitative Easing scheduled to
continue until June, has given banks the capital
to create jobs, especially with these tighter, tougher,
credit standards. China has recently tried to
point the finger at the United States during the
G-2o. Timothy Geithner wisely responded,
"China is fueling its own inflation by holding
down the yuan's value, and its in China's
best interest to let the yuan rise." At this G-2o
meeting China received something it wanted,

2

CU JORDAN_0019

fiscal policy to focus on debt, relative to the exchange rate, and we received something we wanted, guidelines for fiscal policy, relative to the exchange rate, albeit China is still letting the yuan rise to slowly.

The important thing now is that we continue to grow our share of the world. Right now is a turning point in our country. There is no reason China should have fast rail systems and we don't. There is no reason our roads and bridges should be in decay, one of the reasons we are so great

Quantitative Easing is just one tool that will help us increase exports and balance our 39 billon dollar trade deficit with China. I know one sector we should be leading in is energy, especially considering the current oil situation.

China wants to become a consumer based economy like us. They are also looking for a growth spurt to their economy. Imports, specifically our businesses would make their businesses more competitive in the world, as long as we are not letting them steal our Intellectual Property rights this would be good. This is our chance to get a foothold in the world and grow our economy For China to fulfil their aspirations and become a consumer based economy they will need industries, hence they are in their protectionism

3

CU JORDAN_0020

stage.

I know we will continue to assist China along with the rest of the world because we are so interconnected and when businesses are growinging they are innovating, solving problems, creating wealth, and improving the world. I have no doubt that the more successful we are as a country the more freedom will reign as it is now

My purpose has been to make the world a joyful, peaceful and loving place, while improving it. I will do this by innovating and creating assets all over the world.

I have 3 business plans oriented around the, health, financial and real estate sectors. President Barack Obama's new approach towards businesses will help bring them to fluition, and so will the University of Colorado - Denver after re-enrolling me in your business program for accounting and business statistics. You will be incredibly beneficial to my goals and a long life of learning

4

CU JORDAN_0021



# University of Colorado Denver
### Anschutz Medical Campus · Downtown Campus

## Referral for CRIMINAL HISTORY Review

**Applicant Name:** _Chadwick Jordan_

**SID#:** _830 28221_

Referred to Admission Counselor on ___03|25___ , 201 _1_

### Admission Counselor review results:

X_____ Criminal offense satisfactorily explained.  OK to move forward with processing

By _____    _3 /25/201/_
       Admission Counselor       Date

_____ Additional information needed from applicant and request for this entered on ISIS

By _____    __/__/201__
       Admission Counselor       Date

_____ Referred to Criminal History Review Committee

By _____    __/__/201__
       Admission Counselor       Date

10/2010
*Qhoang folder – Admissions Documents – Referral for Criminal History review*

CU JORDAN_0022

# CU DENVER - TRANSFER WEB

## Personal Information

| | |
|---|---|
| First Name | Chadwick |
| Middle Name | Heath |
| Last Name | Jordan |
| Gender (optional) | [X] Male    [] Female |
| Social Security Number | 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 |
| Date of Birth | 06/5/1982 |

**How to Reach You**

| | |
|---|---|
| Email Address | sidewayz8383@gmail.com |
| Home Phone | (720)639-4372 |
| Cell Phone | (303)880-7017 |

## Your Address

**Your Mailing Address**

| | |
|---|---|
| Mailing Address | 4550 E jewell Ave |
| Address Line 2 | Apt. 224 |
| City | Denver |
| State/Province | Colorado |
| ZIP/Postal Code | 80222 |
| Country | United States |
| Is your permanent address the same as above? | [X] Yes    [] No |

## Your Citizenship

Citizenship Type

[X]  U.S. Citizen
[]   Permanent Resident
[]   I Am on or Expecting a Temporary Visa
[]   None of the Above

Please send a copy of your Green Card to admissions@ucdenver.edu.

What is your country of birth? _____

**The following selective service question must be answered to comply with Colorado State law:**

If you are a male between the ages of 17 years and 9 months and 26 years, are you  []  Yes    []  No    [X]  Not Applicable registered with the selective service?

## Military Service

| | |
|---|---|
| Are you - or have you been - a member of the military? | [X] Yes    [] No |
| What is your military status? | Veteran |
| Military Branch | Marines |
| Service Start Date | 12/2000 |
| Service End Date | 06/2015 |

## Ethnicity (Optional)

Are you Hispanic or Latino?          [] Yes          [X] No


[X] Black or African American


## Enrollment Plans

| | | |
|---|---|---|
| In which term do you plan to enroll? | [X] Spring 2015 | [] Summer 2015 | [] Fall 2015 |

Proposed Major                          Economics - BA

Please indicate your preferred housing status:          [] On-Campus Resident          [X] Commuter


## Your Academics

**Please provide information about the high school you attended.**

| | |
|---|---|
| Name | Westminster Senior High School(Ceeb :061440) |
| Address | 6933 Raleigh St |
| City | Westminster |
| State/Province | CO |
| ZIP/Postal Code | 80030-5912 |
| Country | US |
| Secondary School Graduation Date | / |


**Previous College**

Please provide information about any colleges you attended. Include attendance at any campus of the University of Colorado. **Note:** Transcripts from University of Colorado campuses are not required.

| | |
|---|---|
| Name | Community C Denver(Ceeb :004137) |
| Address | |
| City | Denver |
| State/Province | CO |
| ZIP/Postal Code | |
| Country | US |

Dates Attended

| | |
|---|---|
| From | 01/2014 |
| To | / |
| Hours Completed | 350 |
| Degree Earned | |


**Previous College 2**

| | |
|---|---|
| Name | |
| Address | |
| City | |
| State/Province | |
| ZIP/Postal Code | |
| Country | |

Dates Attended

From                              /
To                                /
Hours Completed
Degree Earned

**Previous College 3**
Name
Address
City
State/Province
ZIP/Postal Code
Country

Dates Attended

From                              /
To                                /
Hours Completed
Degree Earned

**Previous College 4**
Name
Address
City
State/Province
ZIP/Postal Code
Country

Dates Attended

From                              /
To                                /
Hours Completed
Degree Earned

**Previous College 5**
Name
Address
City
State/Province
ZIP/Postal Code
Country

Dates Attended

From                              /
To                                /
Hours Completed
Degree Earned

## Your Test Scores

**ACT**

Did you take the ACT? (Results are mandatory only for freshman engineering applicants.)

[ ]    Yes, I have already taken it

[ ]    No, I have not taken it yet.

[X]    No, I will not be taking it

Composite Score _____

**SAT**

Did you take the SAT? (Results are mandatory only for freshman engineering applicants.)

[ ]    Yes, I have already taken it

[ ]    No, I have not taken it yet

[X]    No, I will not be taking it.

Critical Reading Score _____

Math Score _____

Writing Score _____

If you already have a University of Colorado (Boulder, Denver or Colorado Springs) Student ID #, please provide it in the space below.

Former CU Student ID # (if applicable)    830282211

## Your Activities

List all activities and the school years in which you participated in them.

Activity    Football

[ ]    9th Grade

[ ]    10th Grade

[ ]    11th Grade

[X]    12th Grade

## Honors & Awards

List all honors and awards along with the school years in which you received them.

Honor/Award _____

[ ]    9th Grade

[ ]    10th Grade

[ ]    11th Grade

[ ]    12th Grade

## Residency Information

**In-State Tuition Classification**

NOTE: Please make sure you answer the following question correctly. You will be asked to provide proof of Colorado residency if you select "Yes."

If you are seeking the in-state tuition rate, all questions below will need to be completed. The information you provide will be kept confidential and is used solely to determine residency. **Please provide your parent's information, as well, if you are under the age of 23.**

Do you plan to claim Colorado in-state tuition?                [X] Yes            [ ] No

CU JORDAN_0026

**Dates of Continuous Physical Presence in Colorado**

You

From        09/1990

To          /

Your Parent

From        /

To          /

**Colorado Driver's License, Permit or Other State-Related I.D.**
Do you (or your parent, if you're under 23) have a Colorado I D.?          [ ] Yes          [X] No

Date Your I.D. Was Issued          /
Date Your Parent's I.D. Was Issued          /
Was this a renewal of a previous Colorado I.D.?          [ ] Yes          [ ] No

**Colorado Motor Vehicle Registration**
Have you (or your parent, if you're under 23) had a motor vehicle registration?          [X] Yes          [ ] No

You

From        10/2013

To          10/2015

Your Parent

From        /

To          /

**Colorado Voter Registration**
Have you (or your parent, if you're under 23) ever been registered to vote?          [X] Yes          [ ] No
Date of Your Initial Registration          04/2007
Date of Your Parent's Initial Registration          /

**Purchase of Any Colorado Residential Property**
Have you (or your parent, if you're under 23) ever purchased any Colorado residential property?          [ ] Yes          [X] No
Date of Your Purchase          /
Date of Your Parent's Purchase          /

**Employment in Colorado**
Have you (or your parent, if you're under 23) ever been employed?          [X] Yes          [ ] No

You

From        12/2000

To          06/2015

Your Parent

From        /

CU JORDAN_0027

To                              /

**Military Service**
Have you (or your parent, if you're under 23) ever served in the military?          [X] Yes          [] No

(If you have been discharged, please include a copy of your DD214 form with your application.)

You

From            12/2000
To              06/2015

Your Parent

From            /
To              /

**Colorado State Income Taxes Filed**
Have you (or your parent, if you're under 23) filed Colorado state income taxes?          [] Yes          [X] No

You

From            /
To              /

Your Parent

From            /
To              /

**Additional Classification Questions**
If your parents are divorced, which one
lives in Colorado?

Have you had an extended absence from Colorado? (more than one year)          [] Yes          [X] No
Please explain the reason for your absence

**Marital Status**
Are you married?          []  Yes          [X] No
When were you married?          //

## Essay (Optional)

Are you transferring with more than 30 credits?          [] Yes          [X] No

**High School Classes**

In conjunction with your official high school transcript, please fill in the courses and number of years that you took in high school. Do not include courses
that you did not receive credit for or failed

CU JORDAN_0028

## English Classes

This includes communication, composition, debate, speech and literature courses. NOTE: Enter Yearbook and newspaper in the academic electives section below

Class Name        English

Years Taken       1 Year

Class Name

Years Taken

Class Name

Years Taken

Class Name

Years Taken

Class Name

Years Taken

Class Name

Years Taken

## Math Classes

This includes statistics, applied mathematics, accounting and computer science courses with math prerequisites

Class Name        Geometry

Years Taken       1 Semester

Class Name

Years Taken

Class Name

Years Taken

Class Name

Years Taken

Class Name

Years Taken

Class Name

Years Taken

## Natural Science

Unspecified Natural Science With Lab includes anatomy, physiology, botany, ecology, zoology, genetics and other lab sciences.

Unspecified Natural Science Without Lab includes physical science, general science, earth science, astronomy, geology and other non-lab science courses.

| | |
|---|---|
| Class Name | Other Natural Science with Lab |
| Years Taken | 2 Trimesters |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |

## Social Science

This includes U.S. government, economics, sociology, psychology and other social science courses.

| | |
|---|---|
| Class Name | United States History |
| Years Taken | 2 Trimesters |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |
| Class Name | |
| Years Taken | |

## Foreign Language

| Class Name | French |
|---|---|
| Years Taken | 1 Quarter |

| Class Name | Spanish |
|---|---|
| Years Taken | 1 Quarter |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

## Electives Taken

This includes art, music, drama, journalism, yearbook, newspaper and computer science courses.

| Class Name | Art |
|---|---|
| Years Taken | 1 Trimester |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

| Class Name | |
|---|---|
| Years Taken | |

## Almost Finished!

**Wrap things up with these final steps!**

CU JORDAN_0031

Simply answer a few questions below and hit the "Submit Your Application" button  Then you'll be able to:

- Download and print your application packet for your records.
- Send us your official college transcript(s)
- Submit your standardized test scores.
- Pay your $50 application fee.

Remember, once we receive your completed application (including your supporting materials), you'll receive a three-week admission decision!

Have you ever been placed on probation, suspended, expelled or been subject to official disciplinary action   [ ] Yes          [X] No
from any high school or postsecondary institution for any academic misconduct or behavioral misconduct?

If Yes, please complete your application by logging in on a desktop computer using the link we emailed you. You will need to download the Application
Suspension Question Clarification form, fill it out and upload it before submitting your application

Do you have a pending criminal charge OR have you ever been convicted of a crime, made a plea of guilty,   [ ] Yes          [X] No
accepted a deferred judgment, been adjudicated or been required to register as a sex offender?
(Misdemeanor traffic offenses are exempt.) NOTE: You hereby agree to immediately notify the director of
admissions if criminal charges are subsequently brought against you for an offense that occurred prior to the
date you submitted this application. The University of Colorado Denver reserves the right to consider such
charges and take appropriate action, including, but not limited to, denying admission, and if already admitted
and enrolled, summary suspension and/or revocation of admission.

If Yes, please complete your application by logging in on a desktop computer using the link we emailed you. You will need to download the Criminal History
Supplement form, fill it out and upload it before submitting your application

I waive my right to review or access letters and statements of recommendation on my behalf.          [ ] Yes          [X] No
[X]  I hereby certify that, to the best of my knowledge, the information furnished in this application is true and complete. I understand that if found to be
     otherwise, it is sufficient cause for rejection or dismissal. I grant my college permission to release my transcript to CU Denver.

essay_pdf

1

### True Survival

I have been a survivor all of my life.  Surviving implies more than just living, that we are here for inexorable reasons.  Furthermore not all survival is equal, paralleling business and economics the study these businesses.  For instance is prevention the ultimate key to survival, as example, never driving over an improvised explosive device, as opposed to living thorough millions of them?  In the business world we call this risk mitigation, and is quintessential to all surviving organisms.

I often feel a source of bravado; increased testosterone after winning, or surviving near death experiences.  For instance in Iraq, I was hit by a medics Hummer vehicle while I was in my communications Hum-V, which is killing my neck right now. This incidence, like all traumatizing ones, is humbling.  This was a failure of mine, because I believe the fault is always our own, and shows a positive quality of failure-humbling.  So perhaps this is not the best example, how about taking fire from a doped up Jihadist.  The sound of 7.62 mm rounds whizzing by my ear, is a good example this kind of adrenalin that makes me feel "invincible".  This was humbling as well, because people were killed, though only slightly, because I was not one of them.  Beating up on an enemy combatant using hand to hand combat, is the greatest example of a testosterone increase or this feeling.  This is what I am talking about, victory with no loss whatsoever, a high I hope to keep.

I look at people who have never been in combat, car accidents, or risked anything let alone their physical health, and wonder are they the real survivors.  The truth is they are.  If I had immaculate Health, which I don't, after risking my life many times over, my goal is still the same as the individual not taking any risk at all, which is still, immaculate health.  The question is does the risk justify the reward?  Now, I'm sure you can think of plenty scenarios in this regard.

CU JORDAN_0033

essay_pdf

2

Those who practice prevention are the real survivors, for the fact the odds favor their goal of great health; the health reward outweighs this risk. Multiply this fact if you have someone else to take the risk. Proving the quote, "whoever is engaged in war loses," the winner just losses less, less life that is. This is true of all risk, including economic and financial. It just so happens there reward outweighs there risk, or the system (capitalism) would collapse. This is what all politicians, economists, entrepreneurs and the rest us rudimentarily grapple with, risk verse reward.

Well is, "The greater the risk the grater the reward," true then? For the most part, the old adage is true. High risk has the potential for high return. Playing it safe will almost guarantee that you will keep what you have but with little more to show for it. War bears great risk and great reward. However, the risk are born by the few, yet the reward shared by all. I have learned in economics that there are many nuances and intricacies like this, leaving no definite answers because everything extensively based on emotion.

On a weighted scale, I devised a decision purifier, using the following values: glory=1, money=2, success=3, and health=4. Certain decisions became easier to make. Perhaps, if you take a moment and use these values as I did, you will understand my selection of the economist verse the marine, on the other end of this spectrum. Most people probably have not taken the time to realize economist, save more lives, prevent more wars and mitigate these risk more than any other occupation. I do wear my scares and bruise as a reminder of my prior, still critical, occupation as a marine.

The greatest reward of surviving tough situations that are enormously risky, is to know more about yourself. This is powerful knowledge for anyone. Studies have shown the most effective way we learn is thorough failure. I will explain mitigating the risk of terminating all

CU JORDAN_0034

essay_pdf

3

risk, for now, I have just explained why, " What doesn't kill you makes you stronger."    It would
be divine to learn without failing-the painful emotions and occasional physical trauma that
follows. This is my work and what I hope to achieve. Could you imagine reading someone's
biography and then learning their lessons? This would be no doubt be a superb person.

The economist is in the greatest position, I would argue the most important as well. As
an economist I prevent wars; loss for everyone, and if we are at war, I make sure we lose less.
These tasks are achieved by building wealth, a bigger share of the world's wealth and helping
others share in this prosperity. In other words, the more value in money we have, the more likely
we will not go to war, win if we do, and the happier and more peaceful we all will be after
sharing in this prosperity. This is a great responsibility us economist have.

As a self-proclaimed prevention expert, in such a valued position as an economist, I am
going to make my success, yours and powerful. Through the years, great wealth has proven
detrimental to civilizations. For instance Egypt, after thousands of years of great wealth and
peace, decided to reduce its military and was soon overrun by Persia. Thankfully, capitalism;
"war with more purpose then death," leaves us with plenty of failures to learn from.
Nevertheless, I am going to put greater emphasize on competition, learning from others and our
history, in my philosophy. This is where the adage, " He who does not know his history is
doomed repeat it, originates from. Which translates into a greater emphasis on certain basic
principles, in economics. Through sound economics we as a civilization will survive.

CU JORDAN_0035

Kristin Kushmider - Friday April 1. 2016 at 3:30pm
Last edited Thursday May 12, 2016 at 9:14am

The following information was shared by Veteran Student Services:

Hi Denise,

I wanted to introduce you to Dr. Kristin Kushmider - Dean of Students here at the University.
She has been the primary contact in Mr. Jordan's case and will continue to be the main contact
moving forward. Please feel free to contact Dr. Kushmider if you have any concerns or
comments. Hopefully we can work together to make Mr. Jordan successful here at the
University. Thanks, and have a great weekend.

Dr. Kristin Kushmider
Dean of Students – Office of Case Management
303.724.8488

Denise Kupcho
Vocational Rehabilitation Counselor – Vocational Rehabilitation & Employment – Department
of Veteran Affairs
303.914.5544
denise.kupcho@va.gov

Respectfully,

Patrick Browne | Director
CARE Action: Information Gathering Uncategorized

Kristin Kushmider - Tuesday March 15, 2016 at 4:32pm

KDK reviewed social media history. Nothing concerning noted.

Kristin Kushmider - Friday March 11, 2016 at 4:30pm
Last edited Thursday May 12, 2016 at 9:12am

The following email exchange was received and forwarded by Sarah Fields:

Just an FYI. I will send no response.

Sent from my iPhone.

Begin forwarded message:

: Chadwick Jordan
Date: March 11, 2016 at 3:55:10 PM MST
To: "Fields.Sarah"
Subject: Re: Withdrawal

I will discuss this with Dr Kushmider since she has notified my teachers that me missing classes
is out of my control and I will have an opportunity to make up my classes. This is inconsistent
with what you just said. How about you ask her when I can make up my classes and since this is
out of my control, what will be done so I can withdraw. More importantly so I can transfer my
grades. This might help avoid some legal action which I will enjoy. This is a letter of intent to
sue if my GPA and or grades are tarnished due to circumstances out of my control; reducing my
status as a transfer student to another University.
--
Sent from my Android phone with mail.com Mail. Please excuse my brevity.

"Fields. Sarah" wrote:
I have just learned as long as you are under suspension you cannot withdraw from classes. This
is something to discuss with the dean of students.

Sent from Outlook Mobile
☐
Hold Placed Uncategorized

David Steward - Friday March 11, 2016 at 1:56pm
----------------------------------------------------------------
Hold placed until completion of the conduct process.


Kristin Kushmider - Friday March 11, 2016 at 1:38pm
----------------------------------------------------------------
KDK spoke with Sarah Fields. Chadwick is requesting information about the committee who
reviewed his request for a retro active withdrawal.
                                   , he continues to state he is on academic probation (which he is
not) and he is claiming there is a committee monitoring his probationary status (which there is
not) and he didn't seem to understand.
☐
Collatoral Data Sent Uncategorized

David Steward - Friday March 11, 2016 at 10:19am

----------------------------------------------------------------


Kristin Kushmider - Wednesday March 9, 2016 at 4:38pm
----------------------------------------------------------------

CU JORDAN_0037

KDK sent the student the following information:

Dear Mr. Jordan.

Thank you for talking with me on Tuesday. I appreciate your patience as I work to address your questions. Per our conversation I would like to respond to the questions you have. First. you had inquired about receiving a tuition refund. I am inclined to provide this to you should the suspension decision be upheld. Secondly. you had asked for an additional hearing. that would be your appeal request which I would be happy to schedule a meeting with you in person to discuss your appeal once it is submitted. During our meeting I will gladly present to you the documentation you had requested which includes your ability to review a copy of your most recent application to the University and an opportunity to review the criminal background history that the University accessed from the Colorado Bureau of Investigation which will show no juvenile records were obtained. Additionally you had requested a copy of our Student Conduct policies and procedures which I have attached here. in an attempt to address your specific concerns I have highlighted information in the code that may be useful to you.

Your request for additional time for your appeal has been granted. I will allow you an additional 5 business days to gather whatever information you deem pertinent to the appeal process therefore your written appeal is due no later than 5 PM on March 16th. Guidelines for an appeal can be found on page 12 of the Student Code of Conduct (attached).

Furthermore, you had inquired about participating in on-line classes and accessing your transcripts. please review the description on disciplinary suspension on page 11 of the code. students suspended from the university may not attend or participate in any course work at the university. Additionally. after review of your account the pending holds do not pertain to the conduct process you will need to contact those related offices to have the hold removed (i.e. Immunization holds are not managed by our office) . Registration holds will be placed on your account after your appeal process is complete if the suspension decision is upheld.

I believe I have addressed all of the questions we discussed on Tuesday. I look forward to receiving and reviewing your appeal and scheduling a time to meet with you. If you have additional questions please let me know.
Information gathering Uncategorized

Kristin Kushmider - Tuesday March 8. 2016 at 12:39pm
Last edited Wednesday March 9. 2016 at 4:39pm

KDK and DKS met with a representative from the Ombuds Office who had a release from Chadwick to speak with us about his concerns about the conduct process and his appeal. It was also shared there were concerns for him being escalated about the suspension.

Phone conversation with Sarah Fields Uncategorized

David Steward - Tuesday March 8. 2016 at 11:00am
Last edited Wednesday March 9. 2016 at 8:09am

CU JORDAN_0038

Sarah Fields called and wanted to double check [illegible] request to change a classroom due to      fear of retaliation from Chadwick. DKS confirmed the case. Dr. Fields asked if indeed the student was suspended and DKS confirmed that but did add that the appeal deadline was still open and if he appealed the decision could be a week or two. She requested that we notify her in suspensions of CLAS students.
Appeal Request Uncategorized

Kristin Kushmider - Tuesday March 8, 2016 at 10:37am
Last edited Wednesday March 9, 2016 at 4:37pm

KDK spoke with Chadwick by phone. he had several questions and concerns about the conduct process. Chadwick wanted to know if he would receive a tuition refund for the semester. if he could access transcripts to attend another school. if he could take on-line courses. if he could access his application for admission. how long were applications for admission good for. can he receive copies of the policies and procedures for student conduct. could he receive a copy of the threat report from PD. could he have another hearing. could he get an extension on his appeal. why wasn't his criminal history reviewed prior to his attendance.

His request to receive a copy of the threat report from PD was denied by AHEC police chief. he also stated he provided documentation of his criminal history to an academic committee with the university and disclosed it on his original 2006 application. The student also stated repeatedly that he had juvenile cases that were the foundation for the conduct decision and these juvenile records should not have been accessible to the University (note: records are public records obtain through CBI).

Faculty Update Uncategorized

David Steward - Monday March 7, 2016 at 8:35am

DKS sent the following email to              to update      on the status of the case.

I wanted to update you on the status of the conduct case with Chadwick. I met with Chadwick to discuss his case last week on Tuesday and then met with him Friday to discuss the decision reached in the case. He has been suspended from CU Denver through the Summer 2017 semester and is able to return for Fall 2017 if he satisfactorily completes a Forensic Threat Assessment with a nationally recognized expert on threat assessments. Being out for that many semesters he will need to reapply for admission. He does have the ability to appeal my decision and I believe he will do so. His deadline is this Friday and I will keep you informed on what happens with the appeal. He is still banned from campus.
Dave

David Steward

Conduct Decision Meeting Uncategorized

David Steward - Friday March 4, 2016 at 3:00pm
Last edited Monday March 7, 2016 at 8:22am

DKS met with Chadwick with Detective Justin V of the Auraria PD. DKS described the factors which influenced his decision and relayed the decision was that he was not responsible for disrupting class, there was not decision on whether he made threats, and he was responsible for providing false information on his two applications to CU Denver. When Chadwick tried to debate the false information issue DKS redirected him that the purpose of the meeting was to communicate the decision. DKS also reviewed the sanctions given and that an appeal was his way to contest the decision and the appeal deadline is March 11, 2016. DKS then provided Chadwick with a written letter with all the information just discussed and quickly walked him through the letter. At the completion of the meeting Chadwick requested to meet with KK immediately but she was in a meeting so Chadwick stopped at the front desk and scheduled an appointment.

Schedule a decision meeting Uncategorized

David Steward - Friday March 4, 2016 at 9:58am

DKS reached Chadwick via phone at 720-273-9741 and was able to schedule a meeting to discuss the decision and sanctions at 3 PM on Friday, March 4, 2016.

Attempts to contact Uncategorized

David Steward - Thursday March 3, 2016 at 3:30pm
Last edited Friday March 4, 2016 at 9:56am

Starting at approximately 8:00 AM DKS began sending emails to Chadwick's official CU Denver email account and calling phone numbers 720-503-8111 and 303-286-1997 in an attempt to let Chadwick know that a meeting had been established at 3 PM to discuss the decision made in this case. DKS attempted via email three times and attempted via phone four times to reach Chadwick but was unable to reach him.

Conduct Conference Notes Uncategorized

David Steward - Tuesday March 1, 2016 at 3:05pm

Chadwick made an initial statement that he would do what he had to do to stay in school.
- is a business major with a focus in accounting.

Chadwick stated that he is an emotional person and speaks via his emotions.

Chadwick stated that he probably made the statements but did not intend to make threats. It was the teachers fault to interpret them as threats due do his racist feelings.

Chadwick said it was not against the law to use words. it is just a civil issue.

Discussion was about discussing an assignment.
- Statement was about trying to be friends.
- Chadwick was trying to be intellectual.

Chadwick said that there was nothing to be scared of
- discussion was about the assignment
- watched a movie about zombies and reacted to how movies such as this impact society.

When asked how he was doing in class Chadwick stated he had a A.
- When told the teacher was fearful of informing him he was failing he dismissed the fear saying it was unfounded.

When asked about his applications he said there were just two offenses.
- the two in 2000 he stated he was a juvenile (he was 18 years 3 months old)
- he said of the remaining 4 that the two in 2003 were run concurrently with the 2006 cases.

· Chadwick began to escalate with anger and after attempts to deescalate DKS ended the meeting.

DKS stated that he needed time to process and be mindful about a decision and would send an email by Thursday and that Chadwick was still interim suspended until the decision was made.

` Chadwick stated that we wanted to meet immediately with KK but she was in a meeting and could not meet. He said he would call.
Faculty notification Uncategorized

David Steward - Monday February 29, 2016 at 1:45pm

DKS informed all faculty of Chadwick's absence from class the week of February 29 via email and called *David Renof* to inform him that Chadwick had been interim suspended pending the meeting on Friday. March 4.
Interim Suspension Meeting Uncategorized

David Steward - Monday February 29, 2016 at 11:00am
Last edited Monday February 29, 2016 at 1:43pm

DKS tried to find Chadwick at his Monday 9:30 class but Chadwick did not attend that class. DKS did meet up with Chadwick at his Monday 11:00 class and discussed the charges against him as well as informing him of his interim suspension. Chadwick was informed he was not to

be on campus until our meeting on Friday, March 4. DKS also informed him that when he did
come on campus he must call Auraria PD dispatch to be escorted onto campus.

Outreach to Instructor Uncategorized

David Steward - Friday February 26, 2016 at 3:49pm

KK sent an email to the instructor informing ∧ of what action was being taken and to contact
DKS if he had any questions.

called DKS immediately after receiving the email and DKS stated that the student
would be interim suspended and described the conduct process which would follow. DKS also
discussed the procedure if the student would retaliate in any way.

March 4, 2016

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2015039201

Chadwick,

I sent you an email yesterday with the following information and did not hear back from you:

*I am ready to communicate my decision and the sanctions and would like to meet with you today but am limited. Can we meet at 3:00 PM today. If you want or need to meet earlier I can make that work but would need to do some adjusting in my schedule  Let me know what is best for you.*

Please contact me ASAP via phone at 303-556-3682 or via email at david.steward@ucdenver.edu to schedule a time to discuss the decision in this case.

Thanks so much!

David Steward
Student Conduct and Community Standards PO Box 173364, Campus Box 184 | Denver, CO 80217-3364
(o) 303-556-3682,. (f) 303-352-3751,. (e) david.steward@ucdenver.edu

CU JORDAN  0043

University of Colorado
Denver

Office of Student Conduct and Community Standards

Campus Box 196
P O Box 173364 | Denver, CO 80217-3364
o 303 556 2444 | f 303 352 3751
ucdenver edu/standards

March 8, 2016

Chadwick Jordan
1630 Pennsylvania St., Apt 21
Denver, CO 80203

PERSONAL AND CONFIDENTIAL

Regarding Case Number. 2015039201

Dear Chadwick.

This is a follow-up to our conference on March 1, 2016 regarding alleged violations of the
Student Conduct Code, as outlined in your Conference Letter.

Chadwick your conduct came to the attention of my office when a faculty member indicated
they were concerned about allegedly threatening statements. As part of our routine and
regular practice, we double checked your criminal history background. What we discovered
was an extensive criminal history. This extensive criminal background was not fully
disclosed on any application you made to the University in 2011 or 2014. It is clear to me
that all six of the guilty findings are significant even though you stated that the first two from
2000 were while you were a juvenile; they were in fact while you were an adult (18 years of
age). The University takes matters of failing to be completely open and honest on
applications for admission very seriously.

I am also concerned about the statement you made to your faculty and the context in which
it was made. Even when we discussed the statement, you wavered in describing the context
in which the statement was made. At first you described the conversation at that point to be
in a friendly relationship building context and then a few minutes later described the
statement as a discussion aimed specifically at the assignment related to watching a zombie
movie and the describing the impact such movies have on society. In our discussion it was
clear to me that you were unable to see another individual's perspective that such a
statement could be interpreted as threating and went on to say the other individual was at
fault for their perception. As I have considered and reviewed our meeting I believe that the
statement you made could have had the intent of being a threat.

Based on our meeting and the written documentation, and using a preponderance of the
evidence standard, I have made the following determination regarding the alleged violations
outlined in your original conference letter:

(9) Interference, obstruction, or Disruption of University Activity -- Not Responsible
Materially and substantially interfering with, obstructing, or disrupting a university activity. a.
University activities include, but are not limited to, all normal university activities, such as
teaching, research, recreation, meetings, public events, and disciplinary proceedings. b.
This prohibition includes, but is not limited to, the following: behavior disruptive of university
functions; Behavior resulting in injury to persons or damage to property on the campus; and
interference, obstruction, or disruption of the freedom of movement of students, or other
members of the university community and their guests. Interference in any manner with the
public or private rights of citizens, Behavior that threatens or endangers the health or safety

CU JORDAN_0044

of any person, and damage to property are prohibited.

(2) Threats -- No Decision
Threatening or endangering the mental and/or physical health or safety of a person.

(12) Knowingly Providing False Information -- Responsible
The use of false identification or the identification of another person to gain entrance to a facility or business is prohibited. This also includes forging, altering, falsifying or misusing documents or records, or knowingly using/possessing forged, altered or false documents or records.

You have been sanctioned as follows:
**Disciplinary Suspension**
As a result of this incident you are being suspended from the University of Colorado Denver beginning February 29, 2016 and lasting through August 1, 2017. Suspension means that you are not eligible to enroll in any courses including online courses at any of the University of Colorado campuses. You will be eligible to return to the university upon completion of all other sanctions beginning August 1, 2017.

**Forensic Threat Assessment**
Please make an appointment with Nicoletti-Flater Associates, PLLP for a forensic threat assessment, by THIS FIELD IS EMPTY. A forensic threat assessment focuses on determining the likelihood of a threat leading to actual violence. These results will be shared with the CARE TEAM/David Steward. University of Colorado Denver will pay for all costs associated with this assessment. If you fail to cooperate with this request or do not attend your scheduled appointment, there may be additional consequences.

**Auraria Campus Ban**
As a result of this incident you have been suspended from the Auraria Campus beginning February 29, 2016 and ending August 1, 2017. This means that you are not eligible to be anywhere on the Auraria Campus  A hold has been placed on your account. As a result of this suspension you are not eligible to enroll at any of the Auraria institutions including CU Denver, Metropolitan State University of Denver or the Community of College of Denver. If you are seen anywhere on the Auraria Campus during the period of your suspension, the police will be notified and you may be subject to additional Student Conduct or Criminal action.

**Follow-Up Meeting**
When you have completed your suspension and all other sanctions please contact the Student Conduct and Community Standards office to schedule a follow-up meeting. The purpose of this meeting is to review the Forensic Threat Assessment results as well as discussing support mechanisms for moving forward.

Please understand that completion of these sanctions is your responsibility. Failure to complete these sanctions will result in further judicial action, specifically a hold being placed on your records and a stop on your registration.

If you have been given a sanction of probation with loss of good standing or higher, you have the right to appeal this decision. Such an appeal must be made in writing and submitted via the Student Conduct and Community Standards website,

www.ucdenver.edu/standards. This appeal must be submitted no later than March 15, 2016. More information about the appeals process can be found on our webpage www.ucdenver.edu/csw.

It is my hope that you will have a positive experience while a student here at the University of Colorado. The faculty and staff will continue to support your positive contributions to the university learning/living environment. If you have any questions, please do not hesitate to contact me.

Sincerely,


David Steward
Assistant Director of Student Conduct and Community Standards

CU JORDAN 0046


University of Colorado
Denver

Office of Student Conduct and Community Standards

Campus Box 196
P.O. Box 173364 | Denver, CO 80217-3364
o 303 556 2444 | f 303 352 3751
ucdenver.edu/standards

February 26, 2016

Chadwick Jordan

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2015039201

Dear Mr. Jordan,

I have received a report, dated February 25, 2016 that indicates you may have violated the Student Conduct Code. Based on the severity of the report, I am assigning an interim suspension to you from the University of Colorado Denver and excluding you from the Auraria Campus.

This suspension includes an immediate exclusion from the Auraria Campus. You are not to be on any of the CU Denver, Metropolitan State University of Denver, or Community College of Denver campuses, including attending any scheduled classes, other than to attend your scheduled meeting with our office to discuss these allegations. Violation of these restrictions may result in additional student conduct action and/or arrest. This suspension will remain in effect until such a time as your case is heard by the Office of Student Conduct and Community Standards.

According to the information I have received, you allegedly exhibited disruptive classroom behavior, made threats to one or more people, and provided false information on your admissions applications. This alleged behavior may be in violation of the following standards.

**(9) Interference, obstruction, or Disruption of University Activity**
Materially and substantially interfering with, obstructing, or disrupting a university activity. a. University activities include, but are not limited to, all normal university activities, such as teaching, research, recreation, meetings, public events, and disciplinary proceedings. b. This prohibition includes, but is not limited to, the following: behavior disruptive of university functions; Behavior resulting in injury to persons or damage to property on the campus; and interference, obstruction, or disruption of the freedom of movement of students, or other members of the university community and their guests. Interference in any manner with the public or private rights of citizens. Behavior that threatens or endangers the health or safety of any person, and damage to property are prohibited.

**(2) Threats**
Threatening or endangering the mental and/or physical health or safety of a person.

**(12) Knowingly Providing False Information**
The use of false identification or the identification of another person to gain entrance to a facility or business is prohibited. This also includes forging, altering, falsifying or misusing documents or records, or knowingly using/possessing forged, altered or false documents or records.

Admission to the University carries with it the assumption that students will be responsible members of our community. When you chose to enroll at the University of Colorado Denver, you assumed the responsibility to uphold standards of conduct appropriate to the academic and community goals set by the University.

You will need to schedule a conference with me to discuss these charges as soon as possible. Once

CU JORDAN_0047

scheduled the conference will take place in the Tivoli Student Union, Room 227. The purpose of this conference is to discuss your responsibility for this incident and to determine the next steps in the student conduct process. At the time of the conference you may bring written accounts from any witnesses present during the alleged incident, as well as your own account. You may also bring an advisor with you if you wish. I suggest that you refer to the Student Conduct Polices and Procedures at http://www.ucdenver.edu/standards for more information about your rights and responsibilities.

Your attendance at this conference is important. If you do not attend the conference I will review the written documentation and render a decision without your input. If you are unable to attend this conference due to a reasonable conflict, academic or otherwise, you must contact me no later than twenty-four hours prior to your conference to request a new appointment.

Please remember that until the time of our meeting you are not allowed on the campus. If you have any questions please do not hesitate to contact our office at 303-556-3682. I look forward to meeting with you to resolve this situation.

Sincerely,



David Steward
Director Student Conduct and Community Standards
University of Colorado Denver



University of Colorado
Denver | Anschutz Medical Campus

Dean of Students Office
Student Affairs
Campus Box 184
P.O. Box # 173364 | Denver, CO 80217-3364
o 303 556-2444 | f 303 352 3751 | DeanofStudents@ucdenver.edu
ucdenver.edu/DOS

March 25, 2016

Chadwick Jordan
1630 Pennsylvania St Apt 21
Denver, CO 80203

Dear Chadwick,

This letter is in follow up to our meeting on March 21st, in regards to your appeal of the student
conduct decision and sanctions issued to you as a result of your conduct meeting on March 1st.
Based on all of the information available to me and based on our conversation I am modifying your
sanctions.

You were found **responsible** for (12) *knowingly providing false information. the use of false
identification or the identification of another person to gain entrance to a facility or business is
prohibited. This also includes forging. altering. falsifying or misusing documents or records, or
knowingly using/possessing forged, altered or false documents or records*. Your sanction for this
finding was suspension  You failed to disclose on your application for admission submitted in 2014
that you did have a criminal history.

Based on your application for a retroactive withdrawal dated 5/9/14, you did provide some
documentation of your criminal charges and incarceration period to the CLAS Academic Standards
Committee. Although this was not provided on the original application, you did try to provide it at a
later date.  Technically this is still a violation, however, I recognize your efforts as an attempt to
mitigate.  Therefore, I am changing your sanction of suspension to a sanction of **General
Disciplinary Probation** through August 1, 2017. *General Disciplinary Probation is for a designated
period of time during which you are required to show appropriate changes in attitude and behavior.
Specific sanctions or restrictions may be imposed as a part of this sanction but do not result in loss of
good standing with the university. A violation of the terms of general disciplinary probation, or
subsequent misconduct after discipline, is grounds for further disciplinary action, including loss of
good standing. suspension, or expulsion. Disciplinary probation is separate from academic probation.*

Additionally, **"no decision"** could be determined regarding allegedly (2) *threatening behavior.* In our
meeting together you indicated you were not responsible for how others perceived your words, and
that you do not have an obligation to be nice to everyone. We also discussed the nature of an
educational environment and that different expectations for behavior exist in a culture of academia
You were sanctioned to participate in a **Forensic Threat Assessment** and requested this sanction
be eliminated

CU JORDAN_0049



University of Colorado
Denver | Anschutz Medical Campus

Dean of Students Office
Student Affairs
Campus Box 184
P.O. Box # 173364 | Denver, CO 80217-3364
o 303 556-2444 | f 303 352 3751 | DeanofStudents@ucdenver.edu
ucdenver.edu/DOS

Based on our conversation and your disclosure of personal psychiatric notes which support your ongoing treatment with the VA I would still like additional information regarding any potential risk to your safety or the safety of others, as well as recommendations we may gather from an outside assessment that would assist me in supporting your success as a student here at CU Denver. You have agreed to participate in an assessment with Nicoletti-Flater Associates on March 28th, failure to complete this assessment by April 15th will result in a hold being placed on your registration  I thank you for your willingness to engage in this assessment process.

Furthermore, you were also issued an **Auraria Campus Ban**, given your new disciplinary status as on probation this ban has been lifted and you may return to campus. However, I am issuing a **No contact order** preventing you from having any contact with Professor David Keener. You are to have no contact with Professor Keener for any reason  This includes contact by phone, voicemail, email, text messages, internet, or contact through any third party  Any contact with Professor Keener will be considered a violation of the CU Denver Student Code of Conduct and may lead to additional disciplinary action.

Finally, given the amount of time that has passed since you were interim suspended you have requested to be withdrawn from your classes and have your tuition refunded  I will grant this request  Please be advised that as a veteran student you may not directly receive the refund it will likely be returned to Vocational Rehabilitation. Please consult with our Veteran Student Services Office if you have questions

Chadwick, I know this has been a frustrating and challenging time  I sincerely appreciated the time you took out of your day to meet with me and to share some of your personal experiences and philosophies  I hope we are able to continue to engage in future discussions and that you see me as a resource on campus who is here to assist you in being a successful student

Sincerely,

Kristin D.Kushmider, PhD
Dean of Students
University of Colorado Denver

Cc  David Steward,

 University of Colorado
Denver | Anschutz Medical Campus

CU Denver Student Conduct Appeal
Submitted on March 16, 2016 at 4:24:02 pm MDT

Type:                    **Appeal**
Urgency:                 **Normal**

Incident Date·
Incident Time
Incident Location·       **On Campus**

<u>Reported by</u>

Name.          **(Authenticated as jordchad)**
Title:
Email:
Phone·
Address:

<u>Your Information</u>

**Chadwick Jordan (830282211)**          cjllc@post com          7202739741

<u>Appeal Grounds & Rationale</u>

Case Number
**2015039201**

As outlined in Section G.G. of the Code of Student Conduct;
A student may only appeal if they have received a sanction including probation with loss of good standing, housing termination, suspension, or expulsion   A decision reached by a Conduct Officer may be appealed to an Appeal Officer by either the Respondent(s) or Complainant(s). For an appeal to be considered it must meet at least one of the criteria listed below.
Reason for Appeal:
a. To determine whether the conference was conducted fairly in light of the charges and information presented, and in conformity with proscribed procedures giving both the Respondent and complaining parties the opportunity to prepare and present relevant information to be considered in the determination of an appropriate outcome. Minor deviations from designated procedures will not be a basis for sustaining an appeal unless there is a demonstrable adverse effect on the outcome of the conference., b. To determine whether the sanctions(s) imposed were appropriate for the violation of the Student Code of Conduct which the student was found to have committed., c. To consider new information, sufficient to alter the decision or other relevant facts not brought out in the original conference, because such information and/or facts were not known to the person appealing at the time of the original conference.  This does not include information that was known at the time of the conference but was not shared.

The appeal process is a written process, you will not be granted an in person meeting with the Appeal Officer to further discuss this case or your appeal   Please provide a rationale, details, and specifics for each "grounds" box checked above here.
Attention: Kristin Kushmider
Re: 2015039201
Appeal
David Steward failed to prove under the preponderance of evidence standard that I knowingly provided false information. In fact, I had to go down to the Colorado bureau of Investigation and update my criminal background. So the criminal background David Steward used was not correct.  The updated information states in exhibit (A), the official court document, my sentences were suspended by my attorney while I was serving this country in the military 16 years ago, in Integrated Online Network Report, which I may provide! Coupled with the fact that I sustained Traumatic Brain Injury and Post Traumatic Stress Disorder, as listed in exhibit(C) after these two misdemeanors and the lengthy date elapse in time I did not know I provided false information.

The former covers two of the guilty findings in my CBI report, and the other two; "four," were in fact dealt sufficiently by my already. The two crimes I listed in my 2011 and 2014 applications, exhibit (D) 1 and (2) are in fact the only official court documents pertaining to exhibit (F). Look at the Judges signatures. There is nothing false here let alone anything I knew were false. This is because as highlighted in exhibit (F) they ran concurrent to the two crimes in exhibit(D). Therefore, the only official document here is exhibit(D), in legal terms and technically all four crimes are represented in exhibit (D). I did not know I had to provide unofficial information, the type found in secondary accounts like the Colorado Bureau of investigations background report. Therefore, I did not "knowingly provide any false information.

I request the forensic threat assessment sanction be eliminated, since I do not have access to the threat assessment made against me as illustrated in exhibit (G) and because the allegations are obviously not within David Stewards abilities in the first place, nor authority, I will explain in a later paragraph. Furthermore, I have PTSD and Traumatic Brain Injury, diagnosed by a team of psychologist, with ongoing treatment-they know me better than anyone could" who will support my findings that I did not threaten any one, highlighted in exhibit (H)(2) and exhibit (H)(3).

Since this is my first issue at the campus at the very least I request my suspension be eliminated; or overturned in light of the fact 33% of black males have these type of backgrounds due to the political recognition of a racist; or biased judicial system. I do not believe I would have been accused of a threat nor my background of been an issue if I were not of African American; black skin color. And consider the Col. State Gov't Affirmative Action Plan, and Policy 10A: Discrimination/Affirmative Action--General Policy Statement and Long-Range Goals, as this is a text book example, with uttermost pertinence to said case. I ask that you uphold the Mission, Vision and Values of the University of Colorado Denver  Anschutz Medical Campus and dismiss and or overturn these allegations.

I  also request I be withdrawn from my classes due to the fact these circumstances are out of my control and the academic committee, as illustrated in exhibit (I), failed to abide by  article 9; and report these crimes, causing me to move well past my withdrawal deadline after I submitted them all official court documents of my crimes-Exhibit (D), except the two misdemeanors that happened 16 years ago, with the updated information of the suspended sentence, while I was serving this country, and unfortunately occurring before my Traumatic Brain Injury and PTSD.

Also, may you take into consideration I am one of the very few black males attending this university, my Traumatic Brain Injury and Post Traumatic Stress Disorder, my intent to sue David Keener, a English teacher, because judgements are to be based solely on factors demonstrable to performance and expectations as a student, rather, he judged me on whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies, when he filed a threat assessment against me that was false, misleading, slanderous, and quite frankly a flat out lie.  His motivations are unknown. This is a clear case of discrimination.  A police report was filed and an Internal Affairs report.  I requested that he be laid off; and or suspended. Furthermore, I was not responsible for a threat.  I request you find me not responsible for any violations of rule (12) and (2) of the student conduct code.

According to exhibit (J), the University of Colorado-Denver, background disclosure and Authorization background checks are pursuant to the Fair Credit Reporting Act, which states no background check is to go back any further then 7 years.  All of my crimes are past 7 years, rendering them obtained in violation of disclosure this disclosure authorization. For this I render them stricken from the record.  Hire Right, Inc. does not go back further then 7 years; as the professional world in general, due to the Fair Credit Reporting Act. Furthermore, this document clearly states the nature and scope of "any" investigative consumer reports that may be requested, which was violated by the Central Bureau of Investigation background check, of David Steward. I have reported him to Internal Investigations for the aforementioned violation.

Article 10: Nondiscrimination

The University of Colorado does not discriminate on the basis of race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation, or political philosophy in admission and access to, and treatment and employment in, its educational programs and activities. The university takes action to increase ethnic, cultural, and gender diversity, to employ qualified disabled individuals, and to provide equal opportunity to all students and employees.

Qualification for the position and institutional need shall be the sole bases for hiring employees, and the

criteria for retaining employees shall be related to performance evaluation, assessment of institutional need, fiscal constraints, and/or, in the case of university staff, the rational exercise of administrative prerogative.

All students shall have the same fundamental rights to equal respect, due process, and judgment of them based solely on factors demonstrably related to performance and expectations as students. All students share equally the obligations to perform their duties and exercise judgments of others in accordance with the basic standards of fairness, equity, and inquiry that should always guide education.

History: Amended November 8, 2001; September 17, 2013; April 17, 2015, November 6, 2015

The term "officer and exempt professional" was replaced with the term "university staff" effective April 17, 2015.
I was not judged by David Keener based solely on factors demonstrable to performance and expectations as a student, rather, he judged me whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies. Once again I have reported his actions.

Sincerely,
Chadwick Jordan
PH: 720-273-9741
Email: cjllc@post.com

Attachments

exhibita.pdf
exhibitc.html
exhibitd1.pdf
exhibitd2.pdf
exhibitf.pdf
exhibitg.pdf
exhibith1.pdf
exhibith2.pdf
exhibith3.pdf
exhibiti.html
exhibitj.pdf
finalappeal.docx

*Pending IR #00000825*
*Submitted from 73.153.10.121 and routed to David Steward (Assistant Director of Student Conduct and Community Standards)*

 University of Colorado
Denver | Anschutz Medical Campus

CU Denver Student Conduct Appeal
Submitted on March 16, 2016 at 4.12:20 pm MDT

Type:                    **Appeal**
Urgency.                 **Normal**

Incident Date·
Incident Time.
Incident Location:       **On Campus**

<u>Reported by</u>

Name:             **(Authenticated as jordchad)**
Title:
Email:
Phone·
Address

<u>Your Information</u>

**Chadwick Jordan (830282211)**              cjllc@post.com              720-273-9741

<u>Appeal Grounds & Rationale</u>

Case Number
**2015039201**

As outlined in Section G G. of the Code of Student Conduct;
A student may only appeal if they have received a sanction including probation with loss of good standing, housing
termination, suspension, or expulsion.  A decision reached by a Conduct Officer may be appealed to an Appeal
Officer by either the Respondent(s) or Complainant(s)  For an appeal to be considered it must meet at least one of
the criteria listed below
Reason for Appeal:
a. To determine whether the conference was conducted fairly in light of the charges and information
presented, and in conformity with proscribed procedures giving both the Respondent and complaining
parties the opportunity to prepare and present relevant information to be considered in the determination of
an appropriate outcome. Minor deviations from designated procedures will not be a basis for sustaining an
appeal unless there is a demonstrable adverse effect on the outcome of the conference., b. To determine
whether the sanctions(s) imposed were appropriate for the violation of the Student Code of Conduct which
the student was found to have committed., c. To consider new information, sufficient to alter the decision or
other relevant facts not brought out in the original conference, because such information and/or facts were
not known to the person appealing at the time of the original conference.  This does not include information
that was known at the time of the conference but was not shared.

The appeal process is a written process, you will not be granted an in person meeting with the Appeal Officer to
further discuss this case or your appeal.  Please provide a rationale, details, and specifics for each "grounds" box
checked above here
Attention: Kristin Kushmider
Re: 2015039201
Appeal
David Steward failed to prove under the preponderance of evidence standard that I knowingly provided false
information.  In fact, I had to go down to the Colorado bureau of Investigation and update my criminal
background. So the criminal background David Steward used was not correct.  The updated information
states in exhibit (A), the official court document, my sentences were suspended by my attorney while I was
serving this country in the military 16 years ago, in Integrated Online Network Report, which I may provide.
Coupled with the fact that I sustained Traumatic Brain Injury and Post Traumatic Stress Disorder, as listed in
exhibit(C) after these two misdemeanors and the lengthy date elapse in time I did not know I provided false
information.

The former covers two of the guilty findings in my CBI report, and the other two; "four," were in fact dealt sufficiently by my already.  The two crimes I listed in my 2011 and 2014 applications, exhibit (D) 1 and (2) are in fact the only official court documents pertaining to exhibit (F).  Look at the Judges signatures.  There is nothing false here let alone anything I knew were false.  This is because as highlighted in exhibit (F) they ran concurrent to the two crimes in exhibit(D).  Therefore, the only official document here is exhibit(D), in legal terms and technically all four crimes are represented in exhibit (D).  I did not know I had to provide unofficial information, the type found in secondary accounts like the Colorado Bureau of investigations background report. Therefore, I did not "knowingly provide any false information.

I request the forensic threat assessment sanction be eliminated, since I do not have access to the threat assessment made against me as illustrated in exhibit (G) and because the allegations are obviously not within David Stewards abilities in the first place, nor authority, I will explain in a later paragraph.  Furthermore, I have PTSD and Traumatic Brain Injury, diagnosed by a team of psychologist, with ongoing treatment-they know me better than anyone could" who will support my findings that I did not threaten any one, highlighted in exhibit (H)(2) and exhibit (H)(3).

Since this is my first issue at the campus at the very least I request my suspension be eliminated; or overturned in light of the fact 33% of black males have these type of backgrounds due to the political recognition of a racist; or biased judicial system. I do not believe I would have been accused of a thereat nor my background of been an issue if I were not of African American; black skin color. And consider the Col. State Gov't Affirmative Action Plan, and Policy 10A: Discrimination/Affirmative Action--General Policy Statement and Long-Range Goals, as this is a text book example, with uttermost pertinence to said case. I ask that you uphold the Mission, Vision and Values of the University of Colorado Denver  Anschutz Medical Campus and dismiss and or overturn these allegations.

I  also request I be withdrawn from my classes due to the fact these circumstances are out of my control and the academic committee, as illustrated in exhibit (I), failed to abide by  article 9; and report these crimes, causing me to move well past my withdrawal deadline after I submitted them all official court documents of my crimes-Exhibit (D), except the two misdemeanors that happened 16 years ago, with the updated information of the suspended sentence, while I was serving this country, and unfortunately occurring before my Traumatic Brain Injury and PTSD.

Also, may you take into consideration I am one of the very few black males attending this university, my Traumatic Brain Injury and Post Traumatic Stress Disorder, my intent to sue David Keener, a English teacher, because judgements are to be based solely on factors demonstrable to performance and expectations as a student, rather, he judged me on whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies, when he filed a threat assessment against me that was false, misleading, slanderous, and quite frankly a flat out lie.  His motivations are unknown. This is a clear case of discrimination.  A police report was filed and an Internal Affairs report.  I requested that he be laid off; and or suspended. Furthermore, I was not responsible for a threat.  I request you find me not responsible for any violations of rule (12) and (2) of the student conduct code.

According to exhibit (J), the University of Colorado-Denver, background disclosure and Authorization background checks are pursuant to the Fair Credit Reporting Act, which states no background check is to go back any further then 7 years.  All of my crimes are past 7 years, rendering them obtained in violation of disclosure this disclosure authorization. For this I render them stricken from the record.  Hire Right, Inc. does not go back further then 7 years, as the professional world in general, due to the Fair Credit Reporting Act. Furthermore, this document clearly states the nature and scope of "any" investigative consumer reports that may be requested, which was violated by the Central Bureau of Investigation background check, of David Steward.  I have reported him to Internal Investigations for the aforementioned violation.

Article 10: Nondiscrimination

The University of Colorado does not discriminate on the basis of race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation, or political philosophy in admission and access to, and treatment and employment in, its educational programs and activities. The university takes action to increase ethnic, cultural, and gender diversity, to employ qualified disabled individuals, and to provide equal opportunity to all students and employees.

Qualification for the position and institutional need shall be the sole bases for hiring employees, and the

criteria for retaining employees shall be related to performance evaluation, assessment of institutional need, fiscal constraints, and/or, in the case of university staff, the rational exercise of administrative prerogative.

All students shall have the same fundamental rights to equal respect, due process, and judgment of them based solely on factors demonstrably related to performance and expectations as students. All students share equally the obligations to perform their duties and exercise judgments of others in accordance with the basic standards of fairness, equity, and inquiry that should always guide education.

History: Amended November 8, 2001; September 17, 2013; April 17, 2015, November 6, 2015

The term "officer and exempt professional" was replaced with the term "university staff" effective April 17, 2015.
I was not judged by David Keener based solely on factors demonstrable to performance and expectations as a student, rather, he judged me whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies. Once again I have reported his actions.

Sincerely,
Chadwick Jordan
PH: 720-273-9741
Email: cjllc@post.com

<u>Attachments</u>

finalappeal docx
exhibita pdf
exhibitc.html
exhibitd1.pdf
exhibitd2 pdf
exhibitf.pdf
exhibitg pdf
exhibith1.pdf
exhibith2 pdf
exhibith3 pdf
exhibiti html
exhibitj pdf

*Pending IR #00000824*

*Submitted from 73.153.10.124 and routed to David Steward (Assistant Director of Student Conduct and Community Standards)*

1.28.16: Additional incident reported by writing center staff that Chadwick was pacing outside of the hallway to the WC while on the phone and commented "here comes another bitch from there. I'll sue her too". The reporting party indicated he made the statement loudly and angrily.

Contact Us Email Uncategorized

David Steward - Tuesday November 8, 2016 at 1:47pm
Last edited Wednesday November 9, 2016 at 11:47am

Hi Chadwick,

I have made several attempts to reach you by phone and email so that we could discuss the interactions you had with the writing center. Due to your lack of response and willingness to resolve this voluntarily I do need to issue you a conduct notice. Because you are currently on disciplinary probation from this spring and because the same individual is involved I do need to meet with you and the meeting is required. Mr. Steward will be sending you your formal notice. Please contact us to schedule a time for the 3 of us to sit down so that we are able to hear your concerns and address the behavior. I also want you to know that I am meeting with the writing center to address their handling of the situation as well.

Thanks Chadwick,

Kristin

Kristin D. Kushmider, PhD
Dean of Students
University of Colorado Denver, Student Affairs

O 303-556-2444
E kristin.kushmider@ucdenver.edu

Letter Banning Chadwick from the Writing Center Uncategorized

David Steward - Monday November 7, 2016 at 8:44am



University of Colorado
Denver | Anschutz Medical Campus

To schedule meetings or appointments please contact Dora Safoh at Dora Safoh@ucdenver.edu or by
calling (303) 556-2444

Friday, April 8, 2016 11:18:10 AM Mountain Daylight Time

**Subject:** Follow up

**Date:**     Friday, April 8, 2016 11:15:29 AM Mountain Daylight Time

**From:**     Kushmider, Kristin

**To:**        Chadwick Jordan, Jordan, Chadwick H

Hi Chadwick,

Thank you for talking with me earlier this week. I'm sending you a follow up email so you have in writing, the expectations we discussed as a result of the recommendations from your assessment

1. All students are expected to abide by the Student Code of Conduct, the Code of Conduct can be found on the Student Conduct and Community Standards Website. http://www.ucdenver.edu/life/services/standards/Documents/CUDenver-CodeofConduct.pdf
2. I am available to you as your point of contact (POC) for any concerns or problems you may encounter. I am happy to serve in this role for you and and hopeful you will feel comfortable communicating with me before any situation escalates. We can set up regular check-ins if that would be helpful to you when you re-enroll this summer.
3. Patrick Browne will be your POC with Veteran Student Services, you are welcome in their office to engage with the community of veteran students on campus and Patrick can also serve as someone who can assist in addressing any concerns you may have.
4. One of the recommendations we discussed was to make you aware of some resources on campus, below I have included some confidential and non-confidential resource that are available to support your success
   1. Student and Community Counseling Center  http://www.ucdenver.edu/life/services/counseling-center/Pages/default.aspx (Free and confidential)
   2. Ombuds Office: http://www.ucdenver.edu/about/departments/OmbudsOffice/Pages/OmbudsOffice.aspx (Free and confidential)
   3. Office of Case Management  www.ucdenver.edu/csm
   4. Learning Resources Center: http://www.ucdenver.edu/life/services/LRC/Pages/Tutorial-Services-Info.aspx

Chadwick we also discussed enrolling for a Maymester course, information about Maymester can be found here. http://www.ucdenver.edu/programs/summer/Pages/Maymester.aspx and the courses being offered are also listed, http://www.ucdenver.edu/programs/summer/Documents/3-2-16%20Maymester%20Courses.pdf.

If you have any questions while I am out of the office next week, David Steward can assist you: David.steward@ucdenver.edu or 303-556-2444.

I look forward to seeing you again when you enroll for this summer!

Best,

Kristin

Kristin D. Kushmider, PhD
Dean of Students
University of Colorado Denver | Anschutz
Office of Case Management
Main (303) 556-2444

E kristin.kushmider@ucdenver.edu

```
ppt Mgt Module            Mar 15, 2016@15:43:45            Page:    1 of    1
atient: JORDAN,CHADWICK HEATH (9084)MT: NOT REQm              Outpatient
C Prov: RICHLIE,DANIEL G              Team: DENVER FIRM C MD PACT 15 *WH*
otal Appointment Profile        * - New GAF Required    03/15/15 thru 03/15/16
----Patient or Clinic--------Appt Date/Time-------Status--------------------
1   Zzzdenmhc-amccormickind   05/08/2015@15:00      Checked Out
2   Den Er Emergency Room(phy 06/13/2015@15:25      Checked Out
3   Den Prosthetics Eyeglasse 06/29/2015@10:45      Non-count/Checked Out
4   Den Pact Plus Firm A P15  07/21/2015@14:30      Checked Out
5   Zzzdenmhc-amccormickind   08/21/2015@15:00      Checked Out
6   Den Prosthetics Eyeglasse 09/14/2015@09:00      Non-count/Checked Out
7   Den Prosthetics Eyeglasse 10/05/2015@10:00      Non-count/Checked Out
8   Den Er Emergency Room(phy 11/10/2015@21:11      Checked Out
9   Den Dental Er Clinic      12/21/2015@14:00      Checked Out
10  Den Er Emergency Room(phy 12/23/2015@11:34      Cancelled By Clinic
11  Den Er Urgent Care        12/23/2015@12:01      Checked Out
12  Den Er Emergency Room(phy 12/23/2015@14:45      Cancelled By Clinic
13  Den Dental Er Clinic      12/31/2015@15:30      No-show
14  Den Prosthetics Eyeglasse 01/08/2016@09:15      Non-count/Checked Out
15  Den Dental Er Clinic      01/08/2016@13:30      Checked Out
16  Den Oral Surgery          02/18/2016@08:00      Cancelled By Patient
17  Den Er Emergency Room(phy 02/20/2016@11:36      Checked Out
```

CU JORDAN_0073

Friday, March 25, 2016 3:20:47 PM Mountain Daylight Time

**Subject:** Follow up questions please respond
**Date:** Thursday, March 24, 2016 3:09:09 PM Mountain Daylight Time
**From:** Kushmider, Kristin
**To:** Chadwick Jordan

Hi Chadwick,

I hope you're doing well. I had the opportunity to review your psychiatric notes today, thank you so much for providing that information to me. I am working with police to lift your campus ban and also with the registrar to get you withdrawn from your classes and your tuition refunded. I am also finishing up your official appeal response. I did have two follow up questions for you, first, one of your notes indicates an additional meeting with a Ms. Greenstone on 7/2/14 that included a summary of any history of violence that may pertain to your treatment, are you able to provide me with that note? Secondly, based on the information you gave me from your provider I do want to make sure I'm doing everything to support you in being successful here at CU Denver. So I would still like for you to have the additional assessment done with Nicoleti-Flater Associates.

I am very aware that we have already taken up a great deal of your time with this process so I want to offer you two options for the assessment. First, the University can do what's referred to as an indirect assessment. I would provide Nicoleti-Flater Associates with all of the information we have and they will formulate an assessment based on that information. I would provide you with a copy of the report once it is compete. This would not require you to do anything on your end, you don't even need to show up. The other option would be for you to sit down with them and participate in the face to face assessment. In either case the University will pay for the assessment and it would be of no cost to you. You would be provided with copies of either report and the outcome would not affect my decision in this matter but may offer us some additional recommendations for supporting you in being successful.

Please let me know if you have a preference between these two options for additional assessment. I would be happy to answer any questions you have by phone but wanted to provide you with the request in writing for your records. I'm available tomorrow after 1 30 if you have questions and want to talk by phone.

Please let me know at your earliest convenience and we can get this all taken care of. Thank you again for your continued patience, I really appreciate it.

Warm Regards,

Kristin

Kristin D. Kushmider, PhD
Dean of Students
University of Colorado Denver | Anschutz
Office of Case Management
Main (303) 556-2444

E kristin.kushmider@ucdenver.edu


University of Colorado
Denver | Anschutz Medical Campus

To schedule meetings or appointments please contact Dora Safoh at Dora.Safoh@ucdenver.edu or by calling (303) 556-2444

May you send me via email the names of all member of the academic
review board for the school of liberal arts of the University of
Colorado-Denver, with their titles for this spring semester. Also
anyother members of the faculty who review these documents? This is
time sensitive I have an appeal due on the 11th of March 2016 with
Dr. Kushmider.

Sincerely,
Chadwick Jordan
830282211
--
Sent from my Android phone withmail.com Mail. Please excuse my brevity.

CU JORDAN_0071

<file:///C:/Users/Chadwick%20Jordan/Downloads/mailto:jsessionid=4E9BD200F8A7C736F5BFF5FB23B0074E-
n1.lxa05a?to=cjllc%40post.com>>
Date: Wednesday, March 9, 2016 at 3:51 PM
To: Sarah Fields <sarah.fields@ucdenver.edu
<file:///C:/Users/Chadwick%20Jordan/Downloads/mailto:jsessionid=4E9BD200F8A7C736F5BFF5FB23B0074E-
n1.lxa05a?to=sarah.fields%40ucdenver.edu>>
Subject: Re: Re: Chadwick Jordan

was under the academic review board this semester and placed on
academic probation corps withdrawing from class in 2006. I merely want
o know how sat on this committee or board?
--
Sent from my Android phone with mail.com Mail. Please excuse my brevity.

'Fields, Sarah" <SARAH.FIELDS@UCDENVER.EDU> wrote:

Hello,

I&apos;m not sure what you mean by Academic Review Board.  We have
an Academic Standards committee which addresses requests for grade
appeals and those kinds of procedural
issues. We also have an Academics Ethics committee which handles
allegations of academic dishonesty.  The members of those committees
change every academic year and almost every academic semester.

If you have a matter that you&apos;d like to pursue (a retroactive
grade appeal or an allegation of academic misconduct). please let me
know a little more specifically what you need, and I can assist you
in moving forward.

Sarah Fields

Sarah K. Fields, J.D., Ph.D.
Acting Associate Dean for Student Success
College of Liberal Arts and Sciences
Associate Professor, Communication
University of Colorado Denver

Office location:  North Classroom 5014
Phone: 303-556-2557

Mailing Address:
Campus Box 144
P.O. Box 173364
Denver, CO 80217-3364

From: Chadwick Jordan <cjllc@post.com
<file:///C:/Users/Chadwick%20Jordan/Downloads/mailto:jsessionid=4E9BD200F8A7C736F5BFF5FB23B0074E-
n1.lxa05a?to=cjllc%40post.com>>
Date: Wednesday, March 9, 2016 11:13 AM
To: Sarah Fields <sarah.fields@ucdenver.edu
<file:///C:/Users/Chadwick%20Jordan/Downloads/mailto:jsessionid=4E9BD200F8A7C736F5BFF5FB23B0074E-
n1.lxa05a?to=sarah.fields%40ucdenver.edu>>
Subject: Chadwick Jordan

CU JORDAN_0070

If you use a screenreader we recommend that you use the following
page: https://m.mail.com <https://m.mail.com/>


Re: Chadwick Jordan

From:
    "Fields, Sarah" <SARAH.FIELDS@UCDENVER.EDU>
To:
    "Chadwick Jordan" <cjllc@post.com>
Date:
    Mar 10, 2016 1:38:55 PM

Hello,

According to my reading of your transcript, you are not on academic
probation in CLAS or at the university. Because your petition to
retroactively withdraw from the Spring 2007 was approved, that
eliminated any GPA problems. You started over in Spring 2016 with a
blank GPA.

Regarding the committee that which approved your request, I canâ€™t simply
give you their names. The committee changes composition every term and
Iâ€™ve been having problems finding out the committee at that time. The
students who were on it have graduated, the chair at that time is not at
the university this year, and the advisor/staff member has also resigned.

You should have a copy of the letter from the committee confirming that
your petition was granted and it is clear from your transcript that it
was. If you need that letter again, please let me know.

Sincerely,

Sarah Fields

Sarah K. Fields, JD, PhD
Acting Associate Dean for Student Success
College of Liberal Arts and Sciences
Associate Professor, Communication
University of Colorado Denver

Office: North Classroom 5014
Phone: 303-556-2557
Fax: 303-556-4861

Mailing Address:
Campus Box 144
P.O. Box 173364
Denver, CO 80217-3364


From: Chadwick Jordan <cjllc@post.com

CU JORDAN_0069

| Disability | Rating | Decision | Related To | Effective Date |
|---|---|---|---|---|
| right knee patellofemoral pain syndrome and shin splints (claimed as tendinitis) | 10% | Service Connected | | 12/26/2013 |
| right knee patellofemoral pain syndrome (instability) | 10% | Service Connected | | 12/26/2013 |
| facial scars | | Not Service Connected | | |
| left knee patellofemoral pain syndrome and shin splints (claimed as tendinitis) | 10% | Service Connected | | 12/26/2013 |
| left knee patellofemoral pain syndrome (instability) | 10% | Service Connected | | 12/26/2013 |
| traumatic brain injury | 0% | Service Connected | | 12/26/2013 |
| post-concussive headaches with migraine and tension features | 0% | Service Connected | | 12/26/2013 |
| bilateral tinnitus | | Not Service Connected | | |
| other specified depressive disorder (also claimed as acquired psychiatric disorder/PTSD) | | Not Service Connected | | |
| bilateral hearing loss | | Not Service Connected | | |
| alcohol use disorder (38 USC Section 1702) | | Active Psychosis/GW Mental | | |
| residual s/p fracture right ring metacarpal (dominant) (formerly evaluated with middle finger, claimed as right hand condition under DC 5215 and 5299-5215) | 0% | Service Connected | | 12/26/2013 |
| left foot condition | | Not Service Connected | | |
| acquired psychiatric condition (including posttraumatic stress disorder (PTSD)) | | Not Service Connected | PTSD - Personal Trauma | |
| residuals status post fracture of the right middle metacarpal (also claimed as right hand condition, formerly rated with ring finger and formerly 5215)) | 0% | Service Connected | | 12/26/2013 |

# Pending Disabilities

We cannot retrieve your information at this time. Please try again later. We apologize for the inconvenience.

### Add Disabilities

Submit a claim to make any updates to the disabilities that you believe are related to your military service.

Apply Now

CU JORDAN_0068

- Dashboard
  - **My Profile**
    - Personal Information
    - Representatives
    - Disability
    - Dependents
  - **My Claims & Appeals**
    - View all Reviews
    - Disability Claims
    - Disability Appeals
  - **My Benefits & Payments**
    - Benefits
    - Payment History
- Search
- Manage Account

# Disabilities

60%

**Total Combined Disability**

You have a 60% final degree of disability. This percentage determines the amount of benefit pay you will receive.

View your compensation

**Add Disabilities**

Submit a claim to make any updates to the disabilities that you believe are related to your military service.

Apply Now

60%

**Total Combined Disability**

You have a 60% final degree of disability. This percentage determines the amount of benefit pay you will receive.

View your compensation

**Add Disabilities**

Submit a claim to make any updates to the disabilities that you believe are related to your military service.

Apply Now

# Rated Disabilities

Secondary service-connected disabilities are those that developed as a result of, or were worsened by, an existing service-connected disability. An arrow points to each secondary service-connected disability listed below your primary service-connected disability.

Table of Rated Disabilities

| Disability | Rating | Decision | Related To | Effective Date |
|---|---|---|---|---|
| residuals, status post fracture of the right middle and ring metacarpals (also claimed as right hand condition) (formerly 5215) | 0% | Service Connected | | 06/06/2002 |
| left ankle tendinitis | | Not Service Connected | | |
| right ankle strain (formerly residuals, status post right ankle injury, claimed as right foot condition under DC 5271 and 5299-5024) | 10% | Service Connected | | 12/26/2013 |
| pseudofolliculitis barbae (PFB, also claimed as PSB) | 10% | Service Connected | | 12/06/2006 |
| left wrist tendinitis (non-dominant) | | Not Service Connected | | |
| residuals, status post right ankle injury (claimed as right foot condition) (formerly 5271) | 10% | Service Connected | | 06/06/2002 |
| thoracic strain status post motor vehicle accident | 10% | Service Connected | | 12/29/2003 |
| residuals, status post cervical strain status post motor vehicle accident with whiplash injury | 10% | Service Connected | | 12/29/2003 |
| thoracocervical spine strain status post motor vehicle accident (formerly residuals of cervical spine injury with history of neck strain) | 0% | Service Connected | | 06/06/2002 |
| right wrist condition (dominant) | | Not Service Connected | | |
| right ear hearing loss (formerly evaluated as bilateral) | | Not Service Connected | | |

CU JORDAN_0067

RIT ꞏ00012006CR001675-000027

District Court, Adams County, State of Colorado
Case#:D0012006CR001675   Div/Room: G
JUDGMENT OF CONVICTION, SENTENCE   Original
           The People of Colorado vs JORDAN, CHADWICK HEATH
                           DOB  6/05/1982   SID 838389

    AKA: JORDAN, CHAD HEATH

The Defendant was sentenced on:  3/30/2007
People represented by...: KOWERT, C
Defendant represented by: BOWEN, D
UPON DEFENDANT'S CONVICTION this date of: 12/20/2006
The defendant pled guilty to:
Count #    5 Charge: Assault 2-Peace Officer-ATT
           ADDED 12.20.06
C.R.S # 18-3-203(1)(c)                    Class: F5
Date of offense(s):  5/30/2006 to  5/30/2006   Date of plea(s):   12/20/2006

IT IS THE JUDGMENT/SENTENCE OF THIS COURT that the defendant be sentenced to
Department of Corrections           4.00 YEARS              COUNT    5
Credit for Time Served            134.00 DAYS               COUNT    5
CONSECUTIVE TO COUNT        CASE NUMBER: 2006CR   835 Adams County
Plus a mandatory period of parole as required by statute.
Months on parole 0024

              Assessed            Balance
       $      422.50      $       422.50

THEREFORE, IT IS ORDERED the Sheriff of ADAMS COUNTY        shall convey the
DEFENDANT to the following department TO BE RECEIVED AND KEPT ACCORDING TO LAW

               ADDITIONAL REQUIREMENTS
The restraining order pursuant to C.R.S. 18-1-1001 shall remain in effect
until final disposition of the action, or in the case of an appeal, until
disposition of the appeal.


JUDGMENT OF CONVICTION IS NOW ENTERED, IT IS FURTHER ORDERED OR RECOMMENDED:


DATE 3.30.07 NPT_____      JUDGE/MAGISTRATE_____
                                            EDWARD CHARLES MOSS


               CERTIFICATE OF SHERIFF
I CERTIFY THAT I EXECUTED THIS ORDER AS DIRECTED
DATE_____          SHERIFF_____
                              BY DEPUTY_____

COPY SENT
3/30/07

CU JORDAN_0066

District Court, Adams County, State of Colorado        RID 00012006CR000835-000031
Case#:D0012006CR000835   Div/Room: G
JUDGMENT OF CONVICTION, SENTENCE   Original
                The People of Colorado vs JORDAN, CHADWICK HEATH
                                      DOB  6/05/1982   SID 838389

    AKA: JORDAN, CHAD HEATH

---

The Defendant was sentenced on:  3/30/2007
People represented by...: KOWERT, C
Defendant represented by: BOWEN, D
UPON DEFENDANT'S CONVICTION this date of: 12/20/2006
The defendant pled guilty to:
Count #     4 Charge: Controlled Subst-Possess sch 4-over 1g
                  ADDED 12.20.06
C.R.S # 18-18-405(1),(2)(a)(III)(A)         Class: F5
Date of offense(s):  3/09/2006 to  3/09/2006   Date of plea(s):   12/20/2006

---

IT IS THE JUDGMENT/SENTENCE OF THIS COURT that the defendant be sentenced to
THE CUSTODY OF THE EXECUTIVE DIRECTOR OF THE DEPARTMENT OF CORRECTIONS
Department of Corrections          4.00 YEARS                    COUNT      4
Credit for Time Served           216.00 DAYS                     COUNT      4
Plus a mandatory period of parole as required by statute.
Months on parole 0024

                    Assessed            Balance
          $        1,547.50      $       1,547.50

---

THEREFORE, IT IS ORDERED the Sheriff of ADAMS COUNTY        shall convey the
DEFENDANT to the following department TO BE RECEIVED AND KEPT ACCORDING TO LAW
COLORADO STATE DEPARTMENT OF CORRECTIONS DIAGNOSTIC CENTER

---

                    ADDITIONAL REQUIREMENTS
The restraining order pursuant to C.R.S. 18-1-1001 shall remain in effect
until final disposition of the action, or in the case of an appeal, until
disposition of the appeal.

---

JUDGMENT OF CONVICTION IS NOW ENTERED, IT IS FURTHER ORDERED OR RECOMMENDED:


DATE 3.30.07 NPT_____        JUDGE/MAGISTRATE _____
                                        EDWARD CHARLES MOSS


                    CERTIFICATE OF SHERIFF
I CERTIFY THAT I EXECUTED THIS ORDER AS DIRECTED
DATE_____            SHERIFF_____
                                BY DEPUTY_____

                    COPY SENT
                    3/30/07

RID:D0012004CR000029-000017

District Court, Adams County, State of Colorado
Case#:D0012004CR000029  Div/Room: G
JUDGMENT OF CONVICTION, SENTENCE  Original
      The People of the State of Colorado vs. JORDAN, CHADWICK HEATH
                      DOB 6/05/1982

    AKA: JORDAN, CHAD H
    AKA: JORDAN, CHADWICK HEATH
    AKA: JORDAN, CHAD HEATH
    AKA: JORDAN, CHADWICK HEATH
    AKA: JORDAN, CHAD HEATH
    AKA: JORDAN, CHADWICK HEATH
    AKA: JORDAN, CHAD HEATH

---

The Defendant was sentenced on:  7/15/2004
People represented by...:  HEINZ, MICHAEL
Defendant represented by: MARCUS, HERBERT
UPON DEFENDANT'S CONVICTION this date of:  7/15/2004
The defendant pled guilty to:
Count #    2 Charge: Driving Under the Influence
C.R.S # 42-4-1301(1)(a)                    Class: M
Date of offense(s): 12/30/2003 to 12/30/2003   Date of plea(s):   3/17/2004
Count #    3 Charge: MENACING FELONY-CSP
C.R.S # 18-3-206                          Class: F6
Date of offense(s): 12/30/2003 to 12/30/2003   Date of plea(s):   3/17/2004

---

IT IS THE JUDGMENT/SENTENCE OF THIS COURT that the defendant be sentenced to
THE CUSTODY OF THE EXECUTIVE DIRECTOR OF THE DEPARTMENT OF CORRECTIONS
Jail                          1.00 YEARS              COUNT      2
CONCURRENT WITH COUNT  3    CASE NUMBER: 2004CR    29
JAIL SENTENCE TO BE RUN CONCURRENT AND SERVED AT DOC.             /DAJ
Department of Corrections         18.00 MONTHS           COUNT      3
Credit for Time Served            62.00 DAYS             COUNT      3
Plus a mandatory period of parole as required by statute.
Months on parole 0012

|  | Assessed | | Balance |
|---|---|---|---|
| $ | 322.50 | $ | .00 |

---

THEREFORE, IT IS ORDERED the Sheriff of ADAMS COUNTY      shall convey the
DEFENDANT to the following department TO BE RECEIVED AND KEPT ACCORDING TO LAW
COLORADO STATE DEPARTMENT OF CORRECTIONS DIAGNOSTIC CENTER

---

### ADDITIONAL REQUIREMENTS

---

JUDGMENT OF CONVICTION IS NOW ENTERED, IT IS FURTHER ORDERED OR RECOMMENDED:


DATE_____  NPT_____   JUDGE/MAGISTRATE_____
                                      HARLAN R BOCKMAN


### CERTIFICATE OF SHERIFF

I CERTIFY THAT I EXECUTED THIS ORDER AS DIRECTED
DATE_____          SHERIFF_____
                                   BY DEPUTY_____

```
      COURT DISPOSITION      DISMISSED BY DA
      DISPOSITION DATE       09/26/2001
   CHARGE                    02
      CHARGE LITERAL         ASSAULT  3RD DEG
      TYPE/LEVEL             MISDEMEANOR
      OFFENSE DATE           09/29/2000
      DOCKET                 D0302000CR002555
      COURT DISPOSITION      DISMISSED BY DA
      DISPOSITION DATE       09/26/2001
   CHARGE                    03
      CHARGE LITERAL         BAIL-SECURE BOND  VIOLATE BAIL BOND COND-FELONY
      TYPE/LEVEL             FELONY
      OFFENSE DATE           09/29/2000
      DOCKET                 D0302000CR002555
      COURT DISPOSITION      DISMISSED BY DA
      DISPOSITION DATE       09/26/2001
   CHARGE                    04
      CHARGE LITERAL         ASSAULT  3-KNOW/RECKLESS CAUSE INJ
      TYPE/LEVEL             MISDEMEANOR
      OFFENSE DATE           09/29/2000
      DOCKET                 D0302000CR002555
      COURT DISPOSITION      GUILTY
      DISPOSITION DATE       08/25/2004
      SENTENCE               1 YR JAIL — SUSPENDED
   CHARGE                    05
      CHARGE LITERAL         ASSAULT  MENACING
      TYPE/LEVEL             MISDEMEANOR
      OFFENSE DATE           09/29/2000
      DOCKET                 D0302000CR002555
      COURT DISPOSITION      GUILTY
      DISPOSITION DATE       08/25/2004
      SENTENCE               6 MONTHS JAIL — SUSPENDED
======================= Cycle 2 of 15 ==========================
------ ARREST ------
DATE ARRESTED               09/30/2000
AGENCY                      WESTMINSTER POLICE DEPARTMENT
ARREST NUMBER               00274007
NAME USED                   JORDAN, CHADWICK HEATH
CHARGE                      01
   CHARGE LITERAL           SIMPLE ASSAULT  FELONY MENACING         (WEST)
   TYPE/LEVEL               FELONY
======================= Cycle 3 of 15 ==========================
------ ARREST ------
DATE ARRESTED               08/20/2001
AGENCY                      JEFFERSON COUNTY SHERIFF OFFICE
ARREST NUMBER               01232009
NAME USED                   JORDAN, CHADWICK HEATH
CHARGE                      01
   CHARGE LITERAL           ARRESTED FOR OTHER JURISDICTION  FTA FELONY MENACE
                            WESTMINSTER PD
   TYPE/LEVEL               FELONY
CHARGE                      02
   CHARGE LITERAL           FAIL TO APPEAR  FTA 3RD DEG ASSLT WESTMINSTER PD
   TYPE/LEVEL               MISDEMEANOR
======================= Cycle 4 of 15 ==========================
------ ARREST ------
DATE ARRESTED               08/16/2003
AGENCY                      BROOMFIELD POLICE DEPARTMENT
ARREST NUMBER               B03001090
NAME USED                   JORDAN, CHADWICK HEATH
CHARGE                      01
   CHARGE LITERAL           OBSTRUCT POLICE
   TYPE/LEVEL               MISDEMEANOR
   OFFENSE DATE             08/16/2003
CHARGE                      02
   CHARGE LITERAL           DANGEROUS DRUGS  CONT SUBSTANCES
```

CU JORDAN_0063

History: Amended November 8, 2001; September 17, 2013; April 17, 2015, November 6, 2015

The term "officer and exempt professional" was replaced with the term "university staff" effective April 17, 2015.

I was not judged by David Keener based solely on factors demonstrable to performance and expectations as a student, rather, he judged me whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies.  Once again I have reported his actions.


Sincerely,

Chadwick Jordan

PH: 720-273-9741

Email: cjllc@post.com

CU JORDAN_0062

Also, may you take into consideration I am one of the very few black males attending this university, my Traumatic Brain Injury and Post Traumatic Stress Disorder, my intent to sue David Keener, a English teacher, because judgements are to be based solely on factors demonstrable to performance and expectations as a student, rather, he judged me on whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies, when he filed a threat assessment against me that was false, misleading, slanderous, and quite frankly a flat out lie. His motivations are unknown. This is a clear case of discrimination. A police report was filed and an Internal Affairs report. I requested that he be laid off; and or suspended. Furthermore, I was not responsible for a threat. I request you find me not responsible for any violations of rule (12) and (2) of the student conduct code.

According to exhibit (J), the University of Colorado-Denver, background disclosure and Authorization background checks are pursuant to the Fair Credit Reporting Act, which states no background check is to go back any further then 7 years. All of my crimes are past 7 years, rendering them obtained in violation of disclosure this disclosure authorization. For this I render them stricken from the record. Hire Right, Inc. does not go back further then 7 years, as the professional world in general, due to the Fair Credit Reporting Act. Furthermore, this document clearly states the nature and scope of "any" investigative consumer reports that may be requested, which was violated by the Central Bureau of Investigation background check, of David Steward. I have reported him to Internal Investigations for the aforementioned violation.


Article 10: Nondiscrimination


The University of Colorado does not discriminate on the basis of race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation, or political philosophy in admission and access to, and treatment and employment in, its educational programs and activities. The university takes action to increase ethnic, cultural, and gender diversity, to employ qualified disabled individuals, and to provide equal opportunity to all students and employees.


Qualification for the position and institutional need shall be the sole bases for hiring employees, and the criteria for retaining employees shall be related to performance evaluation, assessment of institutional need, fiscal constraints, and/or, in the case of university staff, the rational exercise of administrative prerogative.


All students shall have the same fundamental rights to equal respect, due process, and judgment of them based solely on factors demonstrably related to performance and expectations as students. All students share equally the obligations to perform their duties and exercise judgments of others in accordance with the basic standards of fairness, equity, and inquiry that should always guide education.

Attention: Kristin Kushmider

Re: 2015039201

Appeal

David Steward failed to prove under the preponderance of evidence standard that I knowingly provided false information. In fact, I had to go down to the Colorado bureau of Investigation and update my criminal background. So the criminal background David Steward used was not correct. The updated information states in exhibit (A), the official court document, my sentences were suspended by my attorney while I was serving this country in the military 16 years ago, in Integrated Online Network Report, which I may provide. Coupled with the fact that I sustained Traumatic Brain Injury and Post Traumatic Stress Disorder, as listed in exhibit(C) after these two misdemeanors and the lengthy date elapse in time I did not know I provided false information.

The former covers two of the guilty findings in my CBI report, and the other two; "four," were in fact dealt sufficiently by my already. The two crimes I listed in my 2011 and 2014 applications, exhibit (D) 1 and (2) are in fact the only official court documents pertaining to exhibit (F). Look at the Judges signatures. There is nothing false here let alone anything I knew were false. This is because as highlighted in exhibit (F) they ran concurrent to the two crimes in exhibit(D). Therefore, the only official document here is exhibit(D), in legal terms and technically all four crimes are represented in exhibit (D). I did not know I had to provide unofficial information, the type found in secondary accounts like the Colorado Bureau of investigations background report. Therefore, I did not "knowingly provide any false information.

I request the forensic threat assessment sanction be eliminated, since I do not have access to the threat assessment made against me as illustrated in exhibit (G) and because the allegations are obviously not within David Stewards abilities in the first place, nor authority, I will explain in a later paragraph. Furthermore, I have PTSD and Traumatic Brain Injury, diagnosed by a team of psychologist, with ongoing treatment-they know me better than anyone could" who will support my findings that I did not threaten any one, highlighted in exhibit (H)(2) and exhibit (H)(3).

Since this is my first issue at the campus at the very least I request my suspension be eliminated; or overturned in light of the fact 33% of black males have these type of backgrounds due to the political recognition of a racist; or biased judicial system. I do not believe I would have been accused of a thereat nor my background of been an issue if I were not of African American; black skin color. And consider the Col. State Gov't Affirmative Action Plan, and Policy 10A: Discrimination/Affirmative Action--General Policy Statement and Long-Range Goals, as this is a text book example, with uttermost pertinence to said case. I ask that you uphold the Mission, Vision and Values of the University of Colorado Denver | Anschutz Medical Campus and dismiss and or overturn these allegations.

I also request I be withdrawn from my classes due to the fact these circumstances are out of my control and the academic committee, as illustrated in exhibit (I), failed to abide by article 9; and report these crimes, causing me to move well past my withdrawal deadline after I submitted them all official court documents of my crimes-Exhibit (D), except the two misdemeanors that happened 16 years ago, with the updated information of the suspended sentence, while I was serving this country, and unfortunately occurring before my Traumatic Brain Injury and PTSD.

History: Amended November 8, 2001; September 17, 2013; April 17, 2015, November 6, 2015

The term "officer and exempt professional" was replaced with the term "university staff" effective April 17, 2015.
I was not judged by David Keener based solely on factors demonstrable to performance and expectations as a
student, rather, he judged me whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the
Academic Principles, Professional Rights and Responsibilities, and Related Policies   Once again I have reported his
actions.

Sincerely,
Chadwick Jordan
PH. 720-273-9741
Email. cjllc@post.com


Attachments

exhibita.pdf
exhibitc html
exhibitd1.pdf
exhibitd2.pdf
exhibitf.pdf
exhibitg pdf
exhibith1.pdf
exhibith2.pdf
exhibith3 pdf
exhibiti html
exhibitj.pdf
finalappeal.docx


*Pending IR #00000824*
*Submitted from 73.153 10 124 and routed to David Steward (Assistant Director of Student Conduct and Community Standards)*
*Modified by Kristin Kushmider on March 16, 2016 at 4 46 05 pm MDT from 132 194 28 229*

CU JORDAN_0059

official court documents pertaining to exhibit (F). Look at the Judges signatures. There is nothing false here let alone anything I knew were false. This is because as highlighted in exhibit (F) they ran concurrent to three crimes in exhibit(D). Therefore, the only official document here is exhibit(D), in legal terms and technically all four crimes are represented in exhibit (D) I did not know I had to provide unofficial information, the type found in secondary accounts like the Colorado Bureau of investigations background report Therefore, I did not "knowingly provide any false information

I request the forensic threat assessment sanction be eliminated, since I do not have access to the threat assessment made against me as illustrated in exhibit (G) and because the allegations are obviously not within David Stewards abilities in the first place, nor authority, I will explain in a later paragraph. Furthermore, I have PTSD and Traumatic Brain Injury, diagnosed by a team of psychologist, with ongoing treatment-they know me better than anyone could" who will support my findings that I did not threaten any one, highlighted in exhibit (H)(2) and exhibit (H)(3).

Since this is my first issue at the campus at the very least I request my suspension be eliminated, or overturned in light of the fact 33% of black males have these type of backgrounds due to the political recognition of a racist. or biased judicial system. I do not believe I would have been accused of a threat nor my background of been an issue if I were not of African American, black skin color. And consider the Col State Gov't Affirmative Action Plan, and Policy 10A: Discrimination/Affirmative Action--General Policy Statement and Long-Range Goals, as this is a text book example, with uttermost pertinence to said case. I ask that you uphold the Mission, Vision and Values of the University of Colorado Denver Anschutz Medical Campus and dismiss and or overturn these allegations.

I also request I be withdrawn from my classes due to the fact these circumstances are out of my control and the academic committee, as illustrated in exhibit (I), failed to abide by article 9; and report these crimes, causing me to move well past my withdrawal deadline after I submitted them all official court documents of my crimes-Exhibit (D), except the two misdemeanors that happened 16 years ago, with the updated information of the suspended sentence, while I was serving this country, and unfortunately occurring before my Traumatic Brain Injury and PTSD.

Also, may you take into consideration I am one of the very few black males attending this university, my Traumatic Brain Injury and Post Traumatic Stress Disorder, my intent to sue David Keener, a English teacher, because judgements are to be based solely on factors demonstrable to performance and expectations as a student, rather, he judged me on whether I "felt" like a threat or not, in violation of Article 10 nondiscrimination of the Academic Principles, Professional Rights and Responsibilities, and Related Policies, when he filed a threat assessment against me that was false, misleading, slanderous, and quite frankly a flat out lie His motivations are unknown. This is a clear case of discrimination. A police report was filed and an Internal Affairs report. I requested that he be laid off; and or suspended Furthermore, I was not responsible for a threat. I request you find me not responsible for any violations of rule (12) and (2) of the student conduct code

According to exhibit (J), the University of Colorado-Denver, background disclosure and Authorization background checks are pursuant to the Fair Credit Reporting Act, which states no background check is to go back any further then 7 years. All of my crimes are past 7 years, rendering them obtained in violation of disclosure this disclosure authorization. For this I render them stricken from the record. Hire Right, Inc does not go back further then 7 years, as the professional world in general, due to the Fair Credit Reporting Act Furthermore, this document clearly states the nature and scope of "any" investigative consumer reports that may be requested, which was violated by the Central Bureau of Investigation background check, of David Steward. I have reported him to Internal Investigations for the aforementioned violation

Article 10. Nondiscrimination

The University of Colorado does not discriminate on the basis of race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation, or political philosophy in admission and access to, and treatment and employment in, its educational programs and activities The university takes action to increase ethnic, cultural, and gender diversity, to employ qualified disabled individuals, and to provide equal opportunity to all students and employees.

Qualification for the position and institutional need shall be the sole bases for hiring employees, and the criteria for retaining employees shall be related to performance evaluation, assessment of institutional need, fiscal constraints, and/or, in the case of university staff, the rational exercise of administrative prerogative.

All students shall have the same fundamental rights to equal respect, due process, and judgment of them based solely on factors demonstrably related to performance and expectations as students. All students share equally the obligations to perform their duties and exercise judgments of others in accordance with the basic standards of fairness, equity, and inquiry that should always guide education.


University of Colorado
Denver | Anschutz Medical Campus

CU Denver Student Conduct Appeal
Submitted on March 16, 2016 at 4:12:21 pm MDT
Last modified March 16, 2016 at 4.46:05 pm MDT

Type          **Appeal**
Urgency.      **Normal**

Incident Date:      **2016-03-16**
Incident Time:
Incident Location   **On Campus**

Reported by

Name.
Title
Email:
Phone.
Address:

Your Information

**Chadwick Jordan (830282211)**      1982-06-05      CHADWICK.JORDAN@UCDENVER 303-8111
                                                      Off Campus

Appeal Grounds & Rationale

* Case Number
2015039201

* As outlined in Section G G of the Code of Student Conduct;
A student may only appeal if they have received a sanction including probation with loss of good standing, housing termination, suspension, or expulsion. A decision reached by a Conduct Officer may be appealed to an Appeal Officer by either the Respondent(s) or Complainant(s). For an appeal to be considered it must meet at least one of the criteria listed below.
Reason for Appeal.
a  To determine whether the conference was conducted fairly in light of the charges and information presented, and in conformity with proscribed procedures giving both the Respondent and complaining parties the opportunity to prepare and present relevant information to be considered in the determination of an appropriate outcome  Minor deviations from designated procedures will not be a basis for sustaining an appeal unless there is a demonstrable adverse effect on the outcome of the conference., b. To determine whether the sanctions(s) imposed were appropriate for the violation of the Student Code of Conduct which the student was found to have committed , c. To consider new information, sufficient to alter the decision or other relevant facts not brought out in the original conference, because such information and/or facts were not known to the person appealing at the time of the original conference. This does not include information that was known at the time of the conference but was not shared

* The appeal process is a written process, you will not be granted an in person meeting with the Appeal Officer to further discuss this case or your appeal. Please provide a rationale, details, and specifics for each "grounds" box checked above here.
Attention. Kristin Kushmider
Re: 2015039201
Appeal
David Steward failed to prove under the preponderance of evidence standard that I knowingly provided false information. In fact, I had to go down to the Colorado bureau of Investigation and update my criminal background. So the criminal background David Steward used was not correct. The updated information states in exhibit (A), the official court document, my sentences were suspended by my attorney while I was serving this country in the military 16 years ago, in Integrated Online Network Report, which I may provide. Coupled with the fact that I sustained Traumatic Brain Injury and Post Traumatic Stress Disorder, as listed in exhibit(C) after these two misdemeanors and the lengthy date elapse in time I did not know I provided false information.
The former covers two of the guilty findings in my CBI report, and the other two; "four," were in fact dealt sufficiently by my already   The two crimes I listed in my 2011 and 2014 applications, exhibit (D) 1 and (2) are in fact the only

Chadwick,

Thank you for your efforts on the re-write. I will accept your paper and mark the sanction
complete

David

3

CH JORDAN 0099

Chadwick Jordans, reflection of Beat Them or Ban Them: The Characteristics and Social

Functions of Anger and Contempt

By

Agneta H. Fischer University of Amsterdam

Ira J. Roseman Rutgers, The State University of New Jersey, Camden College of Arts

and Sciences

While explaining my experience with this reflective paper I will start with why Fischer &

Roseman choose the short-term emotion of anger and the long-term emotion of contempt. Next,

I will make clear the author's aim in this journal. Following the authors aim, I will compare the

emotions of anger and contempt. Finally, I will extrapolate on Fischer & Roseman's

Identifications of the social functions of anger and contempt, as well as the authors

identifications of the prototypical reactions of anger and contempt.

*Nice Job! Great idea to start a paper by providing a roadmap.*

The authors choose contempt to focus on because they thought it was important to

investigate the conditions under which one's anger transforms into long term emotions, such as

contempt. The authors obviously believe anger is the precursor to long term emotions. They are

interested in more research relative to angers effect on hate or revenge. In their words anger and

contempt showed distinct roles in constituting, enhancing, or breaking off social relationships.

*Writing in academic writing no extra space between paragraphs.*

*What does this mean?*

The author's aim is to examine the distinction between anger and contempt. ~~There~~ *Their* focus

is not the moral antecedents, rather the relational antecedents and their effect on the motivational

and behavioral components of contempt. The authors use of components is essentially, different

CU JORDAN_0100

life experiences. They first chose to go about it by distinguishing between the distinctive characteristic of anger and contempt. They framed it in a sense of what is most likely to happen. Their argument was that anger belongs to the attack family, aimed at seeking a better outcome, and that contempt belongs to the exclusion family, aimed at excluding one from the social network. There second method was to investigate whether contempt and anger develop differently over time, on the basis that different perceptions of the relationship cause different emotions. Anger was characterized as intense but short term, which sought a less negative outcome, versus contempt, which is less intense but longer lasting, even in treatment, such as exclusion or distancing.

*What do you might of this? Iagree? or dont below.*

*As a reflection paper I want to see your thoughts here. Agree? why or why not?*

The social function of anger according to the authors was for correction and not meant for long term. If this anger persist it turns into contempt. The data supports that when a person is not under our control we take contempt for this person and seek to exile them from our world. The social function of contempt is to exclude one from affecting one's life. If this person is not an outsider already they have been given up on, because the intent of contempt is not to change another. Change versus the end of change. Since contempt is a less intense emotion it must be easier exclude one from one's life rather than go thru the intensity of anger, or trying to change them.

*I see it before but it really here strengthen the paper*

I believe the authors thesis will stand the test of time, because anger does imply change in people. The self-report component of killing was not covered, maybe because this is a rare occurrence. This thesis does fit quite nicely into the data. For instance, murder derives from contempt which is built on anger. This fit because murder is not an intensive emotion. Murder comes from contempt, with a less intense mind state required for planning. Contempt is more

common because most people we don't care to change others, so there is normally no need to be
angry.

Contempt is more destructive than anger. Anger leaves open the possibility to repair a relationship. This option does not seem emotionally available with contempt. The lack of *Agree. I don't know if I do.* intimacy and control in these studies made contempt more likely, which develops on top of anger. In the studies those in the emotional state of contempt did not care if their subjects changed. This implies *they are* ~~there~~ not worthy; or worthy of investment. There is proof that one who feels superior will try to ostracize a human as a means of gaining control *what proof?*

The meaning I derived from this journal was affirming. I support their thesis because I believe a reasonable will find this this journal as common sense. It is affirming to me that anger *is it just those we care about?* is an attack emotion meant to coerce change in those we care about and the less intense but *can't it be* long-term emotion contempt, seek an "end," or solution instead. I'm sure revenge and hate seek *someone we need some* solutions or an end as well. I would like to see more research here as the authors would in *from?* revenge and hatred. The self-report measures have been criticized because of impression management and social desirability influencing the respondents. Nevertheless, the data proved true when crossed checked with the vignette method. These minor discrepancies, such as murder, I consider to be nuances. I will use an experience of my own to further support my conclusion. I became angry on the 11th day of April 2017 at Terry. I knew this was not *citations* contempt which is less intense (Fischer & Roseman, pg. 103). The behavior I was attempting to *also need a* change in the short term was my grade. This was short term coercive action present in *resource* relationships in which you care about the other, which I did. This was an intimate relationship *list.* when considering my many office visits and the small class always working closely in groups. Intimacy and the other components are present when others become angry according to Fischer

& Roseman, pg. 103. There was no reason for me to believe I was not in my control, or I was not intimate with Terry. These two factors rule out contempt and an only leave anger as a possibility. My experience supports the authors thesis that anger is more intense meant for short term correction of those you care about versus contempt, which is less intense and long term meant to remove people you don't care about; or think that can change from one's life.

next your thoughts on the last question I asked.
- Review the reference list found on pages 114 and 115. What two articles would you choose to read for further learning? Why did you select these two.

Jordan - Great start. Just a few things....
Please address the edits and comments here and resubmit your paper.
I will reset the deadline for August 31, 2017.
David.

 University of Colorado **Denver**

Student Conduct and Community Standards
Student Affairs

Campus Box 195
P.O. Box 173364 | Denver, CO  80217-3364
o 303.556.3682 | f 877.556.7704
studentconduct@ucdenver.edu
ucdenver.edu/standards

April 18, 2017

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016085401

Dear Chadwick:

I have received a report, dated April 11, 2017 which indicates you may have violated the
Student Conduct Code as outlined in the CU Denver Code of Student Conduct and the Resident
Handbook (available at http://www.ucdenver.edu/standards &
http://www.ucdenver.edu/life/services/housing/Pages/default.aspx). According to the information
I have received, you allegedly Disrupted class by standing on a chair during class time and
shouted at the faculty member and then proceeded to threaten the faculty member by stating
"I'm going to get you." This alleged behavior may be in violation of the following standards:

1. (2) Threats
Threatening or endangering the mental and/or physical health or safety of a person.

2. (9) Interference, obstruction, or Disruption of University Activity
Materially and substantially interfering with, obstructing, or disrupting a university activity. a.
University activities include, but are not limited to, all normal university activities, such as
teaching, research, recreation, meetings, public events, and disciplinary proceedings. b. This
prohibition includes, but is not limited to, the following: behavior disruptive of university
functions; Behavior resulting in injury to persons or damage to property on the campus; and
interference, obstruction, or disruption of the freedom of movement of students, or other
members of the university community and their guests. Interference in any manner with the
public or private rights of citizens, Behavior that threatens or endangers the health or safety of
any person, and damage to property are prohibited.

Admission to the University carries with it the assumption that students will be responsible
members of our community. When you chose to enroll at the University of Colorado Denver, you
assumed the responsibility to uphold standards of conduct appropriate to the academic and
community goals set by the University.

In response to these allegations I have scheduled a conference for you on **Monday, April 24,
2017 at 2:00 PM**. The conference will take place in the **Tivoli Student Union, Room 227**. The
purpose of this conference is to examine the context of the situation to determine your
responsibility for this incident. At the time of the conference you may bring written accounts from
any witnesses present during the alleged incident, as well as your own account. You may also
bring an advisor with you if you wish. I suggest that you refer to the Student Conduct Policies
and Procedures at http://www.ucdenver.edu/standards for more information about your rights
and responsibilities. Please use this LINK to access a document titled "What to Expect in Your
Conduct Meeting" and read the document before you come to your conduct meeting.

In addition you are removed from your ENG 3170 class on an interim basis. You are not to attend class until a decision has been reached in your case. I will be working to assure your progress in this class would be impacted as little as possible.

Your attendance at this conference is important. If you do not attend the conference I will review the written documentation and render a decision without your input. If you are unable to attend this conference due to a reasonable conflict, academic or otherwise, you must contact me at david.steward@ucdenver.edu or 303-556-3682 no later than twenty-four hours prior to your conference to request a new appointment.

I look forward to meeting with you to resolve this situation

Sincerely,


David Steward
Director of Student Conduct and Community Standards

 University of Colorado **Denver**

Student Conduct and Community Standards
Student Affairs

Campus Box 195
P.O. Box 173364 | Denver, CO 80217-3364
o 303.556.3682 | f 877.556.7704
studentconduct@ucdenver.edu
ucdenver.edu/standards

May 3, 2017

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2016085401

Dear Chadwick:

This is a follow-up to our conference on April 24, 2017 regarding alleged violations of the CU Denver Student Conduct Code, as outlined in your Conference Letter.

Chadwick, you stated you did get angry when a teacher graded you on an assignment when she did not receive the latest version of the homework you submitted by email and then would not consider accepting the latest version of the homework. You reacted in anger by raising your voice, using profanity, and stated you would challenge the grade. While you are challenge grade through appropriate avenues you are not able to disrupt classes in such a manner.

Based on our meeting and the written documentation, and using a preponderance of the evidence standard, I have made the following determination regarding the alleged violations outlined in your original conference letter:

(2) Threats -- Not Responsible
Threatening or endangering the mental and/or physical health or safety of a person.

(9) Interference, obstruction, or Disruption of University Activity -- Responsible
Materially and substantially interfering with, obstructing, or disrupting a university activity. a. University activities include, but are not limited to, all normal university activities, such as teaching, research, recreation, meetings, public events, and disciplinary proceedings. b. This prohibition includes, but is not limited to, the following: behavior disruptive of university functions; Behavior resulting in injury to persons or damage to property on the campus; and interference, obstruction, or disruption of the freedom of movement of students, or other members of the university community and their guests. Interference in any manner with the public or private rights of citizens, Behavior that threatens or endangers the health or safety of any person, and damage to property are prohibited.

You have been sanctioned as follows:
**Return to English Class**
You are to attend your English class from May 1, 2017 through the taking of the final.

**Article Reflection**
Read the article attached to this email and write a reflection paper based on the question posed (also attached to this email). This reflection paper is to be of the quality you would use for an assignment in any class in which you are registered. Submit this paper electronically to me at david.steward@ucdenver.edu by June 16, 2016.

Please understand that completion of these sanctions is your responsibility. Failure to complete these sanctions will result in further judicial action, specifically a hold being placed on your records and a stop on your registration.

If you have been given a sanction of probation with loss of good standing or higher, you have the right to appeal this decision. Such an appeal must be made in writing and submitted via the Student Conduct and Community Standards website, www.ucdenver.edu/standards. This appeal must be submitted no later than May 8, 2017. More information about the appeals process can be found on our webpage www.ucdenver.edu/csw.

It is my hope that you will have a positive experience while a student here at the University of Colorado. The faculty and staff will continue to support your positive contributions to the university learning/living environment. If you have any questions, please do not hesitate to contact me.

Sincerely,


David Steward
Director of Student Conduct and Community Standards

Fischer, A. H., & Roseman, I. J. (2007). Beat them or ban them: the characteristics and social functions of anger and contempt. *Journal of personality and social psychology*, 93(1), 103.

Read the above article and address the following questions in a reflection paper.

1. Why did the authors choose anger and contempt to focus on in this article?

2. In the first three paragraphs of the paper the authors identify their two aims of the paper. What are they?

3. In the first full paragraph on page 104 the author identifies the social function of anger. Please describe this in your own words.

4. In the fifth full paragraph on page 104 the author identifies the social function of contempt. Please describe this in your own words.

5. In the first paragraph under the General Discussion heading on page 112 the author identifies the prototypical reaction of both anger and contempt. Please state each in your own words and whether you agree or disagree with the authors.

6. In the last paragraph on page 113 the authors compare and contrast anger and contempt. Please summarize their conclusions.

7. As a result of reading this article classify your behavior in English Class on April 11, 2017 as anger or contempt? Please justify your response with evidence from this article.

8. Review the reference list found on page 114 and 115. What two articles would you choose to read for further learning? Why did you select these two?

CU JORDAN_0108

Journal of Personality and Social Psychology
2007, Vol. 93, No. 1, 103–115

Copyright 2007 by the American Psychological Association
0022-3514/07/$12.00   DOI: 10.1037/0022-3514.93.1.103

# Beat Them or Ban Them: The Characteristics and Social Functions of Anger and Contempt

Agneta H. Fischer
University of Amsterdam

Ira J. Roseman
Rutgers, The State University of New Jersey, Camden College
of Arts and Sciences

This article reports 3 studies in which the authors examined (a) the distinctive characteristics of anger and contempt responses and (b) the interpersonal causes and effects of both emotions. In the 1st study, the authors examined the distinction between the 2 emotions, in the 2nd study, the authors tested whether contempt could be predicted from previous anger incidents with the same person, and in the 3rd study, the authors examined the effects of type of relationship on anger and contempt reactions. The results of the 3 studies show that anger and contempt often occur together but that there are clear distinctions between the 2 emotions. Anger is characterized more by short-term attack responses but long-term reconciliation, whereas contempt is characterized by rejection and social exclusion of the other person, both in the short-term and in the long-term. The authors also found that contempt may develop out of previously experienced anger and that a lack of intimacy with and perceived control over the behavior of the other person, as well as negative dispositional attributions about the other person, predicted the emergence of contempt.

*Keywords:* anger, contempt, attack, exclusion, social functions

Unfortunately, hostility between individuals or groups is of all times and all cultures. Various negative emotions may be at the heart of hostile reactions, and in this article, we argue that the nature of these emotions influences the intensity and the duration of interpersonal hostility and its effect on the interpersonal relationship between the parties involved in the hostility. We focus on two emotions, anger and contempt, because they commonly occur in negative social interactions, and they both imply a negative appraisal of the intentions of the other person (e.g., Frijda, Kuipers, & ter Schure, 1989; Kuppens, Van Mechelen, Smits, & De Boeck, 2003; Ortony, Clore, & Collins, 1988; Roseman & Smith, 2001). In addition to these similarities, we also think that anger and contempt show important differences, especially with regard to their distinct roles in constituting, enhancing, or breaking off social relationships (see also Fitness & Fletcher, 1993). Our first aim in this article is to distinguish between the social functions of anger and contempt, as inferred from their motivational, behavioral, and relational characteristics.

The focus of previous studies that compared anger and contempt has been on the types of antecedents of both emotions. According to the contempt, anger, and disgust hypothesis proposed by Rozin,

Lowery, Imada, & Haidt (1999), for example, anger, contempt, and disgust provide an emotional basis for morality, and they can be distinguished because they are elicited in response to infringements in three different ethical domains: anger in reaction to the violation of autonomy (individual freedom, rights), contempt in reaction to the violation of the ethics of the community (respect, duty, hierarchical relations), and disgust in reaction to the violation of the ethics of divinity (purity, beauty). In line with this hypothesis, Rozin et al. (1999) showed that respondents are able to assign the appropriate emotion labels (anger, contempt, and disgust) and the appropriate facial expressions to the specific types of violations posited for anger, contempt, and disgust.

Although in the present article we aim to examine the distinction between anger and contempt, our focus is not so much on the different moral antecedents but rather on the relational antecedents and effects and on the motivational and behavioral components of anger and contempt. Our first aim is to distinguish the distinctive characteristics of anger and contempt reactions. We argue that anger can be seen as belonging to the attack-emotion family, aimed at attacking the other person in order to gain a better outcome, whereas contempt belongs to the exclusion-emotion family, aimed at excluding the other person from one's social network (Roseman, Wiest, & Swartz, 1994; Roseman, Copeland, & Fischer, 2003).

Our second aim in this article is to investigate whether contempt and anger develop differently over time, partly on the basis of different perceptions of the relationship with the other person. Whereas anger might usually be characterized as an intense but short-term emotion in which one seeks a less negative outcome by coercing change in another person's behavior, contempt may typically be a less intense but longer-lasting emotion, implying more negative and permanent changes in beliefs about another person (see also Frijda & Mesquita, 1994) and in the treatment of that person (social exclusion or distancing). Thus, if one is angry at

Agneta H. Fischer, Department of Social Psychology, University of Amsterdam, Amsterdam; Ira J. Roseman, Department of Psychology, Rutgers, The State University of New Jersey, Camden College of Arts and Sciences.

We thank Taryn Sobrado, Sven Zebel, and Martijn van Zomeren for their thoughtful comments and suggestions on earlier versions of this article.

Correspondence concerning this article should be addressed to Agneta H. Fischer, Department of Social Psychology, University of Amsterdam, Roetersstraat 15, 1018 WB Amsterdam, the Netherlands. E-mail: a.h.fischer@uva.nl

someone, a relationship with that person is still viable, and it may be worth engaging in an attempt to change the person's behavior, as may be inferred from studies on marital conflicts (see e.g., Gottman & Levenson, 2002). However, if one feels contempt toward someone, the relationship is at risk because one has started to appraise the other person as unworthy or inferior and may therefore stop trying to change the person's behavior or arrive at some reconciliation. Because contempt implies a more extreme negative view of the other person than is generally the case with anger, we argue that contempt tends not to be elicited suddenly but may often result from previous angry interactions with the same person that went unresolved. In sum, contempt may have a different social function than anger.

## The Social Functions of Anger and Contempt

Several authors have argued that emotions have a variety of social functions (e.g., Baumeister, Stillwell, & Heatherton, 1994; Fischer & Manstead, in press; Fridlund, 1994; Frijda & Mesquita, 1994; Keltner & Haidt, 1999; Parrott, 2001), but only a few previous studies have directly compared emotions with regard to their social functions. As a result, social functions have generally been theoretically derived. Social functions are not equivalent to the social effects of an emotion (Fischer & Manstead, in press) but should be derived from the social relational goals and the prototypical appraisals and actions that characterize a specific emotion. We argue that the social function of anger can be conceptualized as attaining a better outcome by forcing a change in another person's behavior. This function can be served by hostile or antagonistic behaviors, that is, by seeking confrontation or by attacking someone, for example, by criticizing, name-calling, or slapping someone. Various studies have demonstrated that the hostile action tendency is indeed one of the core characteristics of anger (de Rivera & Grinkis, 1986; Frijda et al., 1989; Kuppens et al., 2003; Roseman, Wiest, & Swartz, 1994), though it need not be present in all instances of anger.

Given this antagonistic motive and the other-blame appraisal typical of anger (e.g., Roseman, Antoniou, & Jose, 1996; Smith & Lazarus, 1993), it is not surprising that much research to date has focused on the negative consequences of anger displays for the object of one's anger, as is the case with physical, verbal, or social forms of aggression (e.g., Archer, 2000; Archer & Coyne, 2005; Berkowitz, 1993; Bushman, 2002). Although aggression may intimidate others and may therefore produce change in the other person's behavior, aggression is considered maladaptive insofar as it can injure the object and can also lead to retaliation against the aggressive person (e.g., Berkowitz, 1993; Martin et al., 1999). However, various studies have also shown that the social functions of anger can be served when anger is expressed or regulated in a variety of less destructive and more strategic ways, for example, by just telling someone you are angry, by expressing criticism verbally, by temporally ignoring someone, or by merely venting your anger against inanimate objects (e.g., Archer & Coyne, 2005; Averill, 1982; Kuppens et al., 2004; Leary, Twenge, & Quinlivan, 2006; Mackie, Devos, & Smith, 2000; Spielberger et al., 1985; Wolf & Foshee, 2003).

In other words, in line with the proposed social function of anger, the effects of anger need not be negative, especially not in the long-term and especially not from the perspective of the angry

person (see also Averill, 1982; Demoulin et al., 2004; Green & Murray, 1975; Mallick & McCandless, 1966; Van Kleef, De Dreu, & Manstead, 2004). Averill (1982), for example, found that people recalling experiences in which they got angry evaluated a majority of the overall effects of anger episodes as beneficial because they got the object of their anger to change his or her attitude or behavior or because it helped them realize their own strengths or faults. For example, behaving angrily may be a signal to your boss that you feel you are being treated unfairly, or it may enhance your self-esteem because you have finally told your friend the truth about an irritating habit. Research by Kuppens et al. (2004), which showed that angry individuals tend to avoid high status persons (when angry at them) and tend to express their anger to low status persons, also suggested that people tend to express their anger when they think they can correct the behavior of the other person. In the same line, Mackie, Devos, and Smith (2000) found that the perceived strength of an ingroup resulted in an increase of anger and offensive action tendencies against the outgroup (see also van Zomeren, Spears, Fischer, & Leach, 2004). Moreover, in comparing the effects of anger and contempt, Mackie et al. (2000) found that only anger, and not contempt, was a significant predictor of moving against the outgroup.

In other words, insofar as anger is elicited by an undesirable outcome caused by another person or group, anger can be seen as a means of trying to get something done by forcing a change in the target's behavior, especially when one feels that one has power or control over the target. Thus, although the implications of anger expression may initially be considered negative, especially by the anger object, they may be positive for the angry person: if the longer-term effect of anger is to alter an unsatisfactory interaction pattern or relationship between two people, it may be followed by a reconciliation in which a more mutually satisfactory pattern or relationship is established.

The social function of contempt, in contrast, is not to change another person's actions but to exclude the other person from one's social network, perhaps because the one who is feeling contempt perceives no way to influence or change the other person or does not wish to change him or her. If changing another person's behavior is impossible or not worth the effort, then ignoring or belittling the person and excluding him or her from one's social environment may be a more viable way to reduce that person's negative impact on one's outcomes.

Whereas a great deal of attention has been paid to anger, anger behavior, and aggression (see, e.g., Averill, 1982; Geen & Donnerstein, 1998; Lemerise & Dodge, 2000), there is much less research on contempt, with the exception of research on the facial expression of it (see, e.g., Ekman & Friesen, 1986; Ekman & Heider, 1988; Galen & Underwood, 1997; Izard & Haynes, 1988; Russell, 1991a). However, there is a rapidly expanding literature on social exclusion and ostracism (Eisenberger, Lieberman, & Williams, 2003; Horn, 2003; Kurzban & Leary, 2001; Twenge, Baumeister, Tice, & Stucke, 2001; Underwood, 2004; Twenge, Catanese, & Baumeister, 2002, 2003; Williams, 2001; Williams, Forgas, & von Hippel, 2005; Xie et al., 2002), which we contend are behaviors typically associated with contempt. Social exclusion can be accomplished in different ways, one way being ostracism, as in giving the silent treatment. According to Williams (2001), ostracism is "playing out a role, a pretending that the target does not exist" (p. 71). Behaviors that have been reported as reflecting

CH JORDAN 0110

the silent treatment are not making eye contact, not talking, not responding to any questions or comments, making a definite effort to ignore, and trying to avoid all contact. Social exclusion may, however, also be manifested in other ways: for example, by gossiping and by trying to actively belittle and derogate another person, often behind his or her back.

In developmental research, social exclusion has been conceptualized as a form of social aggression (e.g., Archer & Coyne, 2005; Underwood, 2003, 2004; Xie, Cairns, & Cairns, 2002). Comparing social and physical aggression among boys and girls from elementary schools, Xie et al. (2002) found that social aggression was more often used by children and adolescents who were central in their peer social networks than by those who had a more marginal social position. Moreover, social exclusion is a form of social aggression mainly used by girls and women (see also Underwood, 2004), first, because they tend to have larger social networks and second, because they may not have other means to change another person (see also Eagly & Steffen, 1986; Evers, Fischer, Rodriguez Mosquera, & Manstead, 2005; Timmers, Fischer, & Manstead, 1998).

We argue that social exclusion typically involves the same goal as is pursued in the emotion of contempt, namely, to ban another person from one's life. Its deleterious consequences have been demonstrated by various studies that showed that social exclusion has profound negative effects on the self-esteem, the mood, the behavior, and the cognitive processing of the excluded person. For example, it has been shown that socially excluded people demonstrate lethargy, feelings of meaninglessness, self-defeating behavior, an avoidance of aversive self-awareness (Twenge, Catanese, & Baumeister, 2002, 2003), and aggressive retaliation against the person who excluded them (Twenge, Baumeister, Tice, & Stucke, 2001).

In sum, the first hypothesis that was examined in our studies was whether the distinction between the characteristics of anger as an attack emotion and contempt as an exclusion emotion receives empirical support. The second hypothesis concerned the different relational frameworks in which anger and contempt may develop. We hypothesized that the relational antecedents and consequences of anger and contempt are different. Anger more often arises in intimate settings, where a certain amount of control over the other person is expected, which could result in a change of the other person's behavior. Contempt, on the other hand, would be more likely to occur in less intimate settings where less control is expected and where one has a more negative view about the other person. In addition, anger is often beneficial for the relationship in the long-term, as it implies the expectancy to reconcile and to thereby improve the relationship, whereas contempt is detrimental for the relationship. Our third hypothesis concerned the relation between anger and contempt. We assumed that contempt may occur especially if one is still angry. In these cases, the anger is unresolved and no reconciliation with the other person appears possible. Contempt, therefore, may often develop on top of one's anger.

In order to test these hypotheses, we conducted three studies. In Study 1, we examined the participants' ratings of the autobiographical experiences of anger and contempt, to see whether there was support for the hypothesized distinction between the two emotions. In Study 2, we explored the relation between anger and contempt by testing whether previous anger experiences result in

contempt. In Study 3, we manipulated the intimacy of the relationship between the emotional person and the target of the emotion in order to test whether less intimacy and less control results in more contempt than anger. In Studies 2 and 3, we used different methods in order to overcome some possible limitations of the autobiographical method used in the first study.

## Study 1

We hypothesized that the core social function of anger is forcing change in an undesired outcome brought about by another person (coercion); therefore, anger is typically characterized by other-blame and short-term antagonistic responses (defined as seeking confrontation). In the long-term, however, if the undesired outcome has been altered, one's anger may diminish, and one may reconcile with the other person. The social function of contempt, on the other hand, is moving undesirable persons (and their undesirable characteristics and outcomes) away from the self (exclusion) rather than trying to change them, as in anger. This is often done by treating the other person as inferior, as someone who is unworthy of respect or even attention, for example, by derogating, rejecting, or ignoring him or her, both in the short-term and in the long-term. Thus, in addition to appraisals of other-blame, contempt would also include a more permanent negative appraisal of the other person, for example, as having a bad character. In the long-term, therefore, contempt seems likely to result in longer-lasting ruptures in social bonds.

In order to be able to optimally distinguish between the two emotions, we aimed at collecting autobiographical narratives that were exclusively related to either anger or contempt. To achieve this goal, we gave the respondents detailed instructions asking them to differentiate between contempt and anger. We told the participants the following:

> This is a study about the similarities and differences between anger and contempt. These emotions often, but not always, occur simultaneously. We would like to know in which situations individuals experience either contempt or anger and what the characteristics of these emotions are. The first question is whether you can recollect an event in which you felt a fair amount of anger [contempt] toward a person, but hardly any contempt [anger].

The respondents received one of two versions of the questionnaire (either contempt or anger).

### Method

*Participants and procedure.*  Participants were 94 students (30 men and 64 women, $M_{age} = 21.00$, $SD = 3.23$) from the University of Amsterdam who participated in this study in exchange for credit points. Of the participants, 3 were excluded because they had recalled an event in which they were hardly angry or contemptuous. The questionnaire was administered individually in our lab. The participants were assigned at random to recall either an anger event (15 men, 31 women) or a contempt event (15 men, 33 women).

*Questionnaire.*  The questionnaire started with an open-ended question asking participants to describe a situation in which they felt either anger but not contempt or contempt but not anger (toward a person in each case). We then presented a series of

FISCHER AND ROSEMAN

questions about this event, to be rated on 7-point Likert scales (1 = *not applicable*; 7 = *very applicable*). We first asked participants to indicate the intensity of their anger and contempt immediately after the event and after a few days. Next, we asked about appraisals of the event. We examined whether there would be more blaming of the other person in the contempt condition (other-blame, "It was the fault of the other person," versus no-blame, "No one was to blame for this event"). We also asked about a dispositional appraisal of the other person as having a negative character ("I thought the other person was bad"), the participant's felt control over the object ("To what extent could you influence the other person?"; "To what extent did you feel in control of the situation?"; *r* = .51), and the degree of intimacy with the other person ("How well do you know this person?"; "How intimate are you with this person?"; *r* = .91). We also asked whether the object was a man or a woman.

Next, we asked about participants' first or immediate response to the event, measuring two types of immediate responses: verbal attack ("I criticized the other person," "I confronted the other person with my negative feelings about him or her," "I used tough language," "I made unfriendly remarks," α = .78) and derogation ("walking away," "ignoring the other," "showing no respect," "showing disgust," α = .63). We then measured long-term reactions, that is, one's reaction to the other person after a few days, tapping reconciliation ("making up," "talking it over," "solving the problem," α = .87) and rejection ("ignoring," "banning from one's social network," *r* = .67).

We also asked about participants' *emotivational goals* (Roseman et al., 1994), namely, the goals they may have wanted to pursue as part of the emotion they felt (anger or contempt). Two scales were constructed: coercion, which was hypothesized to be more typical of anger ("I wanted the other to apologize," "I wanted the other not to do this again," "I wanted the other to realize that he/she has gone too far," and "I wanted to get even with this person," α = .72), and social exclusion, hypothesized to be more typical of contempt ("I wanted to break the relationship," "I wanted to have nothing to do with this other person anymore," "I did not want to be associated with this person," α = .92). In order to examine the relational consequences of anger versus contempt, we measured negative relational implications ("our relation will not improve," "our relation will deteriorate," and "contact with this person has diminished," α = .75).

### Results

All multivariate analyses of variance (MANOVAs) reported below were conducted with type of emotional event (anger, contempt) and sex of respondent as factors. Because this article does not focus on the sex differences, the simple main effects of the sex of respondents are reported in footnotes, and only the interaction effects with the main variables of interest are described in the text.

*Intensity of emotions.* A repeated measures MANOVA, with intensity of anger and contempt at the beginning of the event, intensity of anger and contempt after a few days, and time (difference between emotions at the two different points in time) as within-subjects factors, revealed a significant multivariate main effect of the emotional event condition, $F(2, 89) = 125.16$, $p < .0001$, a marginally significant main effect of (the within-subjects factor) time, $F(2, 89) = 2.70$, $p < .08$, and a significant interaction

effect, $F(2, 89) = 3.17$, $p < .05$. No effects of sex of respondent were found. Emotional event type was significant for both anger, $F(1, 93) = 44.90$, $p < .0001$, and contempt, $F(1, 93) = 170.78$, $p < .0001$. Simple *t* tests showed that participants reported more initial anger during the anger event than during the contempt event, $t(92) = 5.67$, $p < .0001$, and more initial contempt during the contempt event than during the anger event, $t(92) = -9.57$, $p < .0001$. Further, simple *t* tests of anger and contempt a few days after the event also showed more intensity of anger after the anger event, $t(92) = 4.69$, $p < .0001$, and more intensity of contempt after the contempt event, $t(92) = -13.41$, $p < .0001$ (see Table 1, for the means). Thus, our attempt to collect experiences in which participants reported contempt without much anger and anger without much contempt was successful. Further, the time factor was only significant for contempt, $F(1, 93) = 10.14$, $p < .01$, as was the case for the interaction between time and emotional condition, $F(1, 93) = 6.00$, $p < .05$. Contempt increased significantly over time (and only for the contempt event), whereas the intensity of anger remained similar over time.

*Appraisals.* We conducted a MANOVA with other-blame, no-blame, negative character, and control over object as dependent measures. We found a significant main effect of emotional event, $F(4, 86) = 3.34$, $p < .01$. No effects of sex of respondent were found. Univariate analyses showed that the emotional event main effect was not significant for other-blame and no-blame. However, we found significant univariate effects for the other appraisals: having control, $F(1, 93) = 9.89$, $p < .01$, and seeing the other person as having a bad character, $F(1, 93) = 10.83$, $p < .001$. The

Table 1
*Means and Standard Deviations (in Parentheses) for All Characteristics of the Emotional Responses in the Anger and Contempt Conditions (Study 1)*

| Characteristic of emotion | Type of emotional event | |
|---|---|---|
| | Anger event | Contempt event |
| **Intensity** | | |
| Anger at beginning | 5.63 (1.37)ₐ | 3.63 (2.00)ᵦ |
| Contempt at beginning | 2.35 (1.40)ₐ | 5.42 (1.68)ᵦ |
| Anger after some days | 5.42 (1.52)ₐ | 3.88 (1.85)ᵦ |
| Contempt after some days | 2.46 (1.59)ₐ | 6.25 (1.10)ᵦ |
| **Appraisals** | | |
| Other-blame | 4.98 (1.72)ₐ | 5.29 (1.89)ₐ |
| No-blame | 2.70 (1.81)ₐ | 2.38 (1.94)ₐ |
| Control | 3.96 (1.59)ₐ | 2.91 (1.56)ᵦ |
| Negative character | 3.65 (1.96)ₐ | 4.94 (1.84)ᵦ |
| Intimacy | 5.70 (1.32)ₐ | 3.45 (1.59)ᵦ |
| **Immediate** | | |
| Verbal attack | 4.64 (1.39)ₐ | 3.26 (1.33)ᵦ |
| Derogation | 2.57 (1.33)ₐ | 3.34 (1.24)ᵦ |
| **Long-term** | | |
| Reconciliation | 3.37 (1.96)ₐ | 1.71 (1.66)ᵦ |
| Rejection | 2.62 (1.99)ₐ | 3.02 (2.10)ₐ |
| **Goals** | | |
| Coercion | 4.50 (1.35)ₐ | 3.77 (1.50)ᵦ |
| Social exclusion | 1.82 (1.46)ₐ | 3.27 (1.96)ᵦ |
| **Implications** | | |
| Deterioration | 2.83 (1.63)ₐ | 4.09 (1.65)ᵦ |

*Note.* Means in one row with different subscripts differ at least at *p* < .05.

CU JORDAN 0112

ANGER AND CONTEMPT SOCIAL FUNCTIONS

107

Table 2
*Correlations for All Anger and Contempt Characteristics (Study 1)*

| Characteristic | Anger | Anger after days | Verbal attack | Reconciliation | Coercion | Contempt | Contempt after days | Derogation | Rejection | Social exclusion |
|---|---|---|---|---|---|---|---|---|---|---|
| Anger | — | | | | | | | | | |
| Anger after days | .35* | — | | | | | | | | |
| Verbal attack | .38* | .33** | — | | | | | | | |
| Reconciliation | .26* | .07 | .38** | — | | | | | | |
| Coercion | .32* | .47** | .55* | .22* | — | | | | | |
| Contempt | -.25* | -.08 | -.25* | -.35* | -.04 | — | | | | |
| Contempt after days | -.41* | -.20* | -.33* | -.44* | -.04 | .79* | — | | | |
| Derogation | .02 | .10 | .21* | -.29* | .37* | .37** | .46 | — | | |
| Rejection | -.07 | .21* | -.03 | -.34* | .22* | .26* | .38** | .51** | — | |
| Social exclusion | -.22* | .07 | -.21* | -.45* | .04 | .39* | .46* | .48* | .55* | — |
| Relational deterioration | .18 | .05 | -.197 | -.55* | .05 | .27* | .40** | .46** | .59* | 82 |

*p < .05   **p < .01

means in Table 1 show that in the contempt condition, participants saw the object as having a worse character and reported less control over the object, compared with the anger condition An analysis of variance (ANOVA) with intimacy as a dependent measure showed a significant main effect of emotional condition, $F(1, 93) = 55.66$, $p < .0001$. The means show that participants in the anger condition reported more intimacy with the object than did participants in the contempt condition

*Behavioral reactions* We next conducted a MANOVA with the four immediate and long-term responses as dependent measures and found a multivariate main effect of emotional condition, $F(4, 86) = 11.82$, $p < .0001$ This was univariately significant for three of the four response scales. verbal attack, $F(1, 93) = 22.01$, $p < .0001$; derogation, $F(1, 93) = 4.73$, $p < .05$; and reconciliation, $F(1, 93) = 18.13$, $p < .0001$. In line with predictions, the means in Table 1 show that derogation was more characteristic for the contempt pattern, whereas immediate verbal attack and reconciliation were reported more during anger incidents.

We also found a multivariate main effect of sex of respondent, $F(4, 86) = 3.52$, $p < .01$, which was qualified by a significant interaction. $F(4, 86) = 3.08$, $p < .05$[1] The interaction effect is significant for rejection, $F(1, 93) = 6.68$, $p < .05$, and reconciliation, $F(1, 93) = 5.44$, $p < .05$. Women's greater tendency to reconcile only occurred in the anger events (in the contempt events, both sexes reported hardly any reconciliation). In addition, women reported rejecting the other person more than men did in the contempt condition, whereas men reported rejecting more than women did in the anger condition.

*Emotivational goals* A MANOVA with the two emotivational goals revealed significant main effects of emotional condition, $F(2, 89) = 10.71$, $p < .0001$, and sex of respondent, $F(2, 89) = 3.69$, $p < .05$.[2] No interaction effect between emotional condition and sex of respondent was found. The main effect of emotional condition was significant for social exclusion, $F(1, 93) = 9.95$, $p < .01$, and for coercion, $F(1, 93) = 7.75$, $p < .01$. The coercion goal was more often reported in the anger condition, whereas the goal to socially exclude someone was more frequently reported in the contempt condition

*Relational implications.* An ANOVA on negative relational implications also revealed a significant main effect of emotional

condition, $F(1, 92) = 13.42$, $p < .0001$. Less deterioration was noted in the anger condition than in the contempt condition We also found an interaction with sex of respondent, $F(2, 89) = 6.52$, $p < .05$. Women reported more relationship deterioration ($M_w = 5.35$, $SD = 1.35$) than did men ($M_m = 4.15$, $SD = 1.55$), but only in the anger condition, whereas in the contempt condition, no sex difference was found.

*Correlations.* The results from the MANOVAs show that the different instructions indeed elicited different patterns of reactions that can be characterized as prototypical anger and contempt responses In order to test whether the prototypical anger reactions and implications are associated with the intensity of one's anger and whether the prototypical contempt reactions and implications are associated with the intensity of one's contempt, we computed correlations for all anger and contempt characteristics (see Table 2). As shown in the first column of Table 2, the intensity of anger is significantly and positively associated with verbal attack, reconciliation, and the coercion goal and negatively associated with contempt, contempt after some days, and the social exclusion goal Contempt and contempt after some days, on the other hand, are positively associated with derogation, rejection, and the social exclusion goal, as well as with relationship deterioration, and negatively related to verbal attack and reconciliation These correlations support the hypothesized pattern of prototypical anger and contempt responses and goals First of all, anger and contempt, both at the beginning of the event and after a few days, are not correlated, which is the obvious result of our manipulation. However, whereas anger after some days is significantly related to attack and coercion, it is not related to reconciliation, which

---

[1] Univariate analyses showed that the main effect of sex is marginally significant for verbal aggression, $F(1, 93) = 3.71$, $p < .06$, and highly significant for reconciliation, $F(1, 93) = 12.59$, $p < .001$ Women were more likely to report that they verbally aggressed ($M_w = 4.13$, $SD = 1.47$, $M_m = 3.52$, $SD = 1.97$), but they also tended to reconcile more than did men ($M_w = 2.88$, $SD = 1.89$, $M_m = 1.75$, $SD = 1.31$)

[2] The sex effect was only significant for coercion, $F(1, 92) = 5.14$, $p < .05$ Inspection of the means shows that women ($M = 4.35$, $SD = 1.39$) report more coercion goals than do men ($M = 3.63$, $SD = 1.53$)

108                                  FISCHER AND ROSEMAN

suggests that the longer one remains angry, the less likely it is that one reconciles with the other person. Finally, reconciliation is positively associated with coercion but negatively associated with all contempt characteristics and with relationship deterioration.

## Discussion

In Study 1, we tried to isolate emotional events that had elicited mainly contempt from events that had elicited mainly anger. In order to disentangle the distinctive features of contempt versus anger. We may conclude that our instruction was successful, given the findings that less anger was reported in the contempt condition, less contempt was reported in the anger condition, and no correlations between the reports of the two emotions were found.

The results support our hypotheses concerning the prototypical pattern of contempt, which consists of short-term derogation, long-term social exclusion, a lack of reconciliation, and the absence of relational improvement. Indeed, the correlations also show that derogation, rejection, and contempt are associated with relationship deterioration. This is consistent with our argument that the social function of contempt is to socially exclude the other person. The results also show that anger is indeed characterized more by short-term verbal attack, is followed by some reparation of the harm that has been done (reconciliation), and is ultimately associated with less deterioration of the relationship than is the case for contempt. Our assumption that contempt and anger arise from different relational perspectives was also supported: Participants in the contempt condition perceived the relationship with the other person as less intimate; they more often blamed the other person, perceived the other person as having a negative disposition, and reported less control over the other person. Moreover, we found preliminary evidence for a differential development of the two emotions over time: Whereas the intensity of anger did not change over time, the intensity of contempt increased (during the contempt events), suggesting that contempt may develop on top of one's anger.

Finally, we also found a few differences between men and women, especially with regard to their emotional behaviors: Women reported more attempts to try to change the other person (coercion goals), more reconciliation, and more relationship deterioration in the anger incidents, whereas in the contempt events, no sex differences were found. These differences may be due to the stronger relational orientation of women, and the fact that they were mainly found in the anger condition supports our contention that the viability of the relationship is an important concern when one is angry but not when one feels contempt.

## Study 2

The first study showed that it is possible to disentangle anger and contempt reactions in order to examine their independent implications. However, by using an explicit instruction to state that the study is about the differences between anger and contempt, it is possible that we activated more general anger and contempt knowledge rather than memories of the specific events (see also Robinson & Clore, 2002). In other words, we may have measured respondents' anger and contempt concepts rather than the details of the events and the memory of their actual reactions to these events. The results of this study would be more convincing if we

could show that prototypical anger and contempt reactions are indeed associated with anger and contempt, without using these emotion labels in the instructions. In the following two studies we tried to do just that.

In Study 2, we tested whether manipulating the hypothesized emotivational goal and associated reactions of anger and contempt would indeed lead respondents to recall feelings of anger or contempt. We instructed respondents to "think of an incident in which another person has done something, after which you wanted to confront and criticize this person" (attack condition) or to "ignore this person and keep distant for the time being" (exclusion condition). We hypothesized that in the attack condition one would rate oneself as more angry, whereas in the exclusion condition one would rate oneself as more contemptuous.

In addition, we investigated whether there might be a progression from anger to contempt by testing whether the frequency of one's past anger relates to a judgment of bad character, which might in turn result in the development of contempt toward a person. We reasoned that frequent past anger toward a person may lead one to believe that this person is not likely to change his or her behavior, and thus, one might start to explain the person's transgressions in terms of a negative disposition (bad character). This would, in turn, predict the development of contempt toward this person. Because judging the other person as bad implies both a negative character and a dispositional judgment, we decided to create two variables in order to disentangle these aspects. We especially expected that dispositional attribution would be associated with contempt.

## Method

*Participants and procedure.* The participants were 63 students from the University of Amsterdam (27 men and 36 women) who received either credit points or €2 for their participation. Data were collected individually, either in the lab or in other places in the university building.[3] We made sure that none of the participants had been involved in the earlier studies on anger and contempt.

*Design and materials.* The study had one independent variable (emotivational goal) with two levels (coercion and exclusion). The participants were randomly assigned: 36 to the coercion condition (16 men, 20 women), and 27 to the exclusion condition (11 men, 16 women). The questionnaire was labeled Negative Behavior in Social Situations. We initially asked participants to describe the incident and then asked them to indicate which emotions they had felt (intensity of anger, intensity of contempt) and for how long (duration of anger, duration of contempt). We then asked how frequently they had felt anger toward the object (past anger frequency). We also asked them to evaluate the other person's character at the time of the incident (negative character, egoistic, asocial, immoral, and unfriendly; $\alpha = .62$), how much the transgression was explained in terms of dispositions ("This is how he/she is"; "This is due to his/her personality"; $r = .80$), and how intimate was the relationship with the other person (at the time of the incident). Finally, we measured to what extent the relationship had deteriorated since the incident (negative relational implications, 5 items, $\alpha = .81$).

---

[3] We thank Alexis Salin for the data collection and the data entry for Studies 2 and 3.

## Results

*Intensity and duration of emotion.* A MANOVA with sex of respondent and emotivational goal (attack vs. exclusion) as factors and intensity of anger and contempt as dependent variables revealed a significant multivariate main effect of emotivational goal, $F(2, 58) = 5.46$, $p < .01$. No significant effects of sex or interaction effects were found. Univariate tests showed that emotivational goal had a significant effect only on contempt, $F(1, 62) = 10.49$, $p < .01$. In line with our manipulation, the means (Table 3) show that participants reported more contempt when they had a social exclusion goal. The means for anger are in the predicted direction across conditions but are far from significant.

Another MANOVA with the duration of anger and contempt as dependent variables again revealed a significant multivariate main effect of emotivational goal, $F(2, 58) = 5.32$, $p < .01$, and a marginally significant main effect of sex, $F(2, 57) = 3.09$, $p < .06$ [1] No interaction effects were found. Emotivational goal was significant for the duration of contempt, $F(1, 61) = 6.17$, $p < .05$, and marginally significant for the duration of anger, $F(1, 61) = 3.02$, $p < .09$. An inspection of the means (Table 3) shows that participants reported longer contempt, though also marginally longer anger, in the social exclusion condition compared with the attack condition. In addition, a correlational analysis showed that anger and contempt were not correlated in the beginning of the incident ($r = .02$, ns) but were highly correlated some time after the transgression ($r = .43$, $p < .001$).

A MANOVA with negative character, dispositional attribution, and intimacy as dependent variables showed a multivariate main effect of emotivational goal, $F(3, 58) = 4.17$, $p < .01$, which was univariately significant for negative character, $F(1, 61) = 8.13$, $p < .01$, but not for intimacy and dispositional attributions (although the means of the latter variable were in the predicted

direction). Respondents evaluated the other person as having a more negative character. An additional ANOVA showed that past anger at the same person tended to be marginally more frequent in the exclusion condition than in the attack condition, $F(1, 62) = 3.79$, $p < .06$

*Relational implications.* An ANOVA with negative implications showed a significant effect, $F(1, 62) = 6.50$, $p < .02$ The means show greater deterioration of the relationship between subject and object since the recalled incident in the exclusion condition than in the attack condition (see Table 3).

*Regression analyses.* In order to test the hypothesis that contempt, and not anger, predicts relationship deterioration, we conducted a series of regression analyses. The first step confirmed that relational deterioration was significantly predicted by emotivational goal (dummy coded 0 = attack, and 1 = exclusion), $\beta = .31$, $p < .02$. Second, the emotivational goal (exclusion) predicted the intensity of contempt ($\beta = .37$, $p = .002$) but did not predict the intensity of anger ($\beta = .05$, ns). Third, adding contempt while controlling for emotivational goal showed that contempt was a marginally significant predictor of relational deterioration ($\beta = .23$, $p < .08$), whereas the effect of emotivational goal was reduced to marginal significance ($\beta = .22$, $p < .09$) The Sobel test showed that the beta was significantly reduced ($S = 1.75$, $p < .08$) Thus, we may conclude that contempt partly mediates the relation between emotivational goal and relational implications, whereas anger does not

We also examined whether the intensity of one's contempt rather than the intensity of one's anger can be predicted from a dispositional account of the other's negative behavior We conducted two regression analyses with the intensity of contempt and the intensity of anger as dependent variables and the dispositional attributions as the predictor. The results showed that, as hypothesized, dispositional attribution significantly predicts contempt ($\beta = .65$, $p < .0001$) and does not predict anger ($\beta = .17$, ns)

Finally, we tested whether one's contempt could be predicted by one's past and current anger. Both one's past anger ($\beta = .37$, $p < .01$) and, marginally, one's current anger ($\beta = .20$, $p < .10$) were predictors of one's current contempt. In contrast, when testing whether current anger was predicted by current contempt and the duration of one's contempt, no significant predictors were observed.

## Discussion

The results of Study 2 confirm the idea that contempt is associated with social exclusion, as the intensity and duration of contempt is larger in the social exclusion condition Moreover, the social exclusion condition has elicited stronger reports of relationship deterioration and a more negative evaluation of the other person as bad, replicating the results of Study 1 Because the use of an alternative instruction avoiding the words *anger* and *contempt* has provided the same pattern of results, this suggests that the methods used in Study 1 have not merely tapped respondents' anger and contempt knowledge but have provided reports that seem to reflect their actual reactions during those incidents.

This study also shows interesting results with regard to the relation between the two emotions. Anger was not uniquely related

Table 3
*Means and Standard Deviations (in Parentheses) for All Characteristics of the Emotional Responses in the Attack and Exclusion Conditions (Study 2)*

| Characteristic of emotion | Emotivational goal | |
|---|---|---|
| | Attack | Exclusion |
| *Emotions* | | |
| Anger | 5.92 (1.16)$_a$ | 5.78 (1.40)$_a$ |
| Contempt | 3.25 (2.10)$_a$ | 4.89 (1.91)$_b$ |
| Duration of anger | 3.44 (1.83)$_a$ | 4.30 (1.71)$_{ab}$ |
| Duration of contempt | 2.47 (1.93)$_a$ | 3.69 (2.24)$_b$ |
| Frequency of past anger | 3.53 (1.56)$_a$ | 4.33 (1.71)$_{ab}$ |
| *Relational implications* | | |
| Deterioration | 4.31 (1.35)$_a$ | 5.24 (1.54)$_b$ |
| *Appraisals* | | |
| Negative character | 4.44 (1.31)$_a$ | 5.36 (1.19)$_b$ |
| Dispositional attribution | 4.97 (1.44)$_a$ | 5.44 (1.91)$_a$ |
| Intimacy | 4.28 (1.88)$_a$ | 4.52 (1.78)$_a$ |

*Note.* Means in one row with different subscripts differ at least at $p < .05$ (ab indicates differences at $p < .10$)

[1] No significant univariate sex effects were found

110                                        FISCHER AND ROSEMAN

to the coercion goal but was also reported in relation to the exclusion goal. In other words, the instruction to think of a situation in which one wanted to ignore and keep distant from another person has resulted in anger-plus-contempt experiences rather than contempt-only experiences. In Study 1, we also found somewhat more anger in contempt experiences than contempt in anger experiences, which fits with the idea that contempt is more often accompanied by anger than the other way around. These results are consistent with the idea that contempt may often occur on top of one's anger. The correlations between anger and contempt over time also fit this pattern. Anger and contempt were uncorrelated immediately after the incident but were significantly correlated some days later, which suggests that social transgressions may often start with a mere anger reaction, but this anger may lead to contempt, especially if one has had frequent prior incidents of anger, in reaction to the same person. This is supported by the regression analyses showing that contempt toward a person is significantly predicted from past anger at the same person.

We also replicated the finding that contempt rather than anger is evoked when one perceives the other person as intrinsically bad. However, in contrast with the first study, we did not find differences in intimacy between the two conditions. A close inspection of the reported incidents in the exclusion condition shows that our participants mentioned family members, ex-partners, or friends, whom they all consider relatively, though not extremely, intimate. This focus on more intimate persons may have been prompted by the instructions. In the exclusion condition we told respondents to think of an incident with another person "whom they wanted to ignore and keep distant from *for the time being* [italics added]." This last part of the instruction may have led participants to focus on relatively intimate persons, with whom they ultimately wanted to preserve some relationship. Nevertheless, despite the fact that the incidents concerned intimates, we found that in the exclusion condition, the relationships deteriorated more than in the attack condition

## Study 3

Studies 1 and 2 showed support for our hypotheses concerning the different characteristics of anger and contempt. Study 3 focused more directly on the relational basis of anger and contempt. In Study 1, we found that participants in the anger condition reported more intimacy and more control over the other person than did participants in the contempt condition. This is in line with our hypothesis that anger is more socially functional in intimate relationships, whereas contempt is more socially functional in relationships that are not characterized by mutual commitment or care. The results of Study 2, however, did not show a difference in intimacy in the anger and contempt incidents, which might be explained in terms of the instructions. The aim in Study 3 was to resolve this seeming inconsistency and to see whether the negative behavior of intimates is more likely to elicit a prototypical anger pattern, whereas negative behavior of nonintimates is more likely to elicit a prototypical contempt pattern. That is, does intimacy increase the probability of reacting with anger and trying to correct the problem caused by the other person and does it decrease the probability of responding with contempt and its associated pattern of social exclusion?

To test this hypothesis, we used a vignette in which we systematically varied the type of relationship with the transgressor in a story (being either a friend or a stranger) while holding the type of transgression constant. The use of a vignette method also makes up for one of the limitations of collecting autobiographical stories because the only aspect of the event that is varied is the intimacy with the provoker.

### Method

*Participants and procedure.* Participants were 78 students from the University of Amsterdam (41 men and 37 women) who received either credit points or €2 for their participation. Data were collected individually, either in the lab or in other places in the University buildings.

*Design and materials.* The study had one independent variable (type of relationship) with two levels (friend and stranger). The participants were randomly assigned to the conditions: 39 to the friend condition (20 men, 19 women) and 39 to the stranger condition (21 men, 18 women). The questionnaire was labeled Rule Transgression in Social Situations and described a situation in which they had to imagine themselves sitting in a train late in the evening with either a friend or a stranger who is drunk and who starts scolding the conductor in an aggressive tone for no good reason. A series of questions about their own reactions followed. The questions were highly similar to the ones used in Studies 1 and 2, with a few minor adaptations. Initially, we asked them to indicate the intensity of their emotions (anger and contempt) at that moment and their immediate response to the event: verbal attack (3 items, $\alpha = .85$) and derogation (3 items, $\alpha = .82$). The next set of questions reflected different emotivational goals, namely coercion (4 items, $\alpha = .83$) and social exclusion (5 items, $\alpha = .88$). Then, we asked whether they would feel and act in the same way a couple of days later: rejection of the person (3 items, $\alpha = .92$) and reconciliation with the person (3 items, $\alpha = .92$). We then included an assessment of the dispositional attribution of the provoker's act ("This is how he is"; "This reaction is due to his personality"; $r = .43$). We also asked how much control participants perceived over the other person (control: "I think he will change because of my behavior", "I think my behavior influences him"; "I think I cannot influence him (reverse coded)"; $\alpha = .66$) Finally, we measured negative relational implications (using the same items as in Study 2)

### Results

*Intensity of emotions.* A repeated measures MANOVA with sex of respondent and relationship with the provoker as independent factors, time as a within-subject factor, and immediate and longer-term anger and contempt as dependent variables revealed a significant multivariate main effect of type of relationship. $F(2, 74) = 6.52$, $p < .01$. Simple $t$ tests showed that participants reported more initial anger in the intimate condition than in the stranger condition. $t(77) = 2.04$, $p < .05$, but there was no difference for initial contempt; with respect to anger and contempt after a few days, simple $t$ tests showed a significant effect for contempt only, which was reported as being more intense than anger, $t(77) = -2.24$, $p < .05$ (see Table 4 for the means). Further, a significant effect of the within-subject factor time, $F(2, 74) =$

ANGER AND CONTEMPT SOCIAL FUNCTIONS

111

Table 4

*Means and Standard Deviations (in Parentheses) for All Characteristics of the Emotional Responses in the Anger and Contempt Conditions (Study 3)*

| Characteristic of emotion | Type of relationship | |
| --- | --- | --- |
| | Friend | Stranger |
| **Emotion** | | |
| Anger | 4.89 (1.67)ₐ | 4.10 (1.81)ᵦ |
| Contempt | 4.08 (1.55)ₐ | 4.70 (1.96)ᵦ |
| Anger after some days | 3.18 (1.86)ₐ | 2.95 (1.82)ₐ |
| Contempt after some days | 3.33 (2.12)ₐ | 4.35 (1.94)ᵦ |
| **Immediate responses** | | |
| Verbal attack | 5.04 (1.15)ₐ | 2.81 (1.32)ᵦ |
| Derogation | 2.02 (1.11)ₐ | 4.23 (1.57)ᵦ |
| **Long-term responses** | | |
| Reconciliation | 4.73 (1.58)ₐ | 1.91 (1.26)ᵦ |
| Rejection | 1.97 (1.28)ₐ | 4.96 (1.67)ᵦ |
| **Emotivational goals** | | |
| Coercion | 5.50 (0.97)ₐ | 3.64 (1.60)ᵦ |
| Social exclusion | 2.25 (1.40)ₐ | 4.80 (1.40)ᵦ |
| **Relational implications** | | |
| Deterioration | 3.49 (1.68)ₐ | 4.55 (2.30)ᵦ |
| **Appraisals** | | |
| Negative character | 5.20 (1.29)ₐ | 5.25 (1.92)ₐ |
| Dispositional attribution | 4.27 (1.00)ₐ | 4.81 (1.02)ᵦ |
| Control | 4.54 (1.11)ₐ | 2.47 (1.20)ᵦ |

*Note.* Means in one row with different subscripts differ at least at $p < .05$

20.95, $p < .0001$, and a significant main effect of sex, $F(2, 74) = 4.66$, $p < .05$, were found. No interaction effects were found. The effect of time was significant for both anger, $F(1, 78) = 41.23$, $p < .0001$, and contempt, $F(1, 78) = 6.51$, $p < .03$, showing a decrease of both emotions over time. As in Study 2, correlations showed that later anger and contempt were correlated somewhat higher ($r = .51$, $p < .0001$) than were initial anger and contempt ($r = .39$, $p < .0001$), and no significant correlation between initial anger and later contempt ($r = .11$, ns) was found.

The main effect of sex of respondent was significant for anger, $F(1, 78) = 9.13$, $p < .01$, and marginally significant for contempt, $F(1, 78) = 3.63$, $p < .07$, with women reporting more intense anger and contempt [5]

*Behavioral reactions.* We also conducted a MANOVA with the two immediate and the two long-term responses as dependent measures and found a multivariate main effect of type of relationship, $F(4, 71) = 45.61$, $p < .0001$. This was univariately significant for all reactions, verbal attack, $F(1, 77) = 65.04$, $p < .0001$, derogation, $F(1, 77) = 57.55$, $p < .05$, rejection, $F(1, 77) = 83.42$, $p < .0001$, and reconciliation, $F(1, 77) = 72.67$, $p < .0001$. The means (Table 4) show that derogation and rejection are character-

istic more for the interaction with the stranger, whereas verbal attack and reconciliation were reported more during the interaction with the friend. We also found a main effect of sex of respondent, $F(4, 71) = 3.15$, $p < .02$, but no interactions.[6]

*Emotivational goals.* A MANOVA with the two emotivational goals revealed a significant main effect of type of relationship, $F(2, 74) = 70.75$, $p < .0001$. No sex or interaction effects were found. The main effect of relationship was significant for both social exclusion, $F(1, 78) = 91.36$, $p < .0001$, and for coercion, $F(1, 78) = 37.64$, $p < .0001$. The coercion goal was reported more often in the more intimate relationship, whereas the goal to socially exclude someone was reported more frequently in the stranger condition.

*Appraisals.* We conducted a MANOVA with dispositional attribution and control over the object as dependent measures. We found a main effect of type of relationship, $F(2, 73) = 3.78$, $p < .05$, as well as a marginal main effect of sex, $F(2, 73) = 2.63$, $p < .06$. The univariate tests showed that type of relationship had significant effects on dispositional attributions, $F(1, 74) = 6.46$, $p < .02$, and appraisals of control, $F(1, 74) = 66.05$, $p < .0001$. The means show that participants more often explained the transgression in terms of dispositions in the case of a stranger and perceived more control over an intimate provoker than over a stranger (see Table 4 for the means)[7]

*Relational implications.* An ANOVA with the negative relational implications also revealed a significant main effect of condition, $F(1, 78) = 5.67$, $p < .03$. Consistent with the patterns observed for anger versus contempt events in Studies 1 and 2, less deterioration was noted after being angry than after feeling contemptuous. No sex of respondent effects were found.

*Correlation and regression analyses.* MANOVAs have shown that social transgressions of intimates are characterized more by a prototypical anger pattern, whereas the same transgressions by a stranger more resemble a prototypical contempt pattern. This is in line with our expectation that intimacy would restrain contempt reactions, even though there was no significant effect of relationship type on the intensity of initial contempt. In addition, correlations between the intensity of anger and contempt and the various characteristics again show a significant relation between anger and verbal attack ($r = .44$, $p < .01$) and coercion ($r = .34$, $p < .01$), although not with reconciliation ($r = .09$, ns). As predicted, no significant correlations among contempt, verbal attack, coercion,

---

[5] Simple $t$ tests for both initial anger and contempt and later anger and contempt show that women reported more intense initial anger ($M_w = 4.89$, $SD = 1.43$) than did men ($M_m$, = 4.12, $SD = 1.99$) and that they remained angry ($M_w = 3.68$, $SD = 1.88$) and contemptuous ($M_w = 4.29$, $SD = 2.15$) longer than did men ($M_m = 2.48$, $SD = 1.51$, for anger; $M_m = 3.44$ $SD = 1.95$, for contempt)

[6] Univariate analyses showed that the sex main effect was significant for derogation, $F(1, 78) = 10.19$, $p < .01$, and rejection, $F(1, 77) = 4.95$, $p < .05$. The means show that women were more likely to report that they derogated ($M_w = 3.62$, $SD = 1.88$; $M_m = 2.69$, $SD = 1.50$) and that they also tended to reject more than did men ($M_w = 3.85$, $SD = 2.19$, $M_m = 3.14$, $SD = 2.00$).

[7] Univariately, the main effect of sex was significant for perceived control, $F(1, 74) = 4.46$, $p < .05$. The means indicate that men ($M_m = 3.74$, $SD = 1.54$) reported feeling more control over the other person than did women ($M_w = 3.19$, $SD = 1.54$)

or reconciliation were found, whereas contempt was significantly correlated with derogation ($r = .22$, $p < .05$), rejection ($r = .34$, $p < .01$), and social exclusion ($r = .31$, $p < .01$).

We further thought that the intimacy effects on anger and contempt reactions might be mediated by the perception of control over the other person because more intimacy might allow a greater sense of control. Through a series of regression analyses, we tested whether the perception of control over the other person would mediate the effects of intimacy, assuming that the lack of control would lead to an increase of contempt and that this would be the case especially with persons with whom one is less intimate. The effects of intimacy (dummy coded, 0 = stranger, 1 = intimate) on anger (a summed score of anger intensity, verbal aggression, and coercion) first of all showed that there was a positive relation ($\beta = .61$, $p < .0001$). A similar regression was calculated with a summed score of contempt (intensity of contempt, derogation, and exclusion) and showed a negative relation ($\beta = -.73$, $p < .0001$). Second, intimacy was a positive predictor of control ($\beta = .67$, $p < .0001$), suggesting that the more intimate one is with another person, the more control one expects to have. Third, adding control as a predictor of anger while controlling for intimacy showed that control was not a significant predictor of anger ($\beta = .03$, $ns$), but it was a significant negative predictor of contempt ($\beta = -.38$, $p < .0001$), reducing the effect of intimacy to $\beta = .01$. A Sobel test confirmed that the effect of intimacy was significantly reduced ($S = 3.49$, $p < .0001$).

Finally, we examined whether dispositional attributions would mediate the effects of intimacy on contempt but would not mediate the effects on anger. We found that intimacy was a negative predictor of dispositional attributions ($\beta = -.27$, $p < .02$). Adding dispositional attributions to the contempt equation showed that it was a significant predictor of contempt ($\beta = 23$, $p < .02$) but that the effect of intimacy was significantly reduced ($S = -1.89$, $p < .06$). The effect of intimacy was still highly significant ($\beta = -.66$, $p < .0001$), however. When adding dispositional attributions to the anger equation, the results showed that this was not a significant predictor of anger ($\beta = .10$, $ns$). In sum, control and, to a lesser extent, dispositional attributions partially mediate the effects of intimacy on contempt but do not mediate the effects of intimacy on anger.

### Discussion

Results of the manipulation of intimacy indicate that the nature of the relationship influences the balance between anger and contempt responses after a social transgression. Participants in the intimate condition reported that they would verbally aggress more, that they would impose more change on the other (coercion goal), and that they would finally reconcile more with their friend. In the case of strangers, they reported derogating and rejecting more, with the aim of socially excluding the other person. We may conclude, therefore, that attack was more likely in intimate relationships and social exclusion more likely in reaction to nonintimates. Especially in nonintimate relationships, perceiving a lack of control and blaming the person (negative dispositional attributions) seem to be fertile soil for the development of contempt. On the other hand, social transgressions in intimate relationships may give rise to anger more than to contempt, presumably because intimate relationships are characterized by a

relational concern and the willingness to adjust to each other in order to improve the quality of one's relationship (see e.g., Clark, Fitness, & Brissette, 2004). Furthermore, intimacy inhibits the development of contempt partly because it suggests more control and because it prevents negative dispositional attributions.

### General Discussion

The results of all three studies provide evidence for our first hypothesis that anger and contempt can be characterized by distinct response patterns. A prototypical anger reaction starts with short-term attacks (mostly verbal aggression) but also often results in reconciliation and relationship improvement after some time. The typical anger goal is coercion. The social function of anger is thus to try to alter an undesired outcome by changing the other person's behavior through attacking, which in the end may have positive effects on one's relationship with the other person. Contempt, on the other hand, is characterized by short-term derogation and is more likely to develop into long-term rejection, with the goal of socially excluding this other person. The social function of contempt is to move this person away from oneself and to ban him or her from one's social environment, which typically results in relationship deterioration.

This distinction is based on the different behavioral reactions, emotivational goals, and relational implications that respondents reported in three different studies with different methods. In the first study, we collected autobiographical reports of events in which respondents had experienced anger or contempt; in the second study, we asked them for incidents in which they had either attacked or excluded another person; and in the third study, we presented respondents with a vignette of a transgression by another person, in which we manipulated the relationship with the provoker. Despite the fact that participants reported a wide variety of events, we found distinct patterns of anger and contempt that were highly consistent across the studies.

In our view, these distinctive features can be seen as prototypical (see Russell, 1991b; Russell & Barrett, 1999; Russell & Fehr, 1994), meaning that not all instances of anger and contempt necessarily fit these particular response patterns. For example, there are examples of anger in which individuals are angry at themselves, and there may be instances of what one could call contempt that are characterized by attacking or doing nothing. Moreover, the patterns of contempt and anger that we have distinguished also may occur together and blend. The point of the present article, however, is that typical instances of what we call anger and contempt in common language can be characterized by different prototypical features that correspond with their main social functions.

We also found support for our second hypothesis that anger and contempt are associated with specific characteristics of the relationship with the other person and with one's beliefs about the other person. First of all, Studies 1 and 3 showed that anger more often occurs in reaction to intimates than in reaction to strangers. In addition, one's perception of the other person or the relationship with the other person is an important factor in whether anger or contempt is evoked. When one starts changing one's beliefs about the other person in a more permanent and negative direction—developing the impression that the other person is intrinsically bad and that there is no way to make the other person change—the best

option may be to exclude this person from one's social life. In Study 1, we found that anger is more often reported when one perceives control over an intimate's behavior, whereas contempt is reported when one explains the transgression in terms of a negative disposition (blaming the person). In Study 2, we found further evidence that blaming the person predicted contempt and not anger. Moreover, Study 3 also showed that such negative dispositional attributions mediated the effects of intimacy on contempt. Contempt thus seems to be more than anger characterized by the development of permanent negative belief changes about another person (see also Frijda & Mesquita, 1994; Roseman, 2001). In addition, the amount of control perceived over the behavior of another person was another important mediator of the effects of intimacy on contempt but was not an important mediator of the effects of intimacy on anger. We may thus conclude that the transformation of anger into contempt is inhibited by intimacy but that the perception of lack of control, in addition to the idea that the other person really has a bad character, is fertile soil for the development of contempt. The idea that one cannot change or correct the other's behavior seems an important reason why individuals start socially excluding the other person, as this may be an alternative—and more permanent—way to change or reduce the negative impact of an undesired outcome caused (perhaps repeatedly) by another person's character or traits.

The third hypothesis was that contempt and anger develop differently over time and that contempt often occurs on top of one's anger. The studies indeed suggest that whereas anger may occur without contempt, contempt more often co-occurs with anger. In Study 1, for example, we found that there was more anger in the contempt incidents than contempt in the anger incidents. In Study 2, we also found that in the exclusion condition, the amount of anger was similar to the amount of contempt whereas in the attack condition there is significantly more anger than contempt. In other words, contempt is more often elicited when one is already angry. The possibility that contempt often develops on top of one's anger is also suggested by the correlation patterns of anger and contempt in Studies 2 and 3 (in Study 1, no correlations were found because of the instructions). These show that anger and contempt are fairly highly correlated some time after the incident has taken place, whereas initial anger and contempt are less highly (or not at all) correlated. Moreover, the findings from Study 2 show that repeated experiences of anger (either currently or in the past) increase the likelihood that one develops contempt toward someone rather than just becoming angry at this same person again. This transformation of part of one's anger into contempt may be dangerous insofar as it implies that the inclination to attack co-occurs with the inclination to derogate and exclude a person who is seen as inferior or bad, which may result in hostile acts that are not held in check by affection or social relationships. This mixture of the two emotions may thus explain why in some of the ostracism studies by Williams (2001) a relation between ostracism and aggression was found.

The results of the present studies also lead us to wonder whether anger and contempt are necessarily evoked in response to transgressions in different ethical domains, as has been proposed in the contempt, anger, and disgust hypothesis (Rozin, Lowery, Imada, & Haidt, 1999). Although transgressions from different ethical domains may be differentially frequent in anger incidents as opposed to contempt incidents, the present studies also provide evidence

that the same transgression (for example, speaking rudely to a train conductor) could elicit either anger and/or contempt, depending on how the behavior and the person is appraised. For example, the other's behavior may be interpreted as involving either blockage of a practical or moral goal (e.g., avoiding hurting the conductor's feelings, or preserving order on the train) or as an intrinsic defect in the object of the emotion (such as insensitivity or impudence; see, e.g., Roseman, 2001). These appraisals depend, among other things, on the history of one's relationship with the other person or on the specific social context (see also Manstead & Fischer, 2001; Parkinson, 2001; Parkinson, Fischer, & Manstead, 2005), in addition to the ethical domain to which the behavior belongs.

We did not find many sex differences in contempt and anger responses. Although there are reasons to expect sex differences, with women reporting more anger in intimate relationships (see e.g., Fischer, Rodriguez Mosquera, van Vianen, & Manstead, 2004; Kring, 2000) but also more social exclusion behavior (e.g., Underwood, 2003), we think that sex differences in anger and contempt may be very context-sensitive and, perhaps, therefore did not appear in the present studies. When investigating sex differences in contempt and anger in future studies, context variation should either be restricted or systematically studied.

Finally, a few more words need to be said about our methodology. We are well aware of the fact that self-report measures have often been criticized because they can be biased by impression management and social desirability tendencies. It could also be argued that the great variety of experiences that have been sampled is a limitation because the emotion process is strongly influenced not only by the nature of the event but also by the context in which it emerges and develops (see also Parkinson, 2001) and by the reactions of other people in this context (Fischer, Manstead, & Zaalberg, 2003; Manstead & Fischer, 2001). Although no single method may capture the impact of the contextual and situational features in all its facets, we have included measures of potential contextual determinants, such as intimacy and control, in order to examine their effects. Moreover, in Study 3, we used a vignette method in order to examine the distinct patterns of anger and contempt in reaction to a standardized event and found the same pattern of results. Yet, we acknowledge that it is possible that the autobiographical stories vary in some more ways than we have foreseen and analyzed.

In conclusion, these three studies provide support for the idea that anger and contempt have different characteristics and social functions, with contempt having the more destructive implications for one's relationships with other people. Whereas anger leaves open the possibility to repair the relationship, this option seems further away in the case of contempt. We think it is important to further investigate conditions under which one's anger transforms into contempt and long-term negative emotions like feelings of hatred or revenge (e.g., Baumeister & Butz, 2005; Elster, 1999; Sternberg, 2005). We have shown that a lack of intimacy, a lack of control, and a dispositional attribution of negative behavior make the experience of contempt on top of one's anger more likely. Lack of control, however, does not mean that one feels inferior to the other person. On the contrary, contempt suggests that the other may be seen as inferior to oneself, though at the same time one is not able or does not wish to change the other person (perhaps because the person is seen as not worthy of the needed investment of effort). We may suggest that the feeling of superiority over

CU JORDAN_0119

114                                                    FISCHER AND ROSEMAN

another person often present in contempt can be a mental means of
gaining control that one does not otherwise have. This is in line
with research showing that individuals high in self-esteem are
more likely than those low in self-esteem to use ostracism insofar
as ostracism indicates the presence of contempt (Sommer, Wil-
liams, Ciarocco, & Baumeister, 2001).

Our findings relating contempt to lack of intimacy, lack of
control, and dispositional attributions also lead to the suggestion
that contempt would be more readily experienced in reaction to
outgroup members. For example, studies have shown that infrahu-
manization (Leyens et al., 2000, 2001), which can be interpreted as
a clear indication of contempt, is a more likely response to out-
group members than to ingroup members. We suggest that con-
tempt would be especially felt for those groups who are considered
inferior in status or position and who are also difficult to control,
like people who are mentally retarded, who are drug addicts, or
who are homeless. It is clear, however, that we cannot draw firm
conclusions concerning the effects of status, group membership,
control, or dispositional appraisal on the basis of the present data.
The relations among these variables would be an interesting sub-
ject for future studies.

## References

Archer, J. (2000). Sex differences in aggression between heterosexual
    partners: A meta-analytic review. *Psychological Bulletin, 126,* 651–680.
Archer, J., & Coyne, S. M. (2005). An integrated review of indirect,
    relational, and social aggression. *Personality and Social Psychology
    Review, 9,* 212–230.
Averill, J. R. (1982). *Anger and aggression: An essay on emotion.* New
    York: Springer Publishing Company.
Baumeister, R. F., & Butz, D. A. (2005). Roots of hate, violence, and evil.
    In R. J. Sternberg (Ed.), *The psychology of hate* (pp. 87–103). Wash-
    ington, DC: American Psychological Association.
Baumeister, R. F., Stillwell, A. M., & Heatherton, T. F. (1994). Guilt: An
    interpersonal approach. *Psychological Bulletin, 115,* 243–267.
Berkowitz, L. (1993) *Aggression: Its causes, consequences, and control.*
    New York: McGraw-Hill.
Bushman, B. J. (2002). Does venting anger feed or extinguish the flame?
    Catharsis, rumination, distraction, anger, and aggressive responding.
    *Personality and Social Psychology Bulletin, 28,* 724–731.
Clark, M. S., Fitness, J., & Brissette, I. (2004). Understanding people's
    perceptions of relationships is crucial to understanding their emotional
    lives. In M. B. Brewer & M. Hewstone (Eds.), *Emotion and motivation*
    (pp. 21–47). Malden, MA: Blackwell.
Demoulin, S., Leyens, J.-P., Paladino, M.-P., Rodriguez-Torres, R.,
    Rodriguez-Pérez, A., & Dovidio, J. F. (2004). Dimensions of "uniquely"
    and "non-uniquely" human emotions. *Cognition & Emotion, 18,* 71–96.
de Rivera, J., & Grinkis, C. (1986). Emotions as social relationships.
    *Motivation and Emotion, 10,* 351–369.
Eagly, A. H., & Steffen, V. J. (1986). Gender and aggressive behavior: A
    meta-analytic review of the social psychological literature. *Psycholog-
    ical Bulletin, 100,* 309–330.
Eisenberger, N. I., Lieberman, M. D., & Williams, K. D. (2003, October
    10). Does rejection hurt? An fMRI study of social exclusion. *Science,
    302,* 290–292.
Ekman, P., & Friesen, W. V. (1986). A new pan-cultural facial expression
    of emotion. *Motivation and Emotion, 10,* 159–168.
Ekman, P., & Heider, K. G. (1988). The universality of a contempt
    expression: A replication. *Motivation and Emotion, 12,* 303–308.
Elster, J. (1999). *Strong feelings: Emotion, addiction, and human behavior.*
    Cambridge, MA: MIT Press.

Evers, C. A. M., Fischer, A. H., Rodriguez Mosquera, P. M., & Manstead,
    A. S. R. (2005). Anger and social appraisal: A spicy sex difference.
    *Emotion, 5,* 258–266.
Fischer, A. H., & Manstead, A. S. R. (in press). The social functions of
    emotion. In M. Lewis, J. Haviland-Jones, & L. F. Barrett (Eds.), *Hand-
    book of emotions* (3rd ed.). New York: Guilford Press.
Fischer, A. H., Manstead, A. S. R., & Zaalberg, R. (2003). Social influ-
    ences on the emotion process. *European Review of Social Psychology,
    14,* 171–201.
Fischer, A. H., Rodriguez Mosquera, P. M., van Vianen, E. A. M., &
    Manstead, A. S. R. (2004). Gender and culture differences in emotion.
    *Emotion, 4,* 87–94.
Fitness, J., & Fletcher, G. J. O. (1993). Love, hate, anger, and jealousy in
    close relationships: A prototype and cognitive appraisal analysis. *Jour-
    nal of Personality and Social Psychology, 65,* 942–958.
Fridlund, A. J. (1994). *Human facial expression: An evolutionary view.* San
    Diego, CA: Academic Press.
Frijda, N. H., Kuipers, P., & ter Schure, L. (1989). Relations among
    emotion, appraisal, and action tendency. *Journal of Personality and
    Social Psychology, 57,* 212–228.
Frijda, N. H., & Mesquita, B. (1994). The social roles and functions of
    emotions. In S. Kitayama & H. R. Markus (Eds.), *Emotion and culture:
    Empirical studies of mutual influence* (pp. 51–87). Washington, DC:
    American Psychological Association.
Galen, B. R., & Underwood, M. K. (1997). A developmental investigation
    of social aggression among children. *Developmental Psychology, 33,*
    589–600.
Geen, R. G., & Donnerstein, E. (1998). *Human aggression: Theories,
    research, and implications for social policy.* San Diego, CA: Academic
    Press.
Gottman, J. M., & Levenson, R. W. (2002). A two-factor model for
    predicting when a couple will divorce: Exploratory analyses using
    14-year longitudinal data. *Family Process, 41,* 83–96.
Green, R. A., & Murray, E. J. (1975). Expression of feeling and cognitive
    reinterpretation in the reduction of hostile aggression. *Journal of Con-
    sulting and Clinical Psychology, 43,* 375–383.
Horn, S. S. (2003). Adolescents' reasoning about exclusion from social
    groups. *Developmental Psychology, 39,* 71–84.
Izard, C. E., & Haynes, O. (1988). On the form and universality of the
    contempt expression: A challenge to Ekman and Friesen's claim of
    discovery. *Motivation and Emotion, 12,* 1–16.
Keltner, D., & Haidt, J. (1999). Social functions of emotions at four levels
    of analysis. *Cognition & Emotion, 13,* 505–521.
Kring, A. M. (2000). Gender and anger. In A. H. Fischer (Ed.). *Gender and
    emotion: Social psychological perspectives* (pp. 211–232). London:
    Cambridge University Press.
Kuppens, P., Van Mechelen, I., & Meulders, M. (2004). Every cloud has
    a silver lining: Gender and individual differences determinants of
    anger-related behaviors. *Personality and Social Psychology Bulletin, 30,*
    1550–1564.
Kuppens, P., Van Mechelen, I., Smits, D. J. M., & De Boeck, P. (2003).
    The appraisal basis of anger: Specificity, necessity and sufficiency of
    components. *Emotion, 3,* 254–269.
Kurzban, R., & Leary, M. R. (2001). Evolutionary origins of stigmatiza-
    tion: The functions of social exclusion. *Psychological Bulletin, 127,*
    187–208.
Leary, M. R., Twenge, J. M., & Quinlivan, E. (2006). Interpersonal
    rejection as a determinant of anger and rejection. *Personality and Social
    Psychology Review, 10,* 111–132.
Lemerise, E. A., & Dodge, K. A. (2000). The development of anger and
    hostile interactions. In M. Lewis & J. M. Haviland-Jones (Eds.), *Hand-
    book of emotions* (2nd ed., pp. 594–606). New York: Guilford Press.
Leyens, J.-P., Paladino, P. M., Rodriguez, R. T., Vaes, J., Demoulin, S.,
    Rodriguez, A. P., et al. (2000). The emotional side of prejudice: The role

CU JORDAN_0120

Case No. 1:19-cv-02660-RM-JPO   Document 1   filed 09/17/19   USDC Colorado   pg 138 of 190

of secondary emotions. *Personality and Social Psychology Review, 4,* 186–197.

Leyens, J.-P., Rodriguez-Pérez, A., Rodriguez-Torres, R., Gaunt, R., Paladino, M. P., Vaes, J., et al. (2001). Psychological essentialism and the differential attribution of uniquely human emotions to ingroups and outgroups. *European Journal of Social Psychology, 31,* 395–411.

Mackie, D., Devos, T., & Smith, E. R. (2000). Intergroup emotions. Explaining offensive action tendencies in an intergroup context. *Journal of Personality and Social Psychology, 79,* 602–616.

Mallick, S. K., & McCandless, B. R. (1966). A study of catharsis of aggression. *Journal of Personality and Social Psychology, 4,* 591–596.

Manstead, A. S. R., & Fischer, A. H. (2001). Social appraisal. The social world as object of and influence on appraisal processes. In K. R. Scherer, A. Schorr, & T. Johnstone (Eds.). *Appraisal processes in emotion. Theory, methods, research* (pp. 221–232). New York: Oxford University Press.

Martin, R., Wan, C. K., David, J. P., Wegner, E. L., Olson, B. D., & Watson, D. (1999). Style of anger expression. Relation to expressivity, personality, and health. *Personality and Social Psychology Bulletin, 25,* 1196–1207.

Ortony, A., Clore, G. L., & Collins, A. (1988). *The cognitive structure of emotions.* New York: Cambridge University Press.

Parkinson, B. (2001). Putting appraisal in context. In K. R. Scherer, A. Schorr, & T. Johnstone (Eds.). *Appraisal processes in emotion. Theory, methods, research* (pp. 173–186). London: Oxford University Press.

Parkinson, B., Fischer, A. H., & Manstead, A. S. R. (2005). *Emotion in social relations: Cultural, intergroup and interpersonal processes.* New York: Psychology Press.

Parrott, W. G. (Ed.). (2001). *Emotions in social psychology.* Philadelphia: Psychology Press.

Robinson, M. D., & Clore, G. L. (2002). Episodic and semantic knowledge in emotional self-report. Evidence for two judgment processes. *Journal of Personality and Social Psychology, 83,* 198–215.

Roseman, I. J. (2001). A model of appraisal in the emotion system. Integrating theory, research and applications. In K. R. Scherer, A. Schorr, & T. Johnstone (Eds.). *Appraisal processes in emotion. Theory, methods, research* (pp. 68–92). London: Oxford University Press.

Roseman, I. J., Antoniou, A. A., & Jose, P. E. (1996). Appraisal determinants of emotions. Constructing a more accurate and comprehensive theory. *Cognition & Emotion, 10,* 241–277.

Roseman, I. J., Copeland, J. A., & Fischer, A. H. (2003, January). *Contempt versus anger in interracial attitudes.* Paper presented at the fourth meeting of the Society for Personality and Social Psychology, Los Angeles.

Roseman, I. J., & Smith, C. A. (2001). Appraisal theory. Overview, assumptions, varieties, controversies. In K. R. Scherer, A. Schorr, & T. Johnstone (Eds.). *Appraisal processes in emotion. Theory, methods, research* (pp. 3–19). London: Oxford University Press.

Roseman, I. J., Wiest, C., & Swartz, T. S. (1994). Phenomenology, behaviors and goals differentiate discrete emotions. *Journal of Personality and Social Psychology, 67,* 206–221.

Rozin, P., Lowery, L., Imada, S., & Haidt, J. (1999). The CAD triad hypothesis. A mapping between three moral emotions (contempt, anger, disgust) and three moral codes (community, autonomy, divinity). *Journal of Personality and Social Psychology, 76,* 574–586.

Russell, J. A. (1991a). The contempt expression and the relativity thesis. *Motivation and Emotion, 15,* 149–168.

Russell, J. A. (1991b). In defense of a prototype approach to emotion concepts. *Journal of Personality and Social Psychology, 60,* 37–47.

Russell, J. A., & Barrett, L. F. (1999). Core affect, prototypical emotional episodes, and other things called emotion. Dissecting the elephant. *Journal of Personality and Social Psychology, 76,* 805–819.

Russell, J. A., & Fehr, B. (1994). Fuzzy concepts in a fuzzy hierarchy. Varieties of anger. *Journal of Personality and Social Psychology, 67,* 186–205.

Smith, C. A., & Lazarus, R. S. (1993). Appraisal components, core relational themes and the emotions. *Cognition & Emotion, 7,* 233–269.

Sommer, K. L., Williams, K., Ciarocco, N. J., & Baumeister, R. F. (2001). When silence speaks louder than words. Explorations into the intrapsychic and interpersonal consequences of social ostracism. *Basic and Applied Social Psychology, 23,* 225–243.

Spielberger, C. D., Johnson, E. H., Russell, S. F., Crane, J. C., Jacobs, G. A., & Worden, T. J. (1985). The experience and expression of anger. Construction and validation of an anger expression scale. In M. A. Chesney & R. H. Rosenman (Eds.), *Anger and hostility in cardiovascular and behavioral disorders* (pp. 5–30). New York: Hemisphere Publication Services.

Sternberg, R. J. (Ed.). (2005). *The psychology of hate.* Washington, DC: American Psychological Association.

Timmers, M., Fischer, A. H., & Manstead, A. S. R. (1998). Gender differences in motives for regulating emotions. *Personality and Social Psychology Bulletin, 24,* 974–985.

Twenge, J. M., Baumeister, R. F., Tice, D. M., & Stucke, T. S. (2001). If you can't join them, beat them. Effects of social exclusion on aggressive behavior. *Journal of Personality and Social Psychology, 81,* 1058–1069.

Twenge, J. M., Catanese, K. R., & Baumeister, R. F. (2002). Social exclusion causes self-defeating behavior. *Journal of Personality and Social Psychology, 83,* 606–615.

Twenge, J. M., Catanese, K. R., & Baumeister, R. F. (2003). Social exclusion and the deconstructed state. Time perception, meaninglessness, lethargy, lack of emotion, and self-awareness. *Journal of Personality and Social Psychology, 85,* 409–423.

Underwood, M. K. (2003). *Social aggression among girls.* New York: Guilford Press.

Underwood, M. K. (2004). Glares of contempt, eye rolls of disgust and turning away to exclude. Non-verbal forms of social aggression among girls. *Feminism and Psychology, 14,* 371–375.

Van Kleef, G. A., De Dreu, C. K. W., & Manstead, A. S. R. (2004). The interpersonal effects of anger and happiness in negotiations. *Journal of Personality and Social Psychology, 86,* 57–76.

van Zomeren, M., Spears, R., Fischer, A. H., & Leach, C. W. (2004). Put your money where your mouth is? Explaining collective action tendencies through group-based anger and group efficacy. *Journal of Personality and Social Psychology, 87,* 649–664.

Williams, K. (2001). *Ostracism: The power of silence.* New York: Guilford Press.

Williams, K., Forgas, J., & von Hippel, W. (Eds.). (2005). *The social outcast: Ostracism, social exclusion, rejection, and bullying.* New York: Psychology Press.

Wolf, K. A., & Foshee, V. A. (2003). Family violence, anger expression styles and adolescent dating violence. *Journal of Family Violence, 18,* 309–316.

Xie, H., Cairns, R. B., & Cairns, B. D. (2002). The development of social aggression and physical aggression. A narrative analysis of interpersonal conflicts. *Aggressive Behavior, 28,* 341–355.

Received June 6, 2006
Revision received December 15, 2006
Accepted December 17, 2006 ■

8/9/2017 DKS called to let Chadwick know he had a letter in his CU Denver Account - Left voicemail

8/10/2017 DKS called to let Chadwick know he had an important letter in his CU Denver Email - Left Voicemail

8/11/2017 DKS called to to discuss the letter sent previously via email and get a meeting set. - Left Voicemail

8/14/2017 DKS called Chadwick to discuss the conduct case - Phone went right to voicemail and mailbox was full so could not leave a message.

8/16/2017 DKS called Chadwick to discuss the case - Phone again went right to voicemail and mailbox was full.

8/21/2017 DKS called Chadwick to discuss setting a meeting. Left a message. Chadwick called back later in the day and set up a meeting for that afternoon.


Conduct Conference Uncategorized

David Steward - Monday August 21. 2017 at 1:00pm
Last edited Tuesday August 22, 2017 at 10:37am



Chadwick read his conduct conference letter because he had not read his letter via email.

He stated it was all lies and continued that he did not raise his voice at all and was just checking on what he had requested earlier.

DKS told Chadwick that the incident referenced in the letter was his first interaction at the Financial Aid Office and not the one where they called the police since he would not leave.
- DKS informed Chadwick the second incident is not a part of any conduct issue.

Chadwick stated he never got angry and was calm and quiet the whole time. He only reacted because the "kid" behind the table disrespected him.

DKS asked how the student behind the desk was disrespecting him.
- Chadwick stated that the person said "You people always act this way....."
- Chadwick continued by saying the "kid" was a racist.

DKS told Chadwick that he would notify the Office of Equity of the claims and the Ombuds office could provide assistance as well.

DKS referred to a pattern of behavior noticed when Chadwick does not get something he wants.
- A pattern of becoming confrontational and demanding with a raised voice appearing to be angry.

Chadwick stated he was not angry and was only reacting because he was disrespected.

DKS pointed out that several individuals in the office thought he was angry and had witnessed the raised voice.
- Chadwick stated they were lying and he never raised his voice.
- DKS stated he would email Justin J in the Financial Aid Office and confirm the details of the reports.
- Chadwick said he wanted me to check as well.

DKS did return to the pattern of behavior and state that if the follow-up with Justin confirmed the report that Chadwick would probably be suspended.
- Chadwick stated that the "only pattern is the university pattern of racism"
- DKS did refer to the ability to appeal if suspension was the determination and encouraged Chadwick to utilize the process.

Telephone Conversation with Justin Jaramillo (financial aid) Uncategorized.

David Steward - Thursday August 3, 2017 at 9:41am

Have had several interactions with Chadwick over the past year and a half
- Financial Aid Hurdles
- Faculty issues (caused FA hiccup)
- Applied late this year (July while most applied December and January)
- Need based allocated early
- By July was already out of $
- Met earlier and walked through some discrepancies in application
- Took about a week and was awarded
- Chadwick has almost used all his eligibility
- Didn't get same amount as last year



Chadwick came to front desk asking for me
- Justin wasn't there.
- Became increasingly upset
- used terms
- Not fair
- Racest (why didn't get aid)
- Giving $ to illegal immigrants
- Leaned over counter
- Figitty and jumpy

Calmed down before left office

Justin is worried as he cannot mitigate if Chadwick comes in and escalates.



**Student Conduct & Community Standards**
UNIVERSITY OF COLORADO DENVER

Office of Student Conduct and Community Standards
Campus Box 196
P.O. Box 173364 | Denver, CO 80217-3364
o 303 315 7311
ucdenver.edu/conduct

# Memorandum

**Date:**   September 22, 2017

**To:**   Office of the Registrar
Financial Aid Office
Bursar Office

**Re:**   Student Disciplinary Suspension

**Student Name:** Chadwick Jordan

**Student ID:**

**Academic Schedule**
Managerial Accounting and Professional Issues – ACCT 2220-001
Core Composition II – ENGL 2030-E01
Modern Germany – HIST 4071-001
Principles of Marketing – MKTG 3000-006

To Whom It May Concern:

Chadwick Jordan has been placed on disciplinary suspension effective August 18, 2017 through December 29, 2017. Please immediately withdraw him from classes and place the appropriate disciplinary hold(s) on his account. Please contact David Steward if you have any questions.

Sincerely,
David Steward
Director of Student Conduct and Community Standards
University of Colorado Denver
303.315.7311



University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 1, 2017 at 4 21:23 pm MDT

Type:               Threatening behavior
Urgency:            Normal

Incident Date·      **2017-07-31**
Incident Time·      **3:00 PM**
Incident Location·  -Downtown / Auraria Campus

<u>Reported by</u>

Name·       [redacted]
Title·
Email.      [redacted]
Phone.      [redacted]
Address

        [UNAUTHENTICATED]

<u>Student/s of Concern</u>

Chadwick Jordan (830282211)        1982-06-05
Student of Concern

<u>Concerning Behavior Information</u>

Disruptive Classroom Behaviors:
Rude or insubordinate behavior, Aggressive behavior, Argumentative

Concerns for General Mental Health or Well-being.

Threatening Behaviors

Suicidal Behaviors

Please provide a detailed description of the incident or concern  Please use concise and objective terms to describe your interactions and the specific behaviors you observed.
Student stopped by the office on 7/31 and immediately requested to speak with the "Mexican dude" whose name starts with "J" so I was assuming        and explained he is not available so what could I assist him with. Student was concerned because he did not receive any state or institutional grants. While i was looking at the account the student seemed anxious, pacing back and forth the front counter and looking out the window. After discovering that he applied for his FAFSA late and by the time we awarded him, the funds had, already been depleted in May. Student became irritated at this point and started explaining that since he was a continuing student we should know that he is coming back. Explained it is a yearly application and must be applied within a good time frame since funds are not unlimited. Student began leaning over the desk upset because he feels like he should have been given the grant because he's been here for four years. Started explaining the process as to how it works and that funds do run out and since there is no way to truly determine if the student will return other than completing the application early. Student did not seem to grasp the concept of applying yearly, so I asked the student something along the lines of that the students who submitted the application before the deadline on time should not be considered for extra aid? Once this was said the student became upset and started repeating "I take offense to that, that is offensive, how dare you put words in my mouth". Explained I'm sorry he feels that way but there is no money left to give since the FAFSA was received after there was no more grant funding. Student at this point was annoyed and did not want to listen to what I had to say so I had student take a seat. After consulting with
(another Advisor) letting        know that he was upset and wanted to consult with someone else, the student

approached the counter again and started yelling "He's lying, he's lying, I am not upset" and then took the student to a solution room.

Have you talked to or corresponded with the student regarding your concerns?
No

Does the behavior seem to be getting worse or more frequent?
Yes

Do you wish to remain anonymous if/when the student is contacted?
  ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity. However, please know that anonymity can never been guaranteed. Please see document at top of form for additional questions.
Not sure, Yes

approached the counter again and started yelling "He's lying, he's lying, I am not upset" and
then took the student to a solution room.

Have you talked to or corresponded with the student regarding your concerns?
No

Does the behavior seem to be getting worse or more frequent?
Yes

Do you wish to remain anonymous if/when the student is contacted?
 ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity.
However, please know that anonymity can never been guaranteed. Please see document at top of form for additional
questions
Not sure, Yes

 University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 1, 2017 at 5.13:50 pm MDT

Type            Threatening behavior
Urgency.        Normal

Incident Date    2017-07-31
Incident Time    4:15 PM
Incident Location  -Downtown / Auraria Campus

Reported by

Name.          ████████████
Title.
Email:         ████████████████████
Phone          ████████████
Address·

[UNAUTHENTICATED]

Student/s of Concern

Chadwick Heath Jordan (830282211)    06051982
Witness

Concerning Behavior Information

Disruptive Classroom Behaviors·

Concerns for General Mental Health or Well-being

Threatening Behaviors
Threatening words or actions

Suicidal Behaviors:

Please provide a detailed description of the incident or concern  Please use concise and objective terms to describe
your interactions and the specific behaviors you observed
Student came in and met with Financial Aid Advisor                      . I was sitting next to              at the
front counter so I witness the interaction between              and Jordan.  Jordan wanted to know why he
was not offered the Colorado Student Grant or the University Need Grant.         explained to Jordan
that he submitted his 17-18 FAFSA  July 2017. Due to the FAFSA being submitted after the priority deadline
sadly he missed out on grants. Jordan became upset and said that he filled out the FAFSA later but it was
not his fault he should be awarded the grants because he needs them.       explained that grants are
first come first serve and the FAFSA was open earlier this year ( October 2016) so students have been
applying since October for aid in the 2017-2018. Student said he should be awarded regardless of the other
students who applied early.       said that is not fair for students who submitted the FAFSA early and
completed their file early because  that is making it seem like they don't matter. Jordan voice escalated and
said "I, did not say that. Don't put words in my mouth!" Jordan then wanted to speak to       directly.
     asked the Jordan to please take a seat.  At this point        , Senior Advisor, walked by
     told       that there is an upset student who wants to get grants. Jordan interrupted and said that
he was not upset but        is placing words on in his mouth and wanted to speak to some on how to get
aid. His voice sounded really angry and gave a threatening stare to          . Jordan then began to explain
how        was placing words in his mouth and wanted       to review the video about his
altercation with              and pointed to the cameras. Jordan was really upset and continued to yell.
     took the student to a solution room. After the meeting with          Jordan stormed off the

CH JORDAN  0127

office and was visually upset. During the interaction with both _____ and _____ he was very hostile and puffing his chest. This was very alarming.

Student then called a short time later and ask to meet with Justin directly. Took down information.

Have you talked to or corresponded with the student regarding your concerns?
No

Does the behavior seem to be getting worse or more frequent?
I don't know

Do you wish to remain anonymous if/when the student is contacted?
 ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity. However, please know that anonymity can never been guaranteed. Please see document at top of form for additional questions.
Yes

 University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 2, 2017 at 4:49.15 pm MDT

Type:        Concern for general mental health or well-being
Urgency:     Normal

Incident Date     **2017-07-31**
Incident Time     **3:00 PM**
Incident Location -Downtown / Auraria Campus

Reported by

Name:     [redacted]
Title·
Email:    [redacted]
Phone.    [redacted]
Address·

          [UNAUTHENTICATED]

Student/s of Concern

**Chadwick Jordan (830282211)**        06/05/1982
Student of Concern

Concerning Behavior Information

Disruptive Classroom Behaviors·
**Argumentative**

Concerns for General Mental Health or Well-being
**Extreme mood swings, Unusual or erratic behavior**

Threatening Behaviors·
**Threatening words or actions**

Suicidal Behaviors.

Please provide a detailed description of the incident or concern. Please use concise and objective terms to describe your interactions·and the specific behaviors you observed
Chadwick was upset with the advisor assisting him and was demanding to see the Director. I offered to assist the student in a solution room and listen to the issues since the Director was unavailable. The student was visibly upset that he was not awarded additional grant funding and was argumentative when explaining the fact that his FAFSA was not completed before the priority date. He argued that it should not matter when his FAFSA was completed since he is a continuing student and thus, should have been awarded additional grants despite when he applied for financial aid. He then stated he would be contacting his Congressman to complain about financial aid and hopes that financial aid is no longer offered to any students. While trying to explain the fact that State and University grant funding is limited, Chadwick insisted the problem of the lack of grants was due to immigrants in the U.S. and that he was going to study a Master's program that will eliminate immigrants from entering or remaining in the country. He insisted that he would be graduating after this year, so I explained that he had 51 credits completed and, if the 12 credit hours he was registered for Fall 2017 were completed with passing grades, he would be considered Junior status and would be eligible for an additional $2,000 in loans in the Spring semester to assist with financing educational expenses. I explained that most undergraduate degrees require 120 credit hours but he continued to insist he would be graduating in a year. Also explained that he could apply for scholarships for the 2018-19 academic year which may help with educational costs, as he is close to reaching financial aid aggregates. Chadwick appeared to be calm and stated he would apply for scholarships and come in early January and request the additional loans. His mood quickly changed back to annoyed and Chadwick stated he wished all financial aid was based on merit.

As he was preparing to leave, he informed me that he was filing a lawsuit on a faculty member and that the
FAFSA being completed late was most likely a result of the time consumption created from the lawsuit
preparation. His behavior changed again and he left calmly stating he would apply for scholarships and be
back in early January. Chadwick's overall behavior was erratic and unusual.

Have you talked to or corresponded with the student regarding your concerns?
No

Does the behavior seem to be getting worse or more frequent?
I don't know

Do you wish to remain anonymous if/when the student is contacted?
 ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity.
However, please know that anonymity can never been guaranteed  Please see document at top of form for additional
questions.
Yes

 University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 2, 2017 at 2.21:54 pm MDT

Type·                    Threatening behavior
Urgency.                 Normal

Incident Date            2017-08-01
Incident Time·           3:30 AM
Incident Location.       -Downtown / Auraria Campus

Reported by

Name.              [REDACTED]
Title
Email:             [REDACTED]
Phone.             [REDACTED]
Address·

                   [Authenticated as [REDACTED]]

Student/s of Concern

Chadwick Jordan (830282211)

Concerning Behavior Information

Disruptive Classroom Behaviors:

Concerns for General Mental Health or Well-being

Threatening Behaviors
**Threatening words or actions**

Suicidal Behaviors

Please provide a detailed description of the incident or concern  Please use concise and objective terms to describe
your interactions and the specific behaviors you observed.
I entered the elevator on the first floor of the Student Commons building with this student. As we were going
up the elevator ride the student seemed somewhat agitated. He rolled his shoulders, bobbed his head side to
side and kept shifting his weight back and forth from foot to foot. It was odd behavior for the elevator and it
seemed as though the student was preparing for a boxing match. At one point, he looked back at me (he was
standing right at the elevator door) and I noticed his facial expression seemed a little agitated or aggressive
as well. He looked back forward and resumed shifting his weight and then also shook out his hands, again as
though he was preparing for some sort of athletic event. I walked behind him to the Financial Aid and
Scholarships office and kept my eye on him but when he got to the front desk and spoke to the
representative there, he no longer seemed agitated and seemed like he was now in a good mood. His tone of
voice when speaking to the representative seemed normal and upbeat. I didn't think anything else about it
until later in the day when I learned that there had been an incident involving this student. It was then I
remembered his odd behavior in preparation for speaking with someone about his financial aid awards.

Have you talked to or corresponded with the student regarding your concerns?
**No**

Does the behavior seem to be getting worse or more frequent?
**I don't know**

Do you wish to remain anonymous if/when the student is contacted?
 ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity. However, please know that anonymity can never been guaranteed. Please see document at top of form for additional questions.
**Yes**

 University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 14, 2017 at 12.34:50 pm MDT

Type:              Other (describe below)
Urgency.           Normal

Incident Date:     2017-08-14
Incident Time:     12:15 PM
Incident Location.  -Downtown / Auraria Campus

Reported by

Name·
Title·
Email
Phone:
Address·

[UNAUTHENTICATED]

Student/s of Concern

Chadwick Heath Jordan (830282211)    1982-05-06
Student of Concern

Concerning Behavior Information

Disruptive Classroom Behaviors:

Concerns for General Mental Health or Well-being

Threatening Behaviors
**Violent or aggressive behavior**

Suicidal Behaviors·

Please provide a detailed description of the incident or concern  Please use concise and objective terms to describe your interactions and the specific behaviors you observed.
**Student came in to talk to Justin the Director of Financial Aid. Told student that he needs to leave and to please contact Dean of Students. Told student that is what I was told to tell him. Student refused to leave after I asked him three times to leave.**

Have you talked to or corresponded with the student regarding your concerns?
**No**

Does the behavior seem to be getting worse or more frequent?
**I don't know** ·

Do you wish to remain anonymous if/when the student is contacted?
***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity.
However, please know that anonymity can never been guaranteed. Please see document at top of form for additional questions
**Not sure**

 University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 14, 2017 at 3.18.57 pm MDT

Type                    Threatening behavior
Urgency.                Normal

Incident Date           **2017-08-14**
Incident Time           **12:15 PM**
Incident Location       -Downtown / Auraria Campus

Reported by

Name:
Title·
Email.
Phone:
Address
            [UNAUTHENTICATED]

Student/s of Concern

Chadwick Heath Jordan (830282211)    1982-06-05
Student of Concern

Concerning Behavior Information

Disruptive Classroom Behaviors·

Concerns for General Mental Health or Well-being.

Threatening Behaviors
Violent or aggressive behavior

Suicidal Behaviors

Please provide a detailed description of the incident or concern  Please use concise and objective terms to describe
your interactions and the specific behaviors you observed.
Chadwick Jordan came to the Financial Aid & Scholarships Office and requested to meet with Justin
Jaramillo, Director of Financial Aid, to talk about his financial aid account. I asked student for student id
number and asked for him to take a seat and I will check as Justin might be in a meeting. Walked back to talk
to the                                   , about how to handle student request as the past
experience with the student left me uneasy. I was informed I must tell student to please leave as he is not
allowed to come to the FASO. I walked back to the front and told C. Jordan that he will need to leave and
please contact Dean of Students to schedule appointment with Justin. Jordan inquired if I just asked him to
leave. I told him yes, and that I was told to tell him to leave and to contact Dean of Students. Jordan did not
leave and continued to ask for Justin. I again told the student to please contact Dean of Students. He wanted
to know who gave me the instructions to tell him to leave. I told student my supervisor had provide that
instruction. Student said Justin Jaramillo is your supervisor so did Jaramillo tell you to say that? Told him
no my supervisor is someone else. I did not tell him who my supervisor was as he was getting agitated.
Student then asked if he can have Justin Jaramillo's email. Told student to please contact Dean of Students
and please leave. I felt unsafe after I told him to leave several times but he refused and seemed to get angrier
after each request for him to leave.                      . At this point                  (another staff
member) came to the front and C. Jordan asked            if Justin was in.              told C.
Jordan that J. Jaramillo was in a meeting. Student then wanted to know why he needs to speak to Dean of
Students to speak to J. Jaramillo. C. Jordan asked if all students must do this, told him no but in certain

CU JORDAN  0135

cases this is the policy. I looked up the location of the Dean of Students and wrote it on a piece of paper and told him to have a nice day. Student finally left after 10 minutes. Student was calm until I asked him to leave. After being asked to leave he raised his voice and his volume increased throughout the interaction. He did not make threatening motions but was very agitated and refused to leave. When the student left, the police arrived a couple of minutes later. I gave the description of the incident to the officers, described student, and provided student name and date of birth.

Have you talked to or corresponded with the student regarding your concerns?
No

Does the behavior seem to be getting worse or more frequent?
Yes

Do you wish to remain anonymous if/when the student is contacted?
 ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity However, please know that anonymity can never been guaranteed. Please see document at top of form for additional questions.
Not sure



University of Colorado
Denver | Anschutz Medical Campus

CARE Team Referral
Submitted on August 14, 2017 at 2:53.02 pm MDT

Type·                    Other (describe below)
Urgency.                 Normal

Incident Date.           **2017-08-14**
Incident Time            **1:30 AM**
Incident Location        -Downtown / Auraria Campus

<u>Reported by</u>

Name.
Title·
Email·
Phone·
Address.

                    [Authenticated as                    ]

<u>Student/s of Concern</u>

**Chadwick Jordan (810282211)**      1982-06-05
Student of Concern

<u>Concerning Behavior Information</u>

Disruptive Classroom Behaviors

Concerns for General Mental Health or Well-being

Threatening Behaviors

Suicidal Behaviors:

Please provide a detailed description of the incident or concern. Please use concise and objective terms to describe
your interactions and the specific behaviors you observed.
Chadwick visited the Financial Aid & Scholarships Office on 8/14/17 and was speaking at the front counter
with a Financial Aid Advisor                    . I walked by the front counter and Chadwick made eye
contact with me and requested to speak with Justin Jaramillo. I advised Chadwick that Justin was in a
meeting, and was unavailable. Chadwick continued to speak with                    , and I walked away. I
was requested to document this interaction. Chadwick displayed no inappropriate or concerning behavior to
me during our very brief interaction.

Have you talked to or corresponded with the student regarding your concerns?
**No**

Does the behavior seem to be getting worse or more frequent?
**I don't know**

Do you wish to remain anonymous if/when the student is contacted?
 ***If it is your preference to remain anonymous, the CARE Team will make every effort to maintain anonymity
However, please know that anonymity can never been guaranteed  Please see document at top of form for additional
questions.
**No**



University of Colorado **Denver**
Student Conduct and Community Standards
Student Affairs

# Campus Exclusion Form

| 08/18/2017 | 12/29/2017 | Auraria Campus |
|---|---|---|
| Beginning Date | End Date | Area of exclusion |

Name

| Jordan | Chadwick | Heath | |
|---|---|---|---|
| Last | First | Middle | Alias |

| 830282211 | 720.273.9741 | | |
|---|---|---|---|
| Student ID | Phone #1 | Phone #2 | |

| 2246 Clarkson St. Apt. A | Denver | | CO | 80203 |
|---|---|---|---|---|
| Address | City | | State | Zip Code |

| 06/05/1982 | M | Black | | | | |
|---|---|---|---|---|---|---|
| Date of Birth | Sex | Race | Height | Weight | Hair | Eyes |

Reason For Exclusion

Pattern of aggressive and disruptive behavior.

| David Steward | 303.315.7311 | |
|---|---|---|
| Exclusion Authorized By: | Phone | Phone |

| Signed Electronically | No |
|---|---|
| Signature | Exclusion Letter Attached |

| David Steward | Appeal - 9/21/2017 | 9/22/2017 |
|---|---|---|
| Exclusion served by | Date Served | Current Date |

 University of Colorado
Denver

Office of Student Conduct and Community Standards

Campus Box 196
P.O. Box 173364 | Denver, CO 80217-3364
o 303 556 2444 | f 303 352 3751
ucdenver.edu/standards

# Authorization for Release of Information

Please refer to the current CU Denver Catalog for information regarding the release of information. In compliance with the Family Rights and Privacy Act (FERPA) regulation 34 C.F.R. part 99.30, the disclosure of information from a student's education record requires the parent or eligible student to provide signed and dated written consent before CU Denver discloses personally identifiable information from the student's education records, except as provided in section 99.31.

Student Name: _Chadwick Jordan_    Student ID#: _830285211_

Address: _2246 W Clarkson St_    Phone#: _720 273 3741_

_____

I, _Chadwick Jordan_____, authorize the Office of Student Conduct and
Community Standards to release:

✓_____ Any and all of my student conduct records
_____ Only my records associated with the incident of _____
_____ All of the following information/records:

_____
_____
_____

I permit the above listed information to be released to: (please be specific and list all names that apply)

_Omar Montgomery_
_____

Authorization to release expires (date): _____
(If left blank, authorization will expire one year after signing)

By signing below, I am authorizing the Office of Student Conduct and Community Standards to release to the person(s)/organization specified above the information specified above for the timeframe I have indicated.

_____    _____
(Student Signature)    (Date)

This form can be dropped off in Tivoli 227 or faxed to 303-352-3751. If you have any questions regarding this from please contact us directly at 303-556-2444



University of Colorado **Denver**

Student Conduct and Community Standards
Student Affairs

Campus Box 136
P.O. Box 173364 | Denver, CO 80217-3364
o 303 556 3882 | f 877 556 7704
studentconduct@ucdenver.edu
ucdenver.edu/standards`

August 7, 2017

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2017000601

Dear Chadwick:

I have received a report, dated July 31, 2017 which indicates you may have violated the Student Conduct Code as outlined in the CU Denver Code of Student Conduct and the Resident Handbook (available at http://www.ucdenver.edu/standards & http://www.ucdenver.edu/life/services/housing/Pages/default.aspx). According to the information I have received, you allegedly disrupted the Financial Aid Office while demanding to receive aid which was not available. This alleged behavior may be in violation of the following standards:

1. (6) Abusive Behavior
Verbal abuse, threats, intimidation, coercion, or other behavior which has caused a person substantial emotional distress and where the circumstances would cause a reasonable person to suffer substantial emotional distress. This policy should not be construed, and will not be enacted, to deny any student the right of free speech and expression.

2. (9) Interference, obstruction, or Disruption of University Activity
Materially and substantially interfering with, obstructing, or disrupting a university activity  a University activities include, but are not limited to, all normal university activities, such as teaching, research, recreation, meetings, public events, and disciplinary proceedings  b  This prohibition includes, but is not limited to, the following: behavior disruptive of university functions; Behavior resulting in injury to persons or damage to property on the campus; and interference, obstruction, or disruption of the freedom of movement of students, or other members of the university community and their guests. Interference in any manner with the public or private rights of citizens, Behavior that threatens or endangers the health or safety of any person, and damage to property are prohibited.

Admission to the University carries with it the assumption that students will be responsible members of our community. When you chose to enroll at the University of Colorado Denver, you assumed the responsibility to uphold standards of conduct appropriate to the academic and community goals set by the University.

In response to these allegations I have scheduled a conference for you on **Friday, August 11, 2017 at 1:30 PM**. The conference will take place in the **Tivoli Student Union, Room 227**. The purpose of this conference is to examine the context of the situation to determine your responsibility for this incident. At the time of the conference you may bring written accounts from any witnesses present during the alleged incident, as well as your own account. You may also bring an advisor with you if you wish. I suggest that you refer to the Student Conduct Policies and Procedures at http://www.ucdenver.edu/standards for more information about your rights and responsibilities. Please use this LINK to access a document titled "What to Expect in Your

Conduct Meeting" and read the document before you come to your conduct meeting.

Due to the nature of the incident you may not contact the Office of Financial Aid without going through me to schedule directly with Justin Jaramillo.

Your attendance at this conference is important. If you do not attend the conference I will review the written documentation and render a decision without your input. If you are unable to attend this conference due to a reasonable conflict, academic or otherwise, you must contact me at david.steward@ucdenver.edu or 303-315-7311 no later than twenty-four hours prior to your conference to request a new appointment.

I look forward to meeting with you to resolve this situation.

Sincerely,


David Steward
Director of Student Conduct and Community Standards

CU JORDAN 0142

 University of Colorado **Denver**

Student Conduct and Community Standards
Student Affairs

Campus Box 196
P O Box 173364 | Denver, CO 80217-3364
o 303 556 3682 | f 877 556 7704
studentconduct@ucdenver.edu
ucdenver.edu/standards

August 22, 2017

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2017000601

Dear Chadwick:

This is a follow-up to our conference on August 21, 2017 regarding alleged violations of the CU
Denver Student Conduct Code, as outlined in your Conference Letter.

Chadwick, you stated you did not raise your voice and were simply reacting to the "kid" behind
the front desk who disrespected you. I confirmed with the Office of Financial Aid that several
individuals did heard you raised your voice and did not hear any disrespectful statements made
toward you. This behavior is another incident where you confronted individuals in an office on
campus as a result of hearing news you did not like or agree with.

Based on our meeting and the written documentation, and using a preponderance of the
evidence standard, I have made the following determination regarding the alleged violations
outlined in your original conference letter

(6) Abusive Behavior -- Responsible
Verbal abuse, threats, intimidation, coercion, or other behavior which has caused a person
substantial emotional distress and where the circumstances would cause a reasonable person
to suffer substantial emotional distress. This policy should not be construed, and will not be
enacted, to deny any student the right of free speech and expression.

(9) Interference, obstruction, or Disruption of University Activity -- Responsible
Materially and substantially interfering with, obstructing, or disrupting a university activity. a.
University activities include, but are not limited to, all normal university activities, such as
teaching, research, recreation, meetings, public events, and disciplinary proceedings. b. This
prohibition includes, but is not limited to, the following: behavior disruptive of university
functions, Behavior resulting in injury to persons or damage to property on the campus; and
interference, obstruction, or disruption of the freedom of movement of students, or other
members of the university community and their guests  Interference in any manner with the
public or private rights of citizens, Behavior that threatens or endangers the health or safety of
any person, and damage to property are prohibited.

You have been sanctioned as follows:
**Follow-up Meeting**
You are required to meet with me prior to your re-enrollment at CU Denver The purpose of this
meeting is to check in regarding your progress as a student as well as to review any sanction
items  It is your responsibility to schedule this meeting; you may do so by calling me at
303-315-7311 or emailing me at david.steward@ucdenver.edu.

CU JORDAN 0143

## Counseling

You are required meet with a counselor of your choice for a minimum of four visits. The number of total meetings with the counselor will be determined by the counselor. These meetings are for discussions focused on your reactive and confrontation behavior when you presented with situations you don't like or agree with. You will complete any follow-up recommendations from the clinician. You will need to sign a release of information with this counselor so they can submit verification that you attended and participated in this appointment and can provide information on their ongoing recommendations. These sessions must be completed prior to your return from suspension.

## Disciplinary Suspension

As a result of this incident you are being suspended from the University of Colorado Denver beginning August 18, 2017 and lasting through December 29, 2017. Suspension means that you are not eligible to enroll in any courses including online courses at any of the University of Colorado campuses. You will be eligible to return to the university upon completion of all other sanctions beginning January 2. 2018.

## Auraria Campus Exclusion

As a result of this incident you have been suspended from the Auraria Campus beginning August 22, 2017 and ending December 29, 2017.

This means that you are not eligible to be anywhere on the Auraria Campus. A hold has been placed on your account. As a result of this suspension you are not eligible to enroll at any of the Auraria institutions including CU Denver, Metropolitan State University of Denver or the Community of College of Denver. If you are seen anywhere on the Auraria Campus during the period of your suspension, the police will be notified and you may be subject to additional Student Conduct or Criminal action.

Please understand that completion of these sanctions is your responsibility. Failure to complete these sanctions will result in further judicial action, specifically a hold being placed on your records and a stop on your registration.

If you have been given a sanction of probation with loss of good standing or higher, you have the right to appeal this decision. Such an appeal must be made in writing and submitted via the Student Conduct and Community Standards website, www.ucdenver.edu/standards. This appeal must be submitted no later than August 25, 2017. More information about the appeals process can be found on our webpage www.ucdenver.edu/csw.

Please note, failure to complete the above outcomes by the given deadlines may result in a hold on your student account and/or additional disciplinary actions. In addition, all written sanctions will be checked through Turnitin. If it is found that academic misconduct has occurred, you may be subject to further disciplinary action.

It is my hope that you will have a positive experience while a student here at the University of Colorado. The faculty and staff will continue to support your positive contributions to the university learning/living environment. If you have any questions, please do not hesitate to contact me.

Sincerely,

CU JORDAN  0144

David Steward
Director of Student Conduct and Community Standards

CU JORDAN 0145

DKS called to set an appointment to deliver the interim suspension letter @ 10:57 AM on 3/5/2018. Left a message.

Chadwick called DKS at 1:02 to see what DKS wanted. DKS stated they needed to meet ASAP. Chadwick stated he would be right here.

6/5/2018 DKS placed a Registration Hold until the student can meet regarding his interim suspension and conduct case.


Meeting to Give Interim Suspension Letter Uncategorized

David Steward - Monday March 5, 2018 at 1:30pm
Last edited Monday March 5, 2018 at 2:04pm

DKS met with Chadwick at approximately 1:30 PM and explained the charges and gave Chadwick the Interim Suspension Letter.

Chadwick stated there was an altercation and he was charged but the case was dismissed. When DKS responded that the documents showed a Guilty Plea. Chadwick then stated he would not have plead guilty if he knew it would affect school.

DKS inquired about an AR-15 being purchased. Chadwick stated it was all legal and he bought it at a Tanner Gun show. Detective Verardi asked if he did indeed purchase an AR-15.
- Chadwick stated it was an incomplete Gun.
- He when on the explain it is called a 80/20 gun and can be bought without a background check.

DKS then stated he did not want to discuss the case unless Chadwick was ready to do so. The letter DKS gave to Chadwick indicated a Conduct Conference at 1:00 PM March 8, 2018. DKS offered to meet Tuesday (had one time slot) or Wednesday (had one time slot) but Chadwick said to email him the time on March 8th and he would be there. DKS stated it was already in the letter and Chadwick stated he would be there.

Interim Suspension Decision Uncategorized

David Steward - Monday March 5, 2018 at 9:00am
Last edited Monday March 5, 2018 at 2:41pm

CU JORDAN  0146



**Student Conduct & Community Standards**
UNIVERSITY OF COLORADO **DENVER**

Office of Student Conduct and Community Standards

Campus Box 199
P O Box 173364 | Denver CO 80217-3364
o 303 315 7311
ucdenver edu/conduct

# Memorandum

Date: April 30, 2018

To:     Office of the Registrar:
        Financial Aid Office:
        Bursar Office:

Re:     Student Disciplinary Interim Suspension

Student Name: Chadwick Jordan

Student ID: 830282211

Academic Schedule
        ACCT 2220-002: Managerial Accounting and Professional Issues
        GEOG 3120-001 Geography of Europe
        HIST 3480-001: Introduction to European History
        PSCI 4615-001: Politics-Government of China

To Whom It May Concern:

Chadwick Jordan has been placed on interim disciplinary suspension effective March 5, 2018. This suspension has remained an interim suspension as Chadwick has been unable to attend his conduct conference as a part of the CU Denver conduct process. However, it is clear he will be unable to complete his classes at this current time. Please immediately administratively withdraw him from classes without any tuition reimbursement. Please contact David Steward if you have any questions.

Sincerely,

David Steward
Director of Student Conduct and Community Standards

CU JORDAN  0147

 University of Colorado **Denver**

Student Conduct and Community Standards
Student Affairs

Campus Box 196
P.O. Box 173364 | Denver, CO 80217-3364
o 303.556.3662 | f 877.566.7704
studentconduct@ucdenver.edu
ucdenver.edu/standards

March 5, 2018

Chadwick Jordan
2246 Clarkson St., Apt. A, 80205
Denver, CO 80203
USA

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2017094401

Dear Mr. Jordan,

I have received a report, dated February 19, 2018 which indicates you may have violated the CU Denver Student Code of Conduct. Based on the severity of the report in addition to your pattern of behavior as exhibited by you past conduct history, I am **summarily suspending you from the University of Colorado Denver and excluding you from the Auraria Campus.**

This suspension includes an **immediate exclusion from the University of Colorado Denver Campus and Campus Village Apartments.** You are not to be on campus, including attending any scheduled classes, other than to attend your scheduled meeting with our office to discuss these allegations. Violation of these restrictions may result in additional student conduct action and/or arrest. This suspension will remain in effect until such a time as your case is heard by the Office of Student Conduct and Community Standards.

According to the information I have received, you allegedly got into a verbal altercation outside of your home in August of 2017 and during this you threatened to shoot the individual and then in a different incident within the past several weeks told a different individual that you had recently purchased an AR-15 after acknowledging you should not be talking about this. This alleged behavior may be in violation of the following standards.

**Threats**
Threatening or endangering the mental and/or physical health or safety of a person

**Violation of Local, State, or Federal Law**
Violating the established local, state, or federal laws.

Admission to the University carries with it the assumption that students will be responsible members of our community. When you chose to enroll at the University of Colorado Denver, you assumed the responsibility to uphold standards of conduct appropriate to the academic and community goals set by the University.

I have scheduled a conference for you on **Thursday, March 8, 2018, at 1:00 PM** The conference will take place in the **Tivoli Student Union, Room 227**. The purpose of this conference is to discuss your responsibility for this incident and to determine the next steps in the student conduct process. At the time of the conference you may bring written accounts from any witnesses present during the alleged incident, as well as your own account. You may also

**APPEAL
CASE NO. 2017000601**

David Steward has been deliberately trying to paint me in a bad light. He has been biased and discriminatory from our very first in counter, one in which I was exonerated completely. During this first incident, he called me a liar and said I did not deserve to be at the University of Colorado. Despite my honesty in the whole process, and being found truthful and honest by his superiors, he did not recant these statements ever. This is incredibly biased and discriminatory, and reflects his attitude towards me, to this day. This was a lost semester by the way, lost money, and time out of my life. I told Kristin Kusmider about my discomfort and discrimination of Dave regarding our first encounter. She reassured me to get to know him and it would be alright, and I did not think I was going to have to deal with him again. Unfortunately, I did see David again and in our second encounter I was exonerated as well, except for a charge David made up, he is the only one to accuse me of this conduct violation, one I could not appeal, conveniently, due to the small sanction. If I have the chance I will appeal the fact he did not interview any of my witnesses. And I have received a second opinion from will, the current Title IX office, who previously had David's position. And Will said he would not have filed this charge on me after I have been found not guilty. This was biased and discriminatory as well.

After reading the letter I never stated to Dave I raised my voice ever. He made this up. Rather than discriminate on the distinct sound of my voice, by asking the people in financial aid if the heard me, he should have asked if they always hear me. I did tell him I naturally had a loud voice all the time, and in the Marines, we had to yell at trees to deepen our voices, so we could be heard over the fog of war. He responds this not in the Marines, which is biased and discriminatory. I know you can tell I am black and Chadwick Jordan by the sound of my voice. I believe it to be distinct, so no way is this allegation fair. Also, while discussing this current case

2

CU JORDAN 0151

**APPEAL
CASE NO. 2017000601**

with David. I asked if he interviewed the accuser. and he said no. I then I said, how could you

know if he is telling the truth or not. and he responded, "now you're telling me how to do my

job. Which is biased and discriminatory. And his comment also implied I was trying to tell the

accuser how to do his job. This takes his biased and discriminatory statement to a new level. He

made more biased and discriminatory statements in our last conversation. regarding the current

issue. I said. I "have no reason to be mad I don't need financial aid." he said. "yeah you do". I

did not argue with him he can believe what he wants. This is however a biased and

discriminatory comment. I am retired and I use my military benefits to pay for school. That is

how biased and discriminatory David Steward is, I do not need financial aid. therefore I have no

reason to be mad. David then said when things don't go your way you get mad. This is another

biased and discriminatory statement. fabricated out of the blue by David Steward. This was

nothing more than a personal attack from David. David desperately wants me to be mad, enough

to fabricate a false narrative. That was his reasoning for finding me guilty of disturbing the class

in the 2nd false accusation. He made up some lie I was mad and made a subjective decision. I

was found innocent, I had no reason to be mad. I could not even appeal his decision. As will

stated in the first paragraph I shouldn't have even been charged in the second incident.


David exaggerates everything with me, lies. and is doing his best to destroy my education

because he is racist. Racism is David's motive. David tried to say there was a pattern and the

only pattern we came to, the office of Diversity and inclusion and Title IX. was minorities are in

fact more falsely accused of conduct violations then others; or discriminated on and personally

attacked. There is no other connection. I do not know why I was not placed on probation here.

3

CU JORDAN  0152

APPEAL
CASE NO. 2017000601

David's first response in every one of these incidents was to suspend first, despite the destruction to my life, and ask questions later. If you want to see me arrested just falsely accuse me of something. His use of force from day one has been excessive and as a result I am traumatized. He came and pulled me out of class and had me arrested and destroyed my semester, on every one of these incidents, to find me not guilty. He left no room for the punishment/or discipline of serious conduct violations. He treats me like I'm guilty of assault.

The conference was not conducted fairly in the light of the charges because, on 8/11/2017 was a day I returned to campus to have a meeting with Omar at 2PM. I swung by the financial aid office ask when the loan disbursement date was. The clerk told me I had to report to the student conduct office, she was the clerk I in which this incident I told before going to the back to speak with a supervisor. "I don't appreciate his disrespect. I want to make a complaint". I went to the student conduct office and nobody was there. I had 30 min. until my appt. with Omar, unfortunately I was arrested at the Tivoli because they ran a background check on me when I went to the financial aid office. I did not know I had a ban as proof the email was not open. I had an outstanding traffic ticket/warrant I have taken care of without being charged. I spent that Friday in the county. And it was a rough weekend. The following Tuesday I was attacked be David. By attack I mean, being accused of preposterous things. I am in a much better state of mind now.

I am not guilty of the count (6) abusive behavior, because I did not abuse anyone. I did not verbally abuse threaten, coerce or cause anyone any substantial emotional distress or under these circumstances have I caused anyone emotional distress. I have the right to the financial aid office to seek assistance as my right to freedom of speech and expression, and the right to utilize

4

CU JORDAN 0153



APPEAL
CASE NO. 2017000601

these services as a student.   Dave is trying to deny my rights to free speech and expression.  If I was guilty of count 6 the student or someone would have called the police.  The mentioned reasons denote why I am not guilty of count 6.

I am not guilty of count (9) either, interfering, obstructing or disturbing University Activity, because this was all related to their jobs, and I did not ask for anything special or out of the ordinary or act out of the ordinary.  The financial aid offices functioned as usual as this incident occurred.  Nobody was injured or any property damaged.  I did not interfere with, disrupt, or obstruct student's movement, or anybody for that matter.  I did not interfere with the rights of anybody, and I did not threaten the health or safety of any person or damage any property.  If I was guilty of count 9 the student would of or someone else would have called the campus police.  The mentioned reasons denote why I am not guilty of count 9.

5

CU JORDAN_0154

om: Kushmider, Kristin
nt: Wednesday, September 20, 2017 3:07 PM
: Chadwick Jordan; Jordan, Chadwick H
: Dewese, William; Montgomery, Omar
bject:    Appeal Status

Chadwick,

ope you are well. Dr. Cardenas has completed his review of your appeal, you must retrieve your letter
om your CU Denver email account. Please do so immediately as it contains important information
out your campus ban and when you may be on campus, with permission.

dditionally, I wanted to let you know that I've made special arrangements for you to be seen at the CU
enver Student and Community Counseling Center while you are on suspension. Typically, we do not
ow students to access that service while on disciplinary suspension, but I do understand that making
pointments at the VA could take an extensive amount of time to schedule so I wanted to provide you
th an alternative. If you'd like, you can be seen by a faculty member in the counseling center (you do
ot have to but it would be free for you). Dr. Lisa Forbes has agreed to see you as a client if you wish. I
ink you will really enjoy working with her. I hope you take advantage of this opportunity. If you would
e to set up appointments at the counseling center please contact the Director, Dr. Franklin Kim, to
hedule this appointment. You can reach him via email: FRANKLIN.KIM@UCDENVER.EDU or by phone
)3-315-7277.

ve copied Mr. Dewese and Mr. Montgomery in this email and asked Dr. Cardenas to include them as
cipients of your letter, as I know you are working closely with both of them.

ease let me know if you have questions.

est,

ristin D. Kushmider, PhD
ean of Students
niversity of Colorado Denver, Student Affairs

303-315-7310
kristin.kushmider@ucdenver.edu

From:     Kushmider, Kristin
Sent:     Thursday, October 19, 2017 5:23 PM
To:  Steward, David K
Subject:  Fwd: Chadwick Jordan

Just FYI for his file.
Kristin Kushmider, PhD
Dean of Students
(303) 315-7310
Sent from my iPhone

Begin forwarded message:
From: Chadwick Jordan <cjllcpost@gmail.com>
Date: October 18, 2017 at 12:58:47 PM MDT
To: Kristin Kushmider <KRISTIN.KUSHMIDER@UCDENVER.EDU>
Cc: Omar Montgomery <Omar.Montgomery@ucdenver.edu>
Subject: Chadwick Jordan
Kristin
How are I have an appt. With kim franklin at 4:00 PM on the 23 and my with my
VA counselor at 4:30 PM on the 24th.
Chadwick Jordan

CU JORDAN_0156


University of Colorado
Denver | Anschutz Medical Campus

CU Denver Student Conduct Appeal
Submitted on September 1, 2017 at 4.01:47 pm MDT

Type:              **Appeal**
Urgency·           **Normal**

Incident Date:     **2017-09-01**
Incident Time:
Incident Location·  **On Campus**

Reported by

Name·
Title:
Email·
Phone·
Address.
            [UNAUTHENTICATED]


Your Information

**Chadwick Jordan (830282211)**              cjllc@post.com              7202739741


Appeal Grounds & Rationale

Case Number
**2017000601**

As outlined in Section G.G. of the Code of Student Conduct,
A student may only appeal if they have received a sanction including probation with loss of good standing, housing termination, suspension, or expulsion. A decision reached by a Conduct Officer may be appealed to an Appeal Officer by either the Respondent(s) or Complainant(s) For an appeal to be considered it must meet at least one of the criteria listed below.
Reason for Appeal·
**a. To determine whether the conference was conducted fairly in light of the charges and information presented, and in conformity with proscribed procedures giving both the Respondent and complaining parties the opportunity to prepare and present relevant information to be considered in the determination of an appropriate outcome. Minor deviations from designated procedures will not be a basis for sustaining an appeal unless there is a demonstrable adverse effect on the outcome of the conference., b. To determine whether the sanctions(s) imposed were appropriate for the violation of the Student Code of Conduct which the student was found to have committed., c. To consider new information, sufficient to alter the decision or other relevant facts not brought out in the original conference, because such information and/or facts were not known to the person appealing at the time of the original conference. This does not include information that was known at the time of the conference but was not shared.**

The appeal process is a written process, you will not be granted an in person meeting with the Appeal Officer to further discuss this case or your appeal. Please provide a rationale, details. and specifics for each "grounds" box checked above here.
I had a meeting with Lorain a few times before I came in to the financial aid office this time concerning my financial aid audit. They put a hold on my financial aid and requested information from me, and once again I came to the financial aid office looking for Lorain. I approached the student and said may I speak with a supervisor concerning my aid. He then said," about what". I responded, "I believe there to be some discrepancies in the amount I received". He looks at my aid and says, "that is the same amount everyone receives". I then said that is not what I want to speak with them about. He then says, "you people think your different from everybody else". I could not believe his offensive comment, which is discriminatory. I then said, "are you going to let me speak to a supervisor or sit here and keep disrespecting me". A supervisor approached the desk, because she heard my request. Before going to speak with a financial aid official in

the back, where I also briefly discussed the student's inappropriate behavior with, I notified the staff adjacent to him of his disrespect towards me, saying "I don't appreciate his disrespect may I make a complaint". To me it was enough I spoke with his supervisor. The reason he filed this complaint against me with the student conduct is out of retaliation and his vindictive nature, from my complaints that day. I had a legitimate issue and students have a right to resolve their issues with the authorities. This student flipped me off before during a political march during the 2016 campaign around October. He was marching with the financial aid office, denote a vindictive person. This student's complaint is preposterous.

David Steward has been deliberately trying to paint me in a bad light. He has been biased and discriminatory from our very first in counter, one in which I was exonerated completely. During this first incident, he called me a liar and said I did not deserve to be at the University of Colorado. Despite my honesty in the whole process, and being found truthful and honest by his superiors, he did not recant these statements ever. This is incredibly biased and discriminatory, and reflects his attitude towards me, to this day. This was a lost semester by the way, lost money, and time out of my life. I told Kristin Kusmider about my discomfort and discrimination of Dave regarding our first encounter. She reassured me to get to know him and it would be alright, and I did not think I was going to have to deal with him again. Unfortunately, I did see David again and in our second encounter I was exonerated as well, except for a charge David made up, he is the only one to accuse me of this conduct violation. one I could not appeal, conveniently, due to the small sanction. If I have the chance I will appeal the fact he did not interview any of my witnesses. And I have received a second opinion from will, the current Title IX office, who previously had David's position. And Will said he would not have filed this charge on me after I have been found not guilty. This was biased and discriminatory as well.

After reading the letter I never stated to Dave I raised my voice ever. He made this up. Rather than discriminate on the distinct sound of my voice, by asking the people in financial aid if he heard me, he should have asked if they always hear me. I did tell him I naturally had a loud voice all the time, and in the Marines, we had to yell at trees to deepen our voices, so we could be heard over the fog of war. He responds this not in the Marines, which is biased and discriminatory. I know you can tell I am black and Chadwick Jordan by the sound of my voice, I believe it to be distinct, so no way is this allegation fair. Also, while discussing this current case with David. I asked if he interviewed the accuser, and he said no. I then I said, how could you know if he is telling the truth or not, and he responded, "now you're telling me how to do my job. Which is biased and discriminatory. And his comment also implied I was trying to tell the accuser how to do his job. This takes his biased and discriminatory statement to a new level. He made more biased and discriminatory statements in our last conversation, regarding the current issue. I said, I "have no reason to be mad I don't need financial aid," he said, "yeah you do". I did not argue with him he can believe what he wants. This is however a biased and discriminatory comment. I am retired and I use my military benefits to pay for school. That is how biased and discriminatory David Steward is, I do not need financial aid, therefore I have no reason to be mad. David then said when things don't go your way you get mad. This is another biased and discriminatory statement, fabricated out of the blue by David Steward. This was nothing more than a personal attack from David. David desperately wants me to be mad, enough to fabricate a false narrative. That was his reasoning for finding me guilty of disturbing the class in the 2nd false accusation. He made up some lie I was mad and made a subjective decision. I was found innocent, I had no reason to be mad. I could not even appeal his decision. As will stated in the first paragraph I shouldn't have even been charged in the second incident.

David exaggerates everything with me, lies, and is doing his best to destroy my education because he is racist. Racism is David's motive. David tried to say there was a pattern and the only pattern we came to, the office of Diversity and inclusion and Title IX, was minorities are in fact more falsely accused of conduct violations then others; or discriminated on and personally attacked. There is no other connection. I do not know why I was not placed on probation here. David's first response in every one of these incidents was to suspend first, despite the destruction to my life, and ask questions later. If you want to see me arrested just falsely accuse me of something. His use of force from day one has been excessive and as a result I am traumatized. He came and pulled me out of class and had me arrested and destroyed my semester, on every one of these incidents, to find me not guilty. He left no room for the punishment or discipline of serious conduct violations. He treats me like I'm guilty of assault.

The conference was not conducted fairly in the light of the charges because, on 8/11/2017 was a day I returned to campus to have a meeting with Omar at 2PM. I swung by the financial aid office ask when the loan disbursement date was. The clerk told me I had to report to the student conduct office, she was the

bring an advisor with you if you wish. I suggest that you refer to the Student Conduct Polices and Procedures at http://www.ucdenver.edu/standards for more information about your rights and responsibilities. Since you are banned from campus you will need to contact the Auraria Police Department at 303-556-5000 and request an escort to my office in the Tivoli Student Union.

Your attendance at this conference is important  If you do not attend the conference I will review the written documentation and render a decision without your input. If you are unable to attend this conference due to a reasonable conflict, academic or otherwise, you must contact me no later than twenty-four hours prior to your conference to request a new appointment

Please remember that until the time of our meeting you are not allowed on the campus. If you have any questions please do not hesitate to contact our office at 303-556-3682. I look forward to meeting with you to resolve this situation.

Sincerely,


David Steward
Director of Student Conduct and Community Standards

CU JORDAN_0149

**APPEAL
CASE NO. 2017000601**

I had a meeting with Lorain a few times before I came in to the financial aid office this time

concerning my financial aid audit. They put a hold on my financial aid and requested

information from me, and once again I came to the financial aid office looking for Lorain. I

approached the student and said may I speak with a supervisor concerning my aid. He then

said," about what". I responded, "I believe there to be some discrepancies in the amount I

received". He looks at my aid and says, "that is the same amount everyone receives". I then said

that is not what I want to speak with them about. He then says. "you people think your different

from everybody else". I could not believe his offensive comment, which is discriminatory. I

then said. "are you going to let me speak to a supervisor or sit here and keep disrespecting me".

A supervisor approached the desk, because she heard my request. Before going to speak with a

financial aid official in the back, where I also briefly discussed the student's inappropriate

behavior with. I notified the staff adjacent to him of his disrespect towards me, saying "I don't

appreciate his disrespect may I make a complaint". To me it was enough I spoke with his

supervisor. The reason he filed this complaint against me with the student conduct is out of

retaliation and his vindictive nature. from my complaints that day. I had a legitimate issue and

students have a right to resolve their issues with the authorities. This student flipped me off

before during a political march during the 2016 campaign around October. He was marching

with the financial aid office, denote a vindictive person. This student's complaint is

preposterous.

1

CU JORDAN_0150

clerk I in which this incident I told before going to the back to speak with a supervisor, "I don't appreciate his disrespect, I want to make a complaint". I went to the student conduct office and nobody was there. I had 30 min. until my appt. with Omar, unfortunately I was arrested at the Tivoli because they ran a background check on me when I went to the financial aid office. I did not know I had a ban as proof the email was not open. I had an outstanding traffic ticket/warrant I have taken care of without being charged. I spent that Friday in the county. And it was a rough weekend. The following Tuesday I was attacked be David. By attack I mean, being accused of preposterous things. I am in a much better state of mind now.

I am not guilty of the count (6) abusive behavior, because I did not abuse anyone. I did not verbally abuse threaten, coerce or cause anyone any substantial emotional distress or under these circumstances have I caused anyone emotional distress. I have the right to the financial aid office to seek assistance as my right to freedom of speech and expression, and the right to utilize these services as a student. Dave is trying to deny my rights to free speech and expression. If I was guilty of count 6 the student or someone would have called the police. The mentioned reasons denote why I am not guilty of count 6.

I am not guilty of count (9) either, interfering, obstructing or disturbing University Activity, because this was all related to their jobs, and I did not ask for anything special or out of the ordinary or act out of the ordinary. The financial aid offices functioned as usual as this incident occurred. Nobody was injured or any property damaged. I did not interfere with, disrupt, or obstruct student's movement, or anybody for that matter. I did not interfere with the rights of anybody, and I did not threaten the health or safety of any person or damage any property. If I was guilty of count 9 the student would of or someone else would have called the campus police. The mentioned reasons denote why I am not guilty of count 9.

Attachments

cjappeal.docx

*Pending IR #00001773*

*Submitted from 97 118 243 179 and routed to David Steward (Director of Student Conduct and Community Standards)*



University of Colorado **Denver**

Student Conduct and Community Standards
Student Affairs

Campus Box 196
P.O. Box 173364 | Denver, CO 80217-3364
o 303 556 3682 | f 877 556 7704
studentconduct@ucdenver.edu
ucdenver.edu/standards

September 20, 2017

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2017008701

Dear Mr. Jordan,

I am in receipt of your letter appealing the decision of your hearing from August 21, 2017 with Mr. Steward. The Code of Student Conduct lists three reasons for which a student may appeal a decision:

1. To determine whether the conference was conducted fairly in light of the charges and information presented, and in conformity with proscribed procedures giving both the Respondent and complaining parties the opportunity to prepare and present relevant information to be considered in the determination of an appropriate outcome. Minor deviations from designated procedures will not be a basis for sustaining an appeal unless there is a demonstrable adverse effect on the outcome of the conference.

2. To determine whether the sanctions(s) imposed were appropriate for the violation of the Student Code of Conduct, which the student was found to have committed.

3. To consider new information, sufficient to alter the decision or other relevant facts not brought out in the original conference, because such information and/or facts were not known to the person appealing at the time of the original conference. This does not include information that was known at the time of the conference but was not shared.

I have reviewed both your letter of appeal and the information from your case and I find that your appeal does not meet any of the three grounds listed above.

Therefore, the decision made by Mr. Steward still stands. I have adjusted your campus ban as follows:

1) You must *request permission* to be on the Auraria Campus for your designated appointments with the Counseling Center and any appointments you have with the Office of Identity and Inclusion or the Office of Equity.

2) This request can be made either by contacting Mr. Steward or Dr. Kushmider (via email) at least one business day prior to your appointment. Be advised, last minute requests may not be approved so please prepare in advance.

3) Once you have received written approval via email from Mr. Steward or Dr. Kushmider, you will need to notify Auraria Police regarding the time and day you will be on campus so that you avoid being contacted for trespassing.

4) When you arrive on campus please check in at Tivoli suite 227 to be escorted to your appointments.

Please contact me at 303-315-2110 should you have any questions regarding this letter.

Sincerely,


Raul Cardenas, Jr., PhD

Vice Chancellor of Student Affairs

CC:   Other: Specify below
      Will Dewese, Deputy Title IX Coordinator | Associate Director, Office of Equity
      Kristin Kushmider, Dean of Students
      David Steward, Director, Office of Student Conduct and Community Standards

# CHADWICK APPEAL MEETING PART 1 - RECORDED.m4a

# CU JORDAN_0162

# CHADWICK APPEAL MEETING PART 2 - RECORDED.m4a

## CU JORDAN_0163

CU JORDAN  0163

# *Nicoletti-Flater Associates, PLLP*

**N-FA**
Nicoletti-Flater Associates

3595 S. Teller St. Suite 310 | Lakewood, CO. 80235
Ph: 303-989-1617 | Fax: 303-985-3113 | www.nicoletti-flater.com

## DIRECT RISK ASSESSMENT-CONFIDENTIAL

| | |
|---|---|
| REQUESTING AGENCY: | University of Colorado-Denver |
| REFERRAL CONTACT: | David Steward, Student Conduct and Community Standards |
| DATE OF ASSESSMENT: | March 29, 2016 |
| SUBJECT OF ASSESSMENT: | Chadwick Jordan |

**RISK ASSESSMENT OVERVIEW:** The purpose of a Risk Assessment is to analyze behaviors and/or written or verbal statements that have created concern, feelings of being intimidated, or emotional distress in others whether intended or not. The focus of this risk assessment is to examine the *impact* of the disruption rather than the *intent* of the individual engaging in the concerning behavior. In other words, for the purposes of this assessment, an explanation of *why* a behavior occurred has less relevance than what effect that behavior has on others. The totality of the circumstances will be taken into account and the "reasonable person standard" is applied in making a determination of disruption. The Risk Assessment includes information from multiple sources in order to arrive at a current risk determination. It is the responsibility of the referring agency to ensure the accuracy and validity of all collateral data provided. Additionally, the purpose of a Risk Assessment is not to predict violence but is rather to inform an agency regarding possible risk management considerations of potentially disruptive and/or violent individuals. The Risk Assessment is not intended as a medical or psychiatric evaluation and as a result, no mental diagnosis is provided.

**REASON FOR REFERRAL:** Chadwick Jordan was referred for a Direct Risk Assessment following a police report completed by instructor David Keener and subsequent review from UC Denver's CARE Team.

## RISK MANAGEMENT CATEGORIES:

- **Proactive Attack Behaviors Towards People or Property**-defined as violent behaviors that are premeditated and involve weapons of choice and are directed towards either people or property.

CU JORDAN_0164

Direct Risk Assessment –Chadwick Jordan
Page 2 of 5

- **Reactive Behaviors Towards People or Property**-defined as behaviors or verbalizations that occur in the moment as a reaction to a perceived triggering event and are directed towards either people or property. These behaviors can either be non-violent or violent. In the event the behavior is violent it will involve weapons of opportunity such as body parts or items that are available in the vicinity of the incident.

- **Behaviors That Create Social/Psychological Disruption**-defined as actions that interfere with the functioning of the department/organization, along with causing other people (faculty, students, administrators, etc.) to feel intimidated, bullied, harassed, fearful, etc.

## DETERMINATION OF DIRECT THREAT ASSESSMENT

- There is **INSUFFICIENT** data to support that Mr. Jordan has engaged in Proactive Attack Behaviors towards himself, other people, or property.

- There is **SUFFICIENT** data to support that Mr. Jordan has engaged in Reactive Verbalizations and/or Behaviors.

- There is **SUFFICIENT** data to support that Mr. Jordan has engaged in behaviors that have created Social and Psychological Disruption.

**RISK MANAGEMENT CONSIDERATIONS:** This section will provide recommendations in the areas of: Data Collection and Assessment as well as Countermeasures for Behavioral Disruption in order to manage any future disruption on the part of Mr. Jordan.

AREA I—Data Collection and Assessment:

1. In order to prevent a data gap, which could increase the risk potential, it is recommended a Central Data Collection Point (Vortex) be established. This Vortex should be notified of any and all communications or actions taken regarding Mr. Jordan.

   a. It is suggested that each of the identified involved parties (faculty, staff, involved students, etc.) be contacted and requested to immediately report any escalating verbalizations and/or behaviors in a timely manner directly to the Vortex.

   b. A search for Mr. Jordan's social media pages zero significant results. If his social media pages become public or visible, we suggest that they be monitored.

Direct Risk Assessment –Chadwick Jordan
Page 3 of 5

AREA II---Countermeasures for Behavioral Disruptions: The following countermeasures are being recommended in order to mitigate any future disruption.

1. If it is decided that Mr. Jordan is allowed to continue as a student at UC Denver, he should be provided a "Rules of Engagement" written contract and specific expectations of what behaviors will not be allowed should be outlined along with the potential consequences for non-compliance.  Non-compliance with these rules of engagement should therefore result in immediate consequences.  Only those consequences that the University is confident will be utilized and enforced should be outlined. If he has any questions or is unclear about any portion of this policy, Mr. Jordan should be given the opportunity to address this with a designated Point of Contact (POC) or other knowledgeable administrator prior to signing the written contract.

   a. Mr. Jordan should be provided with a copy of the Rules of Engagement contract that he can refer to as needed.

   b. Examples of expectations that should be outlined in the Rules of Engagement may include the following:

      i. No Contact with David Keener (already implemented).

      ii. Zero tolerance for attack or attack-related behaviors, including veiled threats. Mr. Jordan should be provided with examples of verbalizations that will not be tolerated.

      iii. Mandatory completion of psychotherapy or psychoeducation regarding appropriate social interaction and communication, social skills, and appropriate classroom behavior.

      iv. Limitations for interactions with employees in the Office of Veteran Student Services.

      v. Outlined behaviors that are acceptable/unacceptable in the classroom.

2. Mr. Jordan should be provided information regarding services available on campus. Once it has been determined that Mr. Jordan has reasonable access to resources that can support his mental health needs (whether it be on campus or other mental health professional). it should be explained to Mr. Jordan that he is therefore responsible for utilizing appropriate stress management techniques when he becomes angry, frustrated, or overwhelmed in home or school.

3. The identified POC should monitor Mr. Jordan on a regular basis.  The monitoring should involve meeting with Mr. Jordon, contact faculty and staff that interact with him and periodically monitoring Social Media.

4. If Mr. Jordan's admission is rescinded, notification should be conducted with law enforcement present. He should be provided a "Rules of Engagement" written contract

CU JORDAN_0166

Direct Risk Assessment –Chadwick Jordan
Page 4 of 5

and specific expectations of what behaviors will not be allowed (i.e. ban from Auraria campus) should be outlined along with the potential consequences for non-compliance. Only those countermeasures that the school is confident to enforce should be outlined in the Rules of Engagement. The following recommendations should be viewed as a series of steps followed in order:

    a. If Mr. Jordan continues to contact UC Denver or others outside of what is outlined in the Rules of Engagement, he should be sent a Cease and Desist letter, with consultation from an attorney, from UC Denver to stop all communications. If there is a legitimate foundation for Mr. Jordan to contact UC Denver, he should be provided with a specific Point Of Contact (POC) for all correspondence. Outlined in this letter should be specific behaviors Mr. Jordan shall not engage in (i.e. name-calling, not engaging in veiled threats, allowing necessary time for response, etc.) when contacting the POC. The POC would then disseminate the communications as appropriate and necessary. If any of the communications to the POC are determined to be disruptive or threatening, the information should be forwarded to the Vortex for appropriate action.

    b. If Mr. Jodan ignores the Cease and Desist or violates the Cease and Desist in any way, UC Denver should work with their attorney and should pursue a restraining order. If Mr. Jordan violates this restraining order, UC Denver should immediately contact local law enforcement.

5. If, during any future encounter with Mr. Jordan, he engages in threatening behavior, either verbal or physical, immediate consequences should be implemented as to avoid normalizing disruptive behavior.

6. If Mr. Jordan engages in any future Reactive or escalating Disruptive Behaviors, he should be considered more of a risk to himself and others. If future disruptive behaviors occur it would indicate that Mr. Jordan **is either choosing to disregard rules when it suits him, or he cannot control his internal impulses/urges.**

**The information provided in this report was based solely on limited collateral information and an individual interview with Mr. Jordan. Risk potentials can vary based on triggering events and actions taken by the individual or by the University of Colorado Denver.**

CU JORDAN_0167

Direct Risk Assessment –Chadwick Jordan
Page 5 of 5

_____
John Nicoletti, Ph.D., ABPP
Board Certified Specialist in Police
& Public Safety Psychology

_____
Katherine K. McMann, Psy.D.
Police & Public Safety Psychology
Clinical Associate



**Student Conduct and Community Standards**
Student Affairs

Campus Box 196
P.O. Box 173364 | Denver, CO 80217-3364
o 303 556 3682 | f 877 556 7704
studentconduct@ucdenver.edu
ucdenver edu/standards

June 25, 2018

Chadwick Jordan
Sent electronically to CHADWICK.JORDAN@UCDENVER.EDU

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2017094401

CHADWICK.JORDAN@UCDENVER.EDU

Dear Chadwick:

On March 5, 2018 you and I met to discuss a conduct case based on threats you made toward another individual along with the possibility of you possessing illegal weapons. At this meeting I gave you a letter informing you of these allegations and requesting you attend a meeting in my office on Thursday, March 8, 2018, at 1:00 PM to discuss these alleged violations of the Code of Student Conduct (I am including a copy of this letter with this email). Shortly after our meeting I was informed you were arrested and found with weapons in the trunk of your car as well as illegal drugs and were placed in custody. As a result of this report from Denver PD I am adding another alleged violation to the original letter I gave to you on March 5, 2018. This alleged violation is:

**Drugs:** Possessing, using, providing, manufacturing, distributing, or selling drugs or drug paraphernalia in violation of law or university policies. Use or possession of marijuana, including medical marijuana used or possessed under Colorado Constitution Article 18, section 14, is strictly prohibited on campus. Any such use or possession is a violation of the student code of conduct.

1. Students may violate the student code of conduct if in the presence of prohibited behavior involving drugs. This includes students who knew, or reasonably should have known they were in the presence of drugs, or possessed, displayed, or was in the presence of drug paraphernalia.
2. Misuse of legal substances; use of general products as intoxicants or "means to get high"; and inhaling or ingesting a substance (including but not limited to nitrous oxide, glue, paint, gasoline, solvent, etc.) other than in connection with its intended purpose is also prohibited.
3. Driving while under the influence of drugs.
4. Use of a prescription drug other than by the person to whom the drug is prescribed and in accordance with the prescription is prohibited. This includes sharing drugs such as Ritalin or Adderall. Drugs: Possessing, using, providing, manufacturing, distributing, or selling drugs or drug paraphernalia in violation of law or university policies. Use or possession of marijuana, including medical marijuana used or possessed under Colorado Constitution Article 18, section 14, is strictly prohibited on campus. Any such use or possession is a violation of the student code of conduct.

   1. Students may violate the student code of conduct if in the presence of prohibited behavior involving drugs. This includes students who knew, or reasonably should have known they were in the presence of drugs, or possessed, displayed, or was in the presence of drug paraphernalia.

2. Attending classes or university functions under the influence of drugs shall also be considered a violation of this student code of conduct. This includes disruptive behavior while under the influence of alcohol at official university functions.

Due to your arrest you were unable to appear for the Thursday, March 8, 2018 meeting or reschedule it. I am requesting that you **contact my office** at 303-315-7311 or david.steward@ucdenver.edu before 4:00 p.m. on June 29, 2018 to **re-schedule this meeting**. This new meeting will be held via phone call as you are still excluded from the Auraria Campus. Your input in this process is valuable as it helps me to understand your perspective in the situation. If you fail to do so, I will proceed with this case according to the provisions in the Code of Student Conduct, which allow me to make a decision in this case without your involvement which could result in a hold being placed on your account.

As a reminder please use this LINK to access a document titled "What to Expect in Your Conduct Meeting" and read the document before you come to your conduct meeting.

Thank you for your prompt attention to this matter.

Sincerely,

David Steward
Director of Student Conduct and Community Standards

Based on this documentation, I believe it more likely than not that you, Chadwick, violated the CU Denver Student Code of Conduct by threatening your neighbor, therefore a finding of responsible for the code of conduct charges is appropriate.

## Drugs

The CU Denver Office of Student Conduct and Community Standards received a report from Denver PD (2018-9518073) regarding a controlled substance (cocaine) found in the trunk of your vehicle as it was stopped on March 5, 2018  The report described that the amount of drugs, as well as the packaging of the drugs indicated the drugs may be intended for distribution.

During the phone conduct conference on July 31, 2018 you, Chadwick, stated there were no drugs in your vehicle and further stated the Denver PD officer intentionally lied in the report to convict you and the police officer was on a "witch hunt". You further alleged that the police officer was a racist and discriminatory.

Based on the available evidence at the time of this decision, I believe it is more likely than not that there was cocaine in the trunk of your car, and it was more likely than not packaged as described in the report, indicating it may be intended for drug distribution, and therefore you, Chadwick, violated the CU Denver Student Code of Conduct. A finding of responsible for the code of conduct charges is appropriate.

## Violation of Local, State, or Federal Law. (Weapons)

The CU Denver Office of Student Conduct and Community Standards received information, Denver County Court case number 18CR01675, which stated that you, Chadwick, had firearms/illegal weapons in the trunk of your car.

During the phone conduct conference on July 31, 2018, you stated there were no weapons in your vehicle and that the Denver PD officer intentionally lied in the report to convict you

However, based on the available evidence at the time of this decision, and my conversation with you, I believe it is more likely than not that you, Chadwick, violated the CU Denver Student Code of Conduct by possessing serviceable firearms in the trunk of your car. Therefore, a finding of responsible for the code of conduct charges is appropriate

Based on our phone conference, the information and written documentation referenced above, and using a preponderance of the evidence standard, I have made the following determinations regarding the alleged violations outlined in your original conference letters:

**Threats – Responsible**
Threatening or endangering the mental and/or physical health or safety of a person.

**Drugs or Drug Paraphernalia – Responsible**
Possessing, using, providing, manufacturing, distributing, or selling drugs or drug paraphernalia in violation of law or University policies. Use or possession of marijuana, including medical marijuana used or possessed under Colorado Constitution Article 18, section 14, is strictly prohibited on campus. Any such use or possession is a violation of the student code of conduct. 1. Students may violate the student code of conduct if in the presence of prohibited behavior involving drugs. This includes students who knew, or reasonably should have known they were in the presence of drugs, or possessed, displayed, or was in the presence of drug paraphernalia. 2. Misuse of legal substances; use of general products as intoxicants or means to get high; and inhaling or ingesting a substance (including but not limited to nitrous oxide,

University of·Colorado **Denver**

**Student Conduct and Community Standards**
Student Affairs

Campus Box 195
P.O. Box 173364 | Denver, CO 80217-3364
o 303 556 3662 | t 877 556 7704
studentconduct@ucdenver.edu
ucdenver.edu/standards

(3) 315 -7811
9/19 01:00 pm

September 6, 2018

Chadwick Jordan
CD# 0000671906
P.O. Box 1108
Denver, CO 80201

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2017094401

Dear Chadwick:

This is a follow-up to our conference on July 31, 2018 regarding alleged violations of the CU
Denver Code of Student Conduct, as outlined in your Conference Letters dated March 5, 2018
and June 25, 2018. I will address each of the charges and associated investigation below.

**Threats**
The CU Denver Office of Student Conduct and Community Standards received a report from
Denver PD (2017-533672) regarding an interaction between you, Chadwick Jordan, and
another individual where you threatened to kill the individual (your neighbor) by shooting him.

During our phone conduct conference on July 31, 2018, you were asked about the interaction
and allegation of threat. Chadwick, you stated you were not found guilty of anything that your
car had been stolen, you had been bloodied during the incident, and your neighbors were
simply trying to help out. When asked the names of the neighbors, you stated you didn't know
any of the neighbor's names and did not have a good relationship with them. Chadwick, you
also stated you had restraining orders out against several of the neighbors. During our
conversation it was presented to you that the court paperwork for your criminal case related to
these allegations states you plead guilty to the threats charge. Chadwick, you reported that you
were not found guilty and stated that you and your lawyer had worked things out. At that point,
you stated you would obtain documentation from your lawyer regarding how things were worked
out and would send the documentation to the CU Denver Conduct and Community Standards
office. You then asked for additional time as it might take several weeks to obtain the
paperwork, and that extension to provide documentation was granted.

As of the time of this decision, the documentation you were to send has not been provided by
you, Chadwick, or your attorney, within the established time frame.

I received documentation from the Denver County and Municipal Court regarding the
disposition in relation to these allegations. These documents indicate that you, Chadwick, plead
guilty to a charge of Threats to Injure Person/Property (38-92), while the charge of Disturbing
the Peace was dismissed. Chadwick, the documentation shows that you signed the plea
paperwork on February 7, 2018. The documentation also indicates a number of sentencing
outcomes for the guilty plea, including supervised probation for one (1) year.

September 6, 2018

Chadwick Jordan
CD# 0000671906
PO Box 1108
Denver, CO  80201
Sent via Certified Mail

**PERSONAL AND CONFIDENTIAL**

Regarding: Conduct Records Request

Chadwick,

Please find your conduct records as requested. Please note that these records are provided outside our established procedure as you are currently unable to review the records in the Office of Student Conduct and Community Standards.

Also, note that pages 162 and 163 indicate recorded conversations and cannot be provided in paper form but they were provided to you via email on March 25, 2016.

Sincerely,

David Steward
Director of Student Conduct and Community Standards

2018-9818073

JS 44 (Rev 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

**I. (a) PLAINTIFFS**

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff   Denver
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Denver
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Chadwick Jordan
9853 Colorado Blvd., A-101
Thornton CO 80229    PH: 720-276-5377

Attorneys *(If Known)*

| **II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)* | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff* |
|---|---|---|

*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ☐ 1  U S Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☒ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  NATURE OF SUIT** *(Place an "X" in One Box Only)*                                    Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☒ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U S Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
Section 13-90-107(1)(d), C.R.S. Medical Malpractice, Equal Treatment Co. Cont.
Brief description of cause
Breach of Confidence; Psychotherapist-patient privilege, Invasion of Privacy

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P   DEMAND $   CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**  *(See instructions)*   JUDGE _____  DOCKET NUMBER _____

DATE  8/29/19   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG JUDGE _____